**SUNRISE MEDICAL HHG, INC., Plaintiff,**

v.

**AIRSEP CORPORATION, Defendant.**

No. 99-127J.

United States District Court, W.D. Pennsylvania.

April 25, 2000.

David C. Hanson, Webb, Ziesenheim, Bruening, Logsdon, Orkin & Hanson, Pittsburgh, Oliver E. Todd, Jr., MacMillan, Sobanski & Todd, Toledo, OH, for Sunrise Medical HHG Inc., plaintiffs.

Mitchell J. Banas, Jr., Jaeckle, Fleischmann & Mugel, Buffalo, NY, Byron A. Bilicki, Mollybeth R. Kocialski, John M. Hamilton, Bilicki & Simpson, Jamestown, NY, for Airsep Corporation, defendants.

*AMENDED FINDINGS OF FACT WITH CONCLUSIONS OF LAW*

D. BROOKS SMITH, District Judge.

### TABLE OF CONTENTS

I. AMENDED FINDINGS OF FACT ... 355
 A. The Parties ... 355
 B. The Patents In Suit ... 356
 1. The Claims ... 356
 a. The '303 Patent ... 356
 b. The '224 Patent ... 357
 2. The Specifications ... 359
 a. The '303 Patent ... 359
 b. The '224 Patent ... 362
 3. The Prosecution History of the '303 Patent ... 364
 C. Sunrise's Entry Into the OCD Market ... 367
 D. AirSep's Development of the ImPulse Select ... 368
 E. The Witnesses ... 370
 F. Likelihood of success on the merits ... 371
 1. Ownership ... 371
 2. Infringement ... 373
 a. The '303 Patent ... 373
 i. Whether AirSep's ImPulse Select "Employed a Method" in Violation of the '303 Patent ... 373
 ii. Alleged Non-infringement of Invacare Venture Device ... 373
 iii. Non-infringement Defense of Providing a Dose During Exhalation ... 374
 (A.) Claim Construction Testimony ... 374
 (B.) The Accused Device Can Provide a Dose of Oxygen during Exhalation ... 374
 (C.) The FDA Investigation ... 376
 iv. Equivalence of Fluidic Control Versus Electronic Control ... 377
 v. Whether the Sequence of Steps of the ImPulse Select Matches the Sequence of Steps Required by the '303 Patent ... 379
 vi. Does the Accused Device Meet the "At Least As Great A Rise" Limitation of Claim 3? ... 380
 vii. AirSep's Non-Infringement Opinion Regarding the '303 Patent ... 381
 viii. Has Any Other Person Used the ImPulse Select in Violation of the '303 Patent? ... 381
 ix. Did AirSep Intend Any Entity to Use the ImPulse Select in Violation of That Patent? ... 381
 b. The '224 Patent ... 381
 i. AirSep's Development of the ImPulse and ImPulse Select ... 381
 ii. Structure and Operation of the ImPulse Select ... 381
 iii. The Evolution of the Bypass Valve ... 385
 iv. Definition of Bypass Valve ... 388
 v. Claim Construction Testimony ... 389
 vi. The ImPulse Select's Bypass Valve ... 389
 vii. AirSep's Patents and Patent Applications ... 390
 viii. AirSep's Testing of the EX 2000. ... 391
 ix. The Bench Study Article and Comparison of the EX 2000 to the ImPulse Select ... 392
 x. Sunrise's Testing of the Accused Device to Determine Infringement ... 393

 3. Validity 394
 a. The '303 Patent 394
 i. The Disclaimer 394
 ii. One of Ordinary Skill in the Art 394
 iii. The Combination of U.S. Patent No. 2,766,752 (Meidenbaur) and Smith Reference 394
 b. The '224 Patent 401
 i. One of Ordinary Skill in the Art 401
 ii. The OMS 20/50 Reference (Claim 1) 402
 iii. The Combination of OMS 20/50 Reference and the European Patent (Claims 2-6) 406
 iv. The Combination of the '627 Patent, the '881 Patent and the European Patent 408
 v. Other Indicia of Obviousness 413
 c. Sunrise's Patent Search -- EX 2000 413
 4. Enforceability 413
 a. Patent Misuse--The Puritan Bennett License--The '303 Patent 413
 b. Inequitable Conduct - The '224 Patent 414
 5. Prior Adjudication/Reissue and Reexamination 416
 G. Irreparable Harm 416
 1. Sunrise's Allegations of Lost Market Share and Price Reduction 416
 a. Alleged Price Reduction 416
 b. Alleged Reduction in Market Share 425
 2. Sunrise's Reputation and Goodwill 426
 3. Sunrise's Patent Policies 426
 4. The Annual Report 426
 5. Market Life of Sunrise's Products 427
 6. Sunrise's Delay in Bringing the Action 427
 7. Sunrise's Lost Profits 428
 8. Non-Commercialization of the '303 Patent 430
 9. AirSep's Ability to Meet a Judgment 431
 H. Balance of Hardships 431
 I. False Patent Marking 434

## CONCLUSIONS OF LAW

II. JURISDICTION AND VENUE 434
III. STANDARDS FOR ISSUING A PRELIMINARY INJUNCTION 434
IV. LIKELIHOOD OF SUCCESS ON THE MERITS 436
 A. Ownership 436
 B. Infringement 437
 1. Claim Construction Principles 437
 a. General Precepts 437
 b. Means-Plus-Function Claims 439
 2. Infringement Principles 440
 a. Literal Infringement 441
 b. Doctrine of Equivalents 441
 c. Prosecution History Estoppel 442
 3. Comparison of the '303 Patent Claims to the Accused Method 443
 a. Does AirSep Directly Infringe Claim 3 of the '303 Patent Under 35 U.S.C. § 271 (a)? 443
 b. Is There Direct Infringement of Claim 3 by Others? 443
 i. Literal Infringement 443
 ii. Prosecution History Estoppel and Infringement of Claim 3 Under The Doctrine Of Equivalents. 446
 c. Whether AirSep Intentionally Induced Direct Infringement of Claim 3 448
 4. Comparison of the '224 Patent Claims to the Accused Device 448
 a. Literal Infringement 448
 b. Doctrine of Equivalents 448
 C. Validity 450

1. 35 U.S.C. §102--Anticipation — 451
2. 35 U.S.C. § 103--Obviousness — 451
3. Scope and Content of the Prior Art — 452
4. Level of Ordinary Skill in the Art — 453
5. The Lack of Differences Between the Claims and the Prior Art — 453
 a. Whether Claims 3-5 of the '303 Patent are Invalid Under § 103 as Obvious — 453
 i. Sunrise's Alleged Admission of Invalidity — 453
 ii. Whether Claims 3-5 are Obvious in View of the '752 Patent (Meidenbaur) over Smith — 454
 b. Whether the Claims of the '224 Patent are Invalid — 455
 i. Whether Claims 1-6 of the '224 Patent are Invalid on the Ground of Anticipation — 455
 ii. Whether the Remaining Claims of the '224 Patent are Invalid Under 35 U.S.C. § 103 in View of the OMS 50 Reference Over the European Patent — 456
 iii. Whether Claims 1-7 of the '224 Patent are Invalid Under 35 U.S.C. § 103 in View of the '627 Patent over the OMS 50, the '881 Patent or the European Patent — 457
6. Secondary Considerations of Nonobviousness — 457
D. Enforceability — 457
 1. Whether Sunrise Misused the '303 Patent — 457
 2. Whether There Was Inequitable Conduct During the Prosecution of the '224 Patent — 457
V. IRREPARABLE HARM — 461
VI. THE BALANCE OF THE HARDSHIPS — 463
VII. WHETHER PUBLIC POLICY SUPPORTS THE GRANT OF AN INJUNCTION — 464
VIII. CONCLUSION and ORDER — 465

On February 7-11, 2000, I held a preliminary injunction hearing in the above-captioned patent infringement case, issuing findings of fact on April 7, dkt. no. 84. Pursuant to the court's order contained therein, the parties have filed exceptions to those findings. The following memorandum constitutes my amended findings of fact with conclusions of law pursuant to Fed. R. Civ. P. 52(a). For the following reasons, I will deny plaintiff's motion for preliminary injunction.

## I. AMENDED FINDINGS OF FACT

### A. The Parties

Plaintiff, Sunrise Medical HHG Inc. ("Sunrise"), is a California corporation having a principal place of business for its Respiratory Products Division (also known as Sunrise DeVilbiss) at 100 DeVilbiss Drive, Somerset, Pennsylvania 15501-0635.[1] It is a subsidiary of a publicly traded company.[2] AirSep Corporation, the defendant in this action, is a New York corporation having a principal place of business at 290 Creekside Drive, Amherst, New York 14228.[3]

Sunrise has asserted infringement of Claims 1 through 7 of U.S. Patent Number 5,755,224 ("the '224 patent") and Claims 3 through 5 of U.S. Patent Number 4,457,-303 ("the '303 patent") under 35 U.S.C. § 271(a) and accuses AirSep of directly infringing, contributorily infringing and inducing activities which would constitute

---

1. Complaint ¶ 2; Defendant's Counterclaim ¶ 3.

2. Sunrise Medical HHG, Inc. has its headquarters in Longmont, Colorado. Sunrise's Home Health Care Group has its mobility headquarters in Longmont, Colorado and a mobility manufacturing site in Fresno, California. The Personal Care Products division is located in Southern California with a manufacturing plant in Tijuana. Another mobility plant is located in Avon Lake, Ohio. There is another plant in Stevens Point, Wisconsin. Kocinski Tr. 2/7:205.

3. Answer ¶ 3; Complaint.

the infringement of the '224 Patent and the '303 Patent.[4] The accused device is an electronic oxygen conserving device ("OCD") that provides convenience and mobility to respiratory patients with therapeutic oxygen needs, and which is marketed by AirSep as its ImPulse Select product. The need for such supplemental oxygen delivery methods has existed since at least as early as 1967.[5]

## B. The Patents In Suit

### 1. The Claims

#### a. The '303 Patent

Sunrise claims to be the owner of the '303 patent, which was issued July 3, 1984 upon the application of Dr. Gerald Durkan and entitled "Respirating Gas Supply Control Method and Apparatus Therefore."[6] The '303 patent discloses and claims a method of supplying supplemental dosages of a respirating gas, such as oxygen, to a patient having an inspiration period and expiration period for every breath. The initiation of the inspiration period is sensed and a timing means is used to predetermine the duration $T_1$ of the dose of respirating gas. The duration of $T_1$ is less than the duration of inspiration period $T_2$.[7] The dose is supplied immediately in response to the sensed inspiration. The dose is supplied for the duration $T_1$ at a rate $R_1$ which is set to provide at least as great a rise in the partial pressure of the respirating gas in the blood as the continuous application of said gas at a lower rate $R_2$ for the full duration of the inspiration period $T_2$. Put more simply, it is a method of providing oxygen at a high flow rate during the beginning of the patient's inspiration in such a manner as to oxygenate the patient's blood at least as well as continuously supplying oxygen at a lower, conventional rate throughout the patient's entire inspiration.[8]

One advantage of this invention is that it provides an economical and efficient method of delivery which allows for the conservation of oxygen.[9] The use of a timer to predetermine the period of the dose provides another significant advantage, enabling the volume of the pulse to be substantially constant from one breath to another, even as the respiration rate varies.[10]

As acknowledged in the '303 patent, intermittent demand oxygen flow had been tried in the past,[11] but prior intermittent demand oxygen devices supplied oxygen for the full inspiration period[12] and some prior demand oxygen devices supplied oxygen that, although commencing with a surge in the pattern of flow at the start of inspiration, still supplied oxygen during the entire inspiration period.[13]

The '303 patent contains eight claims, three of which are independent (Claims 1, 2, and 3) and five of which are dependent claims (Claims 4-8). Claims 1 and 2 of the '303 patent are apparatus claims, while Claims 3-8 are directed to a method of supplying dosages of oxygen to a person.[14] Sunrise does not contend that AirSep is

4. Complaint and Plaintiff's Responses to Defendant's First Set of Interrogatories, Interrogatory No. 5.

5. *See* prior art cited against the '303 patent.

6. Greene Tr. 2/7:38-39; PX 1, 21, 22, 163. This patent was the result of an application, serial no. 210,654, which was filed on November 26, 1980. PX 1.

7. $T_1$ represents the amount of time that the delivery valve will be on, while $T_2$ refers to the amount of time that the patient is inhaling. Bliss Tr. 2/8:32-33.

8. PX 1, '303 patent claim 3.

9. PX 1, col. 2, ll. 51-54.

10. *See* Fig. 4 in Bliss and McCoy, "A Bench Study Comparison of Demand Oxygen Delivery Systems and Continuous Flow Oxygen," *Respiratory Care*, Aug. 1999, Vol. 44, No. 8; Bliss Tr. 2/8: 17-20; PX 37, Tab 2.

11. PX 1, '303 patent, col. 1, ll. 12-26.

12. PX 1, '303 patent, col. 1, ll. 37-48.

13. PX 1, '303 patent, col. 1, ll. 48-55.

14. PX 1.

directly or indirectly infringing independent Claims 1 or 2 of the '303 patent.[15]

Claim 3 of the '303 Patent reads:

A method of supplying supplemental dosages of respirating gas to a spontaneously breathing in vivo respiratory system having an inspiration period and an expiration period, said inspiration period being of duration $T_2$ during which period a negative pressure relative to ambient pressure exists in said in vivo respiratory system at the location whereat respirating gas is introduced to said system, said expiration period comprising a positive pressure relative to ambient pressure existing in said in vivo respiratory system at the location whereat respirating gas is introduced to said system, said method comprising the steps of:

(1) sensing initiation of said inspiration period;

(2) using timing means to predetermine a duration $T_1$ for which a dose of respirating gas is to be supplied to said in vivo respiratory system, said duration $T_1$ being less than the duration $T_2$ of negative pressure relative to ambient pressure occurring in said in vivo respiratory system during said inspiration period; and,

(3) supplying immediately in response to said sensed inspiration a dose of respirating gas to said in vivo respiratory system, said dose being supplied only for the duration $T_1$, said dose being supplied substantially at the beginning of said sensed inspiration, said dose of gas being supplied at a rate $R_1$, said rate $R_1$ being set at a value such that it produces at least as great a rise in the partial pressure of said gas in blood interfacing with said respiratory system as the continuous application of said gas

at a lower rate $R_2$ for the duration $T_2$; and,

automatically repeating steps (1), (2), and (3) for a plurality of consecutive inspiration periods.

Claim 4 of the '303 Patent reads:

The method of Claim 3, wherein $T_1$ is less than 0.25 X $T_2$.

Claim 5 of the '303 Patent reads:

The method of Claim 3, wherein $T_1$ is less than 0.5 second.

### b. The '224 Patent

Sunrise also claims to be the owner of the '224 patent issued May 26, 1998 and entitled "Cylinder-Mounted Oxygen Management Device." This patent was applied for by Gregory W. Good, Richard L. Dalton, Jr. and Jon Peter Gilchrist.[16] The '224 patent discloses and claims an oxygen management device adapted to be mounted on a post on a compressed gas cylinder for the purpose of providing a controlled flow of oxygen to a patient. The device comprises a manifold block having an opening to receive the post. The manifold block has a regulator, an over-pressure relief valve, a solenoid-operated flow control valve, and a bypass valve mounted on the manifold block and connected with internal passageways so that no tubing or tubing connectors are used.[17] The '224 patent contains one independent apparatus claim (Claim 1) and six apparatus claims that depend therefrom.

Claim 1 of the '224 Patent reads:

An oxygen management device adapted to be mounted on a post on a compressed oxygen cylinder for delivering a controlled flow of oxygen to a patient comprising:

**15.** Plaintiff's Responses to Defendant's First Set of Interrogatories, Interrogatory No. 5.

**16.** Greene Tr. 2/7:53-54; PX 24. This patent arose from application serial no. 651,273 filed on May 23, 1996.

**17.** PX 24, '224 patent.

a manifold block having an opening adapted to receive a post on an oxygen cylinder;

said manifold block opening having an oxygen connection adapted to engage and seal to a mating connection on an oxygen tank post;

means for securing said manifold block to an oxygen cylinder post received by said opening;

pressure regulating means on said manifold block for reducing the pressure of oxygen received from a cylinder to a predetermined low level;

an overpressure relief valve on said manifold block;

a solenoid operated flow control valve on said manifold block arranged for initiating and interrupting the delivery of oxygen from the cylinder to a patient;

a bypass valve on said manifold arranged in parallel with said solenoid operated flow control valve;

flow restricting means in series with said bypass valve to limit said oxygen flow through said bypass valve;

means for manually opening and closing said bypass valve; and,

control means responsive to inhalation by a patient for opening said solenoid operated flow control valve to deliver a dose of oxygen to a patient.

Claim 2 of the '224 Patent reads:

An oxygen management system, as set forth in claim 1, and further including an annular housing enclosing said manifold block, said pressure regulating means, said overpressure relief valve, said solenoid operated flow control valve, said bypass valve, said flow restrictor and said control means, and wherein said annular housing has an opening aligned with said manifold block opening and adapted to receive a post on an oxygen cylinder.

Claim 3 of the '224 Patent reads:

An oxygen management system, as set forth in claim 2, and further including an oxygen pressure gauge mounted on said manifold block and adapted to indicate the pressure oxygen in said manifold block from an oxygen cylinder.

Claim 4 of the '224 Patent reads:

An oxygen management system, as set forth in claim 2, and further including a knob extending from said housing for movement between first and second positions, and means for opening said bypass valve when said knob is in said first position and for closing said bypass valve when said knob is in said second position.

Claim 5 of the '224 Patent reads:

An oxygen management system, as set forth in claim 4, wherein said bypass valve has a valve stem movable between open and closed positions, and wherein said valve stem is moved by said opening and closing means to said open position when said knob is moved to said first position and to said closed position when said knob is moved to said second position.

Claim 6 of the '224 Patent reads:

An oxygen management system, as set forth in claim 2, and further including means on said housing for selecting and indicating the effective pulse flow rate delivered to an inhaling patient by said solenoid operated flow control valve.

Claim 7 of the '224 Patent reads:

An oxygen management system, as set forth in claim 1, and wherein said manifold block includes a plurality of oxygen passages connecting said pressure

regulating means, said overpressure relief valve, said solenoid operated flow control valve, said bypass valve, and said flow restricting means, and wherein said oxygen passages have a total volume of no greater than 0.1 cubic inch.

Claims 2 through 7 depend from Claim 1; thus, claims 2 through 7 incorporate each and every element of Claim 1 as if the limitations of Claim 1 were repeated within Claims 2 through 7.

### 2. The Specifications

#### a. The '303 Patent

The timing means of the '303 patent predetermines the duration of the pulse, $T_1$, of the '303 Patent. The timing means includes a closed loop fluidic circuit 104 engaged with a power stream source 46 such that the power stream intersects the closed loop 104 at port 96c. When no negative pressure is being sensed, the power stream is vented to the atmosphere 96a.[18] As acknowledged in the '303 patent, fluidic logic elements have been used in prior intermittent demand oxygen systems.[19]

**Fluid Path Excerpt from Fig. 1.**
Note that line 70 becomes line 102.
See Fig. 4 of '303 patent.

Negative pressure in the cannula, which occurs only when a user is inhaling, is sensed by a pressure sensor. A first fluid signal, generated by means 64 on output leg 70, is applied to the second generating means 96 on line 102. If negative pressure is not sensed or ceases, then

---

**18.** PX 1

**19.** PX 1, '303 patent, col. 1, ll. 27-37.

the fluid is cut off from the line 102. Line 102 is attached to the bottom portion of the closed loop 104a of second generating means 96.

The fluid separates along two paths. The first path pushes the power stream to divert the power stream from port 96a to outlet port 96b and thus to the valve line 100. The power stream flows along the valve line and actuates the valve 110 to an open position. The fluid flowing along the second path travels around the closed loop 104 with a variable orifice 106 and an elastomeric balloon 108 attached to the closed loop 104. The variable orifice 106 and elastomeric balloon 108 delay the fluid following along the second path for a pre-determined period of time ($T_1$) depending the size and capacities of the variable orifice and elastomeric balloon chosen. The sizes and capacities are chosen such that the time it takes the fluid to flow along the second path is much less than the inspiratory period of the patient. When the fluid following along the second path reaches the other side of the power stream, this fluid equalizes the power stream at port 96c by effectively pushing the power stream back so that it vents to the atmosphere through port 96a. This also has the effect of closing the fluidically operated demand valve and shutting off the supply of oxygen to the patient.

**Fluid Path to Valve,
Excerpt from Fig. 4**

In the absence of negative pressure, that is, when inspiration ceases, there is no fluid traveling along the first path. Thus, the power stream is not pushed to outlet port 96b but reverts instead to port 96a and is vented to the atmosphere.[20] The absence of a fluid signal on output leg 70 of the generating means 64 results in suppression of the source means 98 (not pictured), which includes solenoid valve 110.

Thus, no respirating gas is applied to the patient during expiration.[21]

Nowhere in the patent specification is a method or apparatus described which is designed to or theoretically capable of delivering respirating gas to a patient during expiration. Moreover, the '303 patent specification draws a distinction between fluidic versus electronic circuits. At column 2, lines 24-30, the specification provides (emphasis added):

**20.** PX 1, Col. 9, l. 64 through Col. 10, l. 53. **21.** PX 1, Col. 13, ll. 43-49.

Of the prior art devices that attempt to detect apneic events, many, (including the devices disclosed in U.S. Pat. No. 3,357,428 to Carlson and 4,206,754 to Cox) periodically generate electrical *(as opposed to fluidic)* signals which are electrically monitored to determine when a patient has ceased to breathe satisfactorily and which activate an alarm as a warning indicator.

The structure for the timing means, as claimed in Claim 3, is described in the specification as follows:

The fluidic path 104 has thereon one or more timing means, such as a fluid restrictive device 106 and/or a capacitance device 108. As shown in the embodiment of FIG. 1, the restrictive device 106 is a variable resistor and the capacitance 108 is a variable capacitance, such as an elastomeric balloon. The restrictive device 106 and the capacitance 108 may be interchanged with similar restrictive devices or capacitances having different values and capacitances.[22]

The '303 Patent specification further explains that various sizes and types of elastomeric balloons or other appropriate devices may be chosen from the variable capacitance device 132.[23] The specification does not provide for a timing means comprising switches and an electrical circuit.

In the abstract, the patentee recites that "[t]he demand gas circuit (20) of the respirator supplies respirating gas to a patient at the beginning of an inspiration and for a time period which is a fraction of the duration of the inspiration." The specification further describes this relationship as follows:

an object of this invention is to provide a respirator apparatus and method of operating the same wherein respirating gas is supplied to a patient substantially at the beginning of an inspiration and

for a time period thereafter which is a fraction of the duration of inspiration.[24]

The patentee again refines this fractional delivery method with the following statement: "Preferably the duration of application of the respirating gas to the patient is less than 0.25 of the duration of an inspiration."[25] In technical language, the patentee reiterates the relationship between the duration of the first fluid signal ($T_2$-inspiration) and the second fluid signal ($T_1$-oxygen delivery) as follows:

Thus, the second generating means 96 generates a second fluid signal on line 100, the second fluid signal having a duration related to the duration of the first fluid signal applied from output leg 70 on line 102. The duration of the first fluid signal on line 102 and the second fluid signal on line 100 are in a predetermined relationship which is dependent upon the values and sizes chosen for the timing means comprising second generating means 96. Such values and sizes should be chosen for this embodiment such that the ratio of the duration of said second fluid signal to the duration of said first fluid signal, and hence the duration of the inspiration, is less than 0.25. In many cases the ratio may approximate 0.125, if desired.[26]

### b. The '224 Patent

The specification of the '224 patent teaches:

[T]he components which comprise the gas management device 10 of the present invention are contained within the housing 13. These components ... include a manifold block 27, a pressure regulator 28, a pressure relief valve 29, the pressure gauge 20, a manually operated bypass valve 30, a solenoid-operated flow control valve 31, a manually adjustable constant flow limiting valve

22. PX 1, Col. 6, ll. 16-25.

23. PX 1, Col. 14, ll. 27-30.

24. PX 1, Col. 2, ll. 45-50.

25. PX 1, Col. 3, ll. 20-24.

26. PX 1, col. 10, ll. 30-44.

or flow restrictor 32, a printed circuit board 33, and a battery (not shown).... Many of these components are integral with the manifold block 27 and are therefore, in fluid communication with each other through a plurality of internal passageways in the manifold block 27. Therefore, an advantage of the gas management device 10 is that no tubing or tubing connectors are used within the device 10. The only tubing and connectors used is [sic] external to the device 10 in conjunction with delivering oxygen from the device 10 to a nasal cannula worn by the patient.[27]

The specification continues:

> The cylinder post may be provided with various standard connection configurations, for example, with a conventional CGA 870 connection. The oxygen cylinder post 13 includes a valve 45 which is operated with a suitable wrench (not shown) to allow pressurized oxygen to flow from the cylinder 14 to the manifold 27.[28]

The '224 patent describes a "post" as requiring a valve within the post.[29] In addition, the patent examiner cited nine patents[30] and a flyer having a photograph thereon of the OMS 50 (a prior art device manufactured by plaintiff) attached to a yoke-type regulator and mounted on the post of an oxygen tank.[31] Notwithstanding the references cited by the examiner, all claims in the patent application were allowed by the Patent Office.[32]

FIG

FIG. 2

27. PX 24, col. 4, ll. 10-27.

28. Bliss Tr. 2/8:54; PX 24, col. 4, ll. 57-62.

29. Kumar Tr. 2/11:100.

30. PX 25-33.

31. PX 163; PX 24, '224 patent, cover page.

32. PX 24; DX 40, file history of '224 patent.

**FIG. 3** **FIG. 6**

The specification of the '224 patent, at column 5, lines 42-46, further recites (emphasis added):

> The bypass valve 30 is connected to bypass the flow control valve 31 to selectively supply a continuous flow of oxygen to the patent [*sic*]. The flow limiting valve 32 is connected *in series with* the bypass valve 30 to establish the rate of oxygen flow when the bypass valve 30 is open. The flow limiting valve 32 may be a manually adjustable needle valve which is set to the desired constant flow rate. Alternately, the flow limiting valve 32 could be replaced with a fixed orifice flow restrictor.

As stated, the flow restricting means set forth in claim 1 of the '224 patent can be a fixed orifice and need not be adjustable.[33] Nowhere, however, does the patent specification describe an apparatus that entirely eliminates the need for a flow limiting valve or fixed orifice flow restrictor. Nor does the patent specification directly describe an apparatus having a flow limiting valve integral with the bypass valve, such that the bypass valve might also perform the function of flow limiting valve 32. Defendant also makes the textual argument

that "[t]he patentee's use of the phrase 'in series with' is unmistakably clear and in contrast to the term 'integral' which the patentee defines later in the specification." It points out column 7, lines 30-39, at which the patentee states:

> A number of the valves and components have been described as being integral with the manifold block 27. As used herein, the term "integral" means that the components are at least mounted directly on the manifold block 27 and in some cases may share common components with the manifold block 27. For example, a valve seat may be machined directly in the manifold block 27, while other components of the valve may be mounted on the manifold block 27.

By using the phrase "in series with," defendant contends, the patentee intentionally drew a distinction between separate structures and structures that are "integral" with one another.

### 3. The Prosecution History of the '303 Patent

The Applicant's claims as originally filed contained no limitation directed to $T_1$ be-

**33.** Kumar Tr. 2/11:60.

ing less than $T_2$.[34] This limitation was added to overcome the Examiner's rejection of the Application based upon U.S. Patent No. 3,910,270 to Stewart, U.S. Patent No. 4,054,133 to Myers, and D. Auerbach *et al.* ("the *Chest* reference").[35] To distinguish Stewart,[36] Applicant argued that:

The operation of Stewart is easily contrasted with Applicant's claimed method. Applicant supplies a pulse of gas having duration $T_1$ which is less than the duration $T_2$ of negative pressure relative to ambient occurring in said in vivo respiratory system during inspiration.

. . . . .

Thus, even if it were argued that Stewart supplied a pulse, $T_1$ for the pulse would *equal* $T_2$ so that the patient could not inspire further.

. . . . .

[C]ontrary to the patent's desired time frame for respiration, Stewart supplies gas even during a time when the patient would otherwise be exhaling. With Applicant's method, on the other hand, gas supply can *never* last longer then the patient's inspiratory effort.[37]

Applicant next argued that this limitation also overcame *Chest.* In *Chest,*

oxygen is supplied to the patient throughout inspiration. . . . The *Chest* article provides no teaching or even a clue that the supply of oxygen in the negative demand mode could be termi-

nated earlier than the cessation of a detected negative pressure. . . .[38]

Applicant further stated that

it cannot be said that the device described in U.S. Patent No. 4,054,133 to Myers and whose operation is reported in *Chest* provides a pulse of respirating gas having a duration $T_1$ which is less than the duration $T_2$ of inspiration as claimed by Applicant.

. . . . .

Applicant supplies a pulse of gas during an early part of the portion of a respiratory cycle in which a negative pressure occurs in the in vivo respiratory system, but not for the entire portion of the cycle wherein negative pressure occurs. . . . The beauty of Applicant's method is that Applicant can accomplish the same physiological result using less gas by supplying the pulse for the time $T_1$ rather than supplying gas for the duration $T_2$.[39]

Applicant also recited:

[P]rior art methods and systems have attempted to supply a patient with supplemental gas either throughout respiration or throughout inspiration upon demand.

. . . . .

Rather than continually supplying a patient with supplemental gas, or rather than just supplying a patient with supplemental gas throughout inspiration, Applicant's method and apparatus capitalize upon the effective early stage in-

34. DX 41.

35. *Chest,* 74.1 July 1978, pp. 39-44; DX 41.

36. The Stewart reference discloses a device which supplies a medicinal gas at a fixed rate to the tank so that the volume delivered to the patient on each cycle will equal the volume delivered to the tank. PX 8. Thus, with Stewart, a total tidal volume to be supplied might take two (2) seconds to supply, whereas the patient might want to effectively inspire for only one (1) second. DX 41. The volume-cycled respirator has the important advantage of being able to deliver a constant tidal volume independent of a change in the patient's

compliance and resistance developing in the airway. PX 8. Thus, Stewart can supply gas throughout the inhalation period and into the patient's exhalation period. DX 41; PX 8.

37. DX 41, 2/22/83 Amendment at 17-18 (some emphasis added). Dr. Messner disagreed with the inventor's statement in the '303 Patent that respirating gas is never applied to the patient during expiration. Messner Tr. 2/8:176.

38. DX 41, 2/22/83 Amendment at 19-20.

39. DX 41, 2/22/83 Amendment at 21-22.

spiratory phenomenon recognized by Applicant. In accordance with this phenomena [sic], Applicant has concluded that it is more advantageous to apply a greater volume of respirating gas (such as oxygen) per second and to apply the oxygen only during an effective early stage of inspiration.

. . . . .

The pulse has a duration $T_1$ which is less than the duration $T_2$ of the inspiration.[40]

The Examiner conducted an interview with Applicant on March 29, 1983. At that time, a proposed claim was submitted to distinguish the prior art of record.[41] The Examiner suggested revisions to the proposed claim, specifically that the limiting language "said dose being supplied only for a duration $T_1$" be added. Applicant adopted this suggested limitation in his May 6, 1983 amendment to application Claim 58, which ultimately issued as patent Claim 3.[42] In that amendment, the Applicant reiterated that the limitation in the claims that $T_1$ be less than $T_2$ was necessary to overcome prior art references directed to devices and methods that supplied a dose of respirating gas throughout the inspiration period:

> [R]ather than just supplying a patient with supplemental gas throughout inspiration (as is done by the Auerbach and Myers et al. references relied on by the Examiner), Applicant supplies a dose of respirating gas only for the duration $T_1$ which is less than the duration $T_2$. . . .[43]

The Examiner, in his third and last office action, rejected application Claim 58 on obviousness grounds. In arguing that the limitation directed to $T_1$ being less than $T_2$ overcame the cited prior art, Applicant stated:

Auerbach et al. certainly do not recognize a method wherein the shortening of the duration of gas supply has a favorable physiological effect on a patient.

. . . . .

[I]t [is] inconceivable that Auerbach et al. were concerned with shortening the duration of the supply of gas to a time period less than the duration of negative pressure or that the same would even be feasible given the particular mechanical structure involved.[44]

In so distinguishing the prior art, Applicant further explained the meaning of the limitation that $T_1$ be less than $T_2$. In particular, Applicant explained that the duration of the dose of gas $T_1$ is in a predetermined relationship with the duration of inspiration $T_2$:

> [W]hile the point in time at which the supply of Applicant's dose begins is dependent upon the sensing of the initiation of inspiration, the point in time at which Applicant's dose is terminated, and hence the duration $T_1$, is not strictly governed for each inspiration by the duration of the inspiration nor the sensitivity of the sensor.[45]

This limitation was added by way of Applicant's October 18, 1983, Amendment. It was added to overcome U.S. Patent 4,106,-503 to Rosenthal, *et al.*, which, according to Applicant, "was cited against a corresponding foreign application filed by Applicant."[46]

Following a second interview with the Examiner held on September 20, 1983, the Applicant amended application Claim 58 to include the limitation "using timing means to predetermine a duration $T_1$."[47] The Applicant describes the claimed "timing means" as follows:

**40.** DX 41, 2/22/83 Amendment at 13-14.

**41.** *I.e.*, Stewart, Auerbach, *et al.* and Myers. DX 41.

**42.** DX 41.

**43.** DX 41, 5/6/83 Supp. Amendment at 9.

**44.** DX 41, 10/18/83 Amendment at 7-8.

**45.** DX 41, 10/18/83 Amendment at 9.

**46.** DX 41, 10/18/83 Amendment at 11.

**47.** DX 41, 10/18/83 Amendment at 2.

The choice of values and sizes for the particular elements (particularly the resistance 106 and the capacitance 108) determine the duration of the second fluid signal which controls the application of a dose to the patient. In this regard, the specification states at page 18 that "An appropriate value is chosen for the resistance of a variable resistor 106 and a capacitance 108 of appropriate maximum capacity is chosen so that the first fluid signal traveling around the closed loop fluidic circuit 104 will be delayed for a predetermined time before the signal reaches the second end 104b of the fluidic circuit."[48]

The relationship between $T_1$ and $T_2$ is further acknowledged and emphasized in patent Claims 4 and 5, which depend upon Claim 3 of the '303 patent. These dependent claims recite specific relationships between $T_1$ and $T_2$ as follows:

4. The method of Claim 3, wherein $T_1$ is less than $0.25xT_2$.

5. The method of Claim 3, wherein $T_1$ is less than 0.5 second.

Finally, following Applicant's request that the Rosenthal patent "be made of record in the prosecution file of the Captioned application," Applicant distinguished the claimed invention over Rosenthal by stating that "the Rosenthal *et al.* apparatus requires a reset switch 34, meaning that the apparatus is *not* capable of operating in an automatically recycling mode in the manner claimed by Applicant."[49]

In all, the patent examiner cited eighteen patents[50] and three articles[51] considered during the examination of the '303 patent. Notwithstanding the acknowledged prior art and the references cited by the examiner, claims 3, 4 and 5 as amended were ultimately allowed by the Patent Office.[52]

## C. Sunrise's Entry Into the OCD Market

In 1993, Sunrise purchased DeVilbiss and operated it as a subsidiary until it became a division of Sunrise.[53] The following year, Sunrise purchased the assets of PulsAir.[54] PulsAir owned the '303 patent and sold an OCD under the name of OMS 20/50, which utilized this patented technology.[55] Sunrise began selling the OMS 20/50 immediately after its purchase of PulsAir and continued to market it until the summer of 1997.[56] The OMS 20/50 utilized the technology claimed in the '303 patent inasmuch as it used a timing means to time the delivery of the pulses of oxygen, which would be supplied at the onset of inspiration and only for a duration of time less than the time of inspiration.[57]

In 1995, Sunrise put together a team to develop its next generation OCD product. Gregory W. Good, Richard L. Dalton and Peter Gilcrest invented the subject matter which later became the EX 2000.[58] They applied for a patent which issued on May 26, 1998 as the '224 patent. The inventors, as is customary in such circumstances, assigned their right and interest in the '224 patent to their employer, Sunrise.[59] The new EX 2000 OCD was first shown to the marketplace at the November 1996 MedTrade show.[60] Sunrise invested at least

48. DX 41, 10/18/83 Amendment at 4 n.1.

49. DX 41, 10/18/83 Amendment at 11-12 (emphasis added).

50. PX 2-19.

51. PX 1, '303 patent, cover page.

52. PX 1, '303 patent; DX 41, file history of '303 patent.

53. Greene Tr. 2/7:34.

54. Greene Tr. 2/7:38.

55. Greene Tr. 2/7:38-39, 40.

56. Greene Tr. 2/7:39, 40, 44.

57. Greene Tr. 2/7:44:

58. Greene Tr. 2/7:53.

59. PX 24; Greene Tr. 2/7:54.

60. Greene Tr. 2/7:49.

$526,319 in wages, materials and capital expenses to develop the EX 2000.[61]

The EX 2000 differs significantly from the OMS 20/50. First, the EX 2000 is made to be used only on oxygen cylinders with an 870 style post, because, unlike the OMS 20/50, the EX 2000 has an internal regulator adapted only to such a post. Second, the EX 2000 fits directly over the oxygen cylinder post and does not hang off to the side as the OMS 20/50 and its external regulator do. Third, the EX 2000 has an internal pressure relief valve, as well as a bypass valve to provide a flow of oxygen around the control valve when continuous flow rather than pulsed oxygen is desired, or in the event of battery failure. The OMS 20/50 had neither an internal regulator nor pressure relief valve. The EX 2000 also has a flow restrictor to limit flow through the bypass valve to an acceptable dosage rate of 2 liters per minute. Finally, the EX 2000 does not utilize the internal tubing of the OMS 20/50. The functions are instead designed into the manifold block.[62] According to Greene, the EX 2000 utilizes the technology of both the '224 patent and claims 3 to 5 of the '303 patent.[63]

### D. AirSep's Development of the ImPulse Select

AirSep developed its first OCD in 1996, under the name of ImPulse, with a company named Medisonic. The ImPulse was first commercially available in November 1996.[64] The ImPulse was designed to compete directly with the Chad OCD.[65] Like the Chad unit, the ImPulse provides a pulse of oxygen on intermittent breaths, and, like both the Chad OCD and the OMS 20/50, utilized an external regulator.[66] AirSep still sells the ImPulse today, albeit in minuscule quantities.[67]

In the summer of 1997, AirSep decided to develop a new OCD. This project commenced with a meeting during which the design of the EX 2000 was reviewed and discussed.[68] The principal designer of the ImPulse Select was Norman McCombs,[69] one of whose first actions was to take apart and examine an EX 2000[70] that had been given to him by Joseph Priest, the President of AirSep.[71] McCombs performed an extensive evaluation of all aspects of the EX 2000, by means of visual inspection, disassembly and measuring the pressures.[72]

As developed, the ImPulse Select has three modes, an "A" mode, a "B" mode and a continuous flow mode.[73] During development, the "A" mode was referred to by AirSep as the "AirSep" or Chad mode because it provides the same type of dosing methodology as the Chad and the original ImPulse devices.[74] The "B" mode was referred to by AirSep as the "DeVilbiss" mode because it provides the same type of dosing methodology as the Sunrise/DeVilbiss EX 2000,[75] providing oxygen for the

61. Greene Tr. 2/7:54-55; PX 125.

62. Greene, Tr. 2/7:50-52, 59, 100; Good Tr. 2/10:57.

63. Greene, Tr. 2/7:53-54, 55.

64. Priest Tr. 2/9:27-28; Mizerkiewicz Tr. 2/9:137; DX 23.

65. Alessi Tr. 2/8:186.

66. Alessi Tr. 2/8:185; Priest Tr. 2/9:36.

67. Priest Tr. 2/9:28.

68. The agenda for the meeting includes the entry "Review New DeVilbiss PulseDose OCD". Mizerkiewicz Tr. 2/9:151-152; McCombs Tr. 2/8:235-36; PX 41.

69. McCombs Tr. 2/8:245.

70. McCombs Tr. 2/8:237-38.

71. McCombs Tr. 2/8:235- 36.

72. McCombs Tr. 2/8:235-36, 237.

73. McCombs Tr. 2/8:244.

74. McCombs Tr. 2/8:244; Alessi Tr. 2/8:186, 193-94.

75. Alessi Tr. 2/8:192, 193; McCombs Tr. 2/8:244; PX 44, 45, 46, 47.

selected pulse time on every breath.[76] The "B" mode of the ImPulse Select was specifically designed by AirSep to include the same functionality as is provided by the Sunrise/DeVilbiss EX 2000,[77] that is, to incorporate varying pulse widths on switch-selectable settings numbered from "one" to "six."[78] The ImPulse Select also has a continuous flow mode, like the EX 2000.[79]

The ImPulse Select was introduced to the market at the MedTrade show in November 1998.[80] The AirSep employees manning the display booth at the show marketed the new OCD as working just like the EX 2000.[81]

Like Sunrise's OCDs, the AirSep ImPulse Select senses the initiation of inspiration.[82] It then provides a dose of respirating gas immediately in response to sensed inspiration.[83] The ImPulse Select supplies a pulse of oxygen in response to the detection of inhalation by the pressure sensor. The length of this pulse is predetermined, not by fluidic circuitry as in the '303 patent, but by a resistor and capacitor network comprising an electronic timing means.[84]

Thus, the ImPulse Select has a timer that controls the predetermined time $T_1$.[85] Every time the OCD senses a breath, a resistor and capacitor in the timing circuit predetermine the time that the delivery valve will be on.[86] When a patient uses the ImPulse Select, the duration of $T_1$ is less than the duration of $T_2$ in the vast majority of circumstances.[87] The ImPulse Select can provide oxygen during exhalation, but only if the patient is breathing very rapidly, so that the inspiration time is very short, and the ImPulse Select was set at its higher settings, giving a long pulse duration.[88] There was testimony to the effect that this would happen less than one percent of the time.[89] AirSep acknowledged that only 0.3% of the ImPulse Select units shipped are returned for this reason.[90]

Only when the ImPulse Select is operated in the "B" mode at setting "6" would oxygen be supplied during exhalation, and then only to patients at breathing rates of more than 35 breaths per minute. Flow rate 6 is the longest flow rate setting of the ImPulse Select; if that setting is reduced, the likelihood of a patient ever receiving oxygen during exhalation is likewise reduced.[91] At settings 1 to 5 of the ImPulse Select, a patient will not be supplied with oxygen during exhalation even at 35 breaths per minute.[92]

For every setting of the ImPulse Select, except setting 6 in the B mode, $T_1$ is less than 0.5 second.[93] Assuming that 10% of users of the ImPulse Select have restrictive lung disease, only 0.23% of ImPulse Select users would have an inspiration period of less than one-half second.[94] Indeed,

76. Bliss Tr. 2/8:37.

77. Alessi Tr. 2/8:189.

78. Mizerkiewicz Tr. 2/9:148-51.

79. Bliss Tr. 2/8:31; McCombs Tr. 2/8:244.

80. Priest Tr. 2/9:28-29.

81. Greene Tr. 2/7:60, ll. 12-15; Easley Tr. 2/10:152-53.

82. Bliss Tr. 2/8:29-30.

83. Bliss Tr. 2/8:33-35.

84. Klimaszewski Tr. 2/9:178-80, 185; Bliss Tr. 2/8:31.

85. Bliss Tr. 2/8:30-31.

86. Bliss Tr. 2/8:131-32.

87. Bliss Tr. 2/8:33.

88. Bliss Tr. 2/8:37-38.

89. Bliss Tr. 2/8:38-42; PX 37, Tab 9.

90. Alessi Tr. 2/8:222, 219-20.

91. Bliss Tr. 2/8:148.

92. Bliss Tr. 2/8:43-45, 114-17.

93. Bliss Tr. 2/8:46.

94. Bliss Tr. 2/8:144-47.

in seven of the twelve possible settings of the ImPulse Select, $T_1$ is less than .25 times $T_2$ when the inspiration period is one second or greater.[95]

The ImPulse Select also has a flow restricting orifice. The valve seat of the ImPulse Select bypass valve has the smallest cross-sectional area of any part of the bypass path. This orifice controls the rate of flow to 2 liters per minute, and oxygen must pass through this orifice (in continuous flow mode) to reach the patient.[96] Thus, the bypass circuit of the ImPulse Select has a valve which includes a choking (restricting) orifice that controls flow. Oxygen through this circuit moves from an inlet port, past the valve components, through a valve seat containing the choking orifice, and into the outlet port.

Plaintiff contends that these two components are arranged in a serial manner as required by the '224 patent.[97] The fact that the valve seat of the ImPulse Select bypass valve and the choking orifice are coincident, it argues, does not alter the function of the units. If the valve seat of the ImPulse Select and the choking orifice were separated, plaintiff asserts that the function would remain the same.[98]

AirSep stipulates that the ImPulse Select has every element of the claims of the '224 patent except the flow restricting means "in series with" the bypass valve.[99] The infringement analysis of the '224 patent is therefore dependent entirely on the resolution of that sole issue.

## E. The Witnesses

Dr. David Greene is the Vice President of Technology for the Respiratory Products Division of Sunrise Medical HHG, Inc.[100]

Mr. Richard Kocinski is the President of the Respiratory Products Division of Sunrise Medical HHG, Inc.[101]

Mr. Peter Bliss, Sunrise's technical expert, is a partner in a consulting firm called Valley Inspired Products. Valley Inspired Products does design engineering consulting, product testing, education and marketing services, all directed at respiratory product manufacturers.[102] Mr. Bliss has been a paid consultant to Sunrise prior to his involvement in this litigation.[103] Mr. Bliss has been paid approximately twenty thousand dollars by Sunrise for a project of redesigning one of Sunrise's liquid oxygen units.[104]

Dr. William Messner, Sunrise's technical expert, is an associate professor at Carnegie Mellon University.[105]

Mr. James Alessi is an engineer at AirSep Corporation and is a named inventor on a utility and design patent directed to the ImPulse Select.[106]

Mr. Norman McCombs is the Senior Vice President of AirSep.[107] Mr. McCombs is a named inventor on a utility and a design patent application directed to the ImPulse Select and a separate patent application directed to the bypass valve of the ImPulse Select.[108]

**95.** Bliss Tr. 2/8:45-46.

**96.** Bliss Tr. 2/8:48-50.

**97.** According to plaintiff, flow through the bypass circuit of the ImPulse Select goes through the interior of the valve past the sealing surface and into the choking orifice, all of which are in series. Bliss Tr. 2/8:143-44.

**98.** Bliss Tr. 2/8:51-52, 70-71.

**99.** Bilicki Tr. 2/8:47.

**100.** Greene 2/7:33.

**101.** Kocinski 2/7:128.

**102.** Bliss Tr. 2/8:11-12.

**103.** Bliss Tr. 2/8:140-41.

**104.** Bliss Tr. 2/8:141.

**105.** Messner Tr. 2/8:152.

**106.** Alessi Tr. 2/8:183.

**107.** McCombs Tr. 2/8:233.

**108.** McCombs 2/8:245.

Mr. Joseph L. Priest is the President and Chief Operating Officer of AirSep Corp.[109]

Mr. Mark Mizerkiewicz is an engineer and a research and design manager at AirSep Corporation and has been employed by AirSep since 1996.[110]

Mr. Andrzej Klimaszewski is a senior project engineer for AirSep Corporation who specializes in electronics.[111] Mr. Klimaszewski has been an AirSep employee approximately eight years.[112]

Mr. Donald Hunter is an engineering manager with Sunrise and was the designated corporate witness on the issue of Sunrise's testing and comparison of the accused device.[113]

Mr. Gregory Good is a former employee of Sunrise and one of the named inventors of the '224 Patent.[114] Mr. Good left the employ of Sunrise in February of 1997.[115]

Mr. Daniel Easley is the former President of the Respiratory Products Division at Sunrise and is the current President of Sunrise's Mobility Products Division at Sunrise. He left his position as President of the Respiratory Products Division in May of 1999.[116]

Mr. Sam Kumar, AirSep's expert, is the President of Teknocraft, Inc., a valve/control component designer and manufacturer located in Florida.[117] Mr. Kumar has an extensive background in fluidic control components, having studied the same while obtaining his master's degree in mechanical engineering and subsequently working for the Corning Fluidics Department for approximately five years.[118] In addition, Mr. Kumar taught certain courses and seminars while working for Corning.[119] Mr. Kumar is a named inventor on several patents directed to valves and valve components.[120] Mr. Kumar has worked with Puritan Bennett and Sunrise Medical in the past.[121]

Mr. Ronald Kareken is a registered patent attorney and counsel to AirSep Corporation.[122]

### F. Likelihood of success on the merits

#### 1. Ownership

AirSep disputes Sunrise's claim to ownership of the '224 Patent,[123] because no assignment history of the '224 Patent was introduced into evidence, either by way of documentary evidence or witness testimony on the patent's chain of title.[124] Sunrise, however, points to evidence that the inventors of the '224 patent directly assigned all their right and title to the patent to Sunrise, and that Sunrise consequently owns all right and title to the '224 patent.[125] I conclude that Sunrise does in fact own the '224 patent.

Sunrise also purports to own the '303 Patent.[126] This ownership claim is more problematic, requiring an examination of a somewhat convoluted chain of title. Dr. Gerald Durkan, the named inventor of the

109. Priest Tr. 2/9:23.

110. Mizerkiewicz Tr. 2/9:136.

111. Klimaszewski Tr. 2/9:173.

112. Klimaszewski Tr. 2/9:171.

113. Hunter 2/9:233.

114. Good Tr. 2/10:41, 74; PX 24.

115. Good Tr. 2/10:41.

116. Easley Tr. 2/10:119.

117. Kumar Tr. 2/10:168-69.

118. Kumar Tr. 2/10:158-59.

119. Kumar Tr. 2/10:163.

120. Kumar Tr. 2/10:172.

121. Kumar Tr. 2/10:170.

122. Kareken Tr. 2/11:116.

123. Greene Tr. 2/7:54.

124. Tr. 2/7 -- 2/11.

125. Greene Tr. 2/7:54; PX 24.

126. Greene Tr. 2/7:38.

'303 Patent, assigned certain rights to the '303 Patent to Tritec, Inc. through an assignment dated June 8, 1982. Dr. Durkan kept a reversionary interest to the '303 Patent.[127] Tritec, Inc. assigned its rights, title and interest to the '303 Patent to TriTec Industries on May 26, 1983. PX 21 and 22.[128] On or before August 1983, $CRYO_2$ Corporation purchased TriTec Industries, Inc.[129]

On August 1, 1983, TriTec Industries, Inc. (a subsidiary of $CRYO_2$ Corporation) granted what purports to be a security interest in the '303 patent to Kircaldie, Randall & McNabb.[130] That document is drafted as a conditional assignment which, if the underlying note is paid, is then void; otherwise and until then, it grants a full assignment of the patent to Kircaldie. On July 5, 1984, TriTec Industries, Inc. granted a conditional assignment and second security interest to State Street Bank and Trust Company.[131]

On February 8, 1988, $CRYO_2$ Corporation assigned all interest in the '303 patent of both it and its subsidiary TriTec Industries, Inc. to DOC Technologies, Inc.[132] Also on February 8, 1988, DOC Technologies, Inc. granted a security interest in the '303 patent to Healthdyne, Inc.[133] On July 7, 1989, DOC Technologies, Inc. assigned its interest in the '303 patent to PulsAir Anstalt.[134] On January 18, 1994, PulsAir Anstalt assigned its interest in the '303 patent to DeVilbiss Health Care, Inc., which was at that time a wholly-owned subsidiary of Sunrise.[135] On June 27, 1997,

Sunrise merged with its wholly-owned subsidiary, DeVilbiss Health Care, Inc., so that DeVilbiss Health Care, Inc. was no longer a separate company, but instead became a Sunrise division. The interest of DeVilbiss Health Care, Inc. was thus assigned to Sunrise.[136]

Defendant contends that no assignment exists from any entity to CryO2 of the rights to the '303 Patent. Thus, when CryO2 executed an assignment of the patent on February 8, 1988 to DOC Technologies, CryO2 did not in fact own any right, title or interest to the '303 Patent. And even if CryO2 did have rights to the '303 Patent at one time, defendant argues, it transferred those rights to Kircaldie, Randall & McNabb by way of security interest five years before it purported to assign them to DOC Technologies.

As a result, defendant argues, the February 8, 1988 assignment from CryO2 to DOC Technologies did not transfer any rights to the '303 Patent. If defendant is correct, this defect in title would appear to propagate down the entire chain: *i.e.*, as of July 7, 1989, DOC Technologies did not own any rights to the '303 Patent, so its assignment to PulsAir Anstalt did not work to transfer any interest in the patent, either.

On August 15, 1991, Kircaldie and Durkan executed *nunc pro tunc* assignments, effective February 8, 1988 and July 6, 1989, respectively, of their security and reversionary interests in the '303 patent to

127. PX 138; PX 21; PX 22, at S-10607.

128. PX 138; PX 22, at S-10608.

129. PX 138; PX 22, at S-10650, p. 1, ¶ 2.

130. PX 138; PX 22, at S-10610.

131. PX 138; PX 22, at S-10613. Defendant argues that TriTec Industries granted this security interest despite the fact that TriTec Industries no longer owned any right, title or interest to the '303 Patent. It is not clear how this allegedly null-and-void grant could affect the chain of title as between the parties *sub judice,* and I will consider it no further.

132. PX 138; PX 22, at S-10632.

133. PX 138; PX 22, at S-10619. On July 20, 1989, Healthdyne, Inc. released the security interest in the '303 patent that it had obtained from DOC Technologies, Inc. on February 8, 1988. PX 138; PX 22, at S-10637.

134. PX 138; PX 22, at S-10644.

135. PX 138; PX 22, at S-10670.

136. PX 138; PX 22, at S-10672.

DOC Technologies, Inc.[137] Defendant complains that the *nunc pro tunc* assignments are nothing more than an attempt to validate what it considers to be the previously ineffective, encumbered, July 7, 1989 assignment from DOC Technologies to PulsAir Anstalt, from which, of course, DeVilbiss purportedly acquired its interest in the '303 Patent which it later assigned to plaintiff. Thus, defendant argues that if the *nunc pro tunc* agreement is invalid, DOC Technologies never owned any right, title or interest to the '303 Patent and neither does Sunrise;[138] if Sunrise does not own the '303 Patent, Sunrise does not have standing to bring the instant patent infringement action based on the '303 Patent.

## 2. Infringement

### a. The '303 Patent

### i. Whether AirSep's ImPulse Select "Employed a Method" in Violation of the '303 Patent

Defendant argues that Sunrise adduced no evidence, testimonial or documentary, that AirSep has employed a method using the ImPulse Select that infringes the method of Claim 3 of the '303 Patent. To the contrary, it contends that the evidence adduced shows only that AirSep manufactures and sells the ImPulse Select device to its customers, home health care dealers, who, in turn, provide the device to patients needing such a device.[139]

### ii. Alleged Non-infringement of Invacare Venture Device

Dr. Greene performed an infringement analysis of the '303 Patent as compared to a device called the Invacare Venture.[140] one of the salient features of which is that the valve always remains open for a fixed duration of one second.[141] If a patient on the Invacare Venture breaths rapidly enough, his or her inspiration time may be less than one second,[142] in which case the Invacare Venture would provide a dose of oxygen during a portion of the patient's exhalation.[143]

As discussed *supra*, claim 3 of the '303 Patent requires that the dosage interval $T_1$ always be less than the inspiratory period $T_2$, but notably, according to defendant, Sunrise never sued Invacare for infringement of the '303 Patent.[144] The ImPulse Select also provides a dose of oxygen for a range of fixed periods of time, dependent on the positions of the various selector switches.[145] Plaintiff responds that it is irrelevant that Invacare was never sued for infringement of the '303 patent because the Invacare Venture had an inspiration period that was always one second.[146] In contrast, the longest pulse time of the ImPulse Select in the B6 setting is only 0.5 second.[147] Thus, far fewer patients are likely to receive a dose of oxygen during exhalation with the ImPulse Select than with the Venture.

**137.** PX 138; PX 22, at S-10650, 10663.

**138.** Dr. Greene claimed to know that Sunrise owns the '303 Patent because he had seen a Patent Office description of ownership. Greene Tr. 2/7:38-39. Yet, Dr. Greene could not point to any assignment in the certified assignment record from anyone to CryO2. Greene Tr. 2/7:115. In addition, Dr. Greene did not "feel competent to really chase th[at] train. . . ." Greene Tr. 2/7:115-16. Sunrise offered the testimony of no other witness on the chain of title of the '303 Patent to Sunrise. Tr. 2/7 -- 2/11.

**139.** *Cf,* Trial Testimony, 2/7 -- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**140.** Greene Tr. 2/7:92.

**141.** Greene Tr. 2/7:93, 123.

**142.** Greene Tr. 2/7:93-94.

**143.** Greene Tr. 2/7:94.

**144.** Greene Tr. 2/7:94.

**145.** PX 64.

**146.** Greene Tr. 2/7:123.

**147.** PX 64, ¶ 20.

### iii. Non-infringement Defense of Providing a Dose During Exhalation

#### (A.) Claim Construction Testimony

No claim, including claim 3, of the '303 Patent requires normal breathing patterns as a limitation of the claim,[148] nor does Claim 3 require normal operating circumstances or conditions as a limitation.[149] In addition, the '303 Patent specification does not describe normal or typical breathing patterns as a qualification to the limitation of $T_1$ being less than $T_2$.[150] Rather, $T_1$ must always be less than $T_2$ in order for the claim to be satisfied.[151]

#### (B.) The Accused Device Can Provide a Dose of Oxygen during Exhalation

Defendant argues that the use of the ImPulse Select does not practice a method with a step of "using timing means to predetermine a duration $T_1$ for which a dose of respirating gas is to be supplied to said in vivo respiratory system, *said duration $T_1$ being less than the duration $T_2$* of negative pressure relative to ambient pressure occurring in said in vivo respiratory system during said inspiration period."[152] Plaintiff, for its part, admits that the accused device *can* (although almost never does) provide oxygen during exhalation,[153] but emphasizes that the ImPulse Select, operating in "B" mode, was *designed* and is *intended* to supply oxygen to a patient only during inhalation.[154] In support of that contention, plaintiff notes that the ImPulse Select patient manual provides that an "actual oxygen delivery to the patient occurs only at the exact point in the breathing cycle when the patient starts to inhale," and that "the ImPulse Select does not deliver oxygen during exhalation."[155] It also points out that there are no AirSep documents or advertisements indicating that the ImPulse Select is intended to provide oxygen during exhalation, and that the ImPulse Select has never been marketed as anything but a device that provides oxygen only during inhalation.[156]

AirSep has received complaints from customers who have returned the ImPulse Select because it provided a dose during exhalation,[157] but only 0.3% of the users of the ImPulse Select have experienced the provision of oxygen during exhalation and returned the OCD.[158] Thus, some number of ImPulse Select users less than 99.7% do not receive oxygen during exhalation. Through March of 1999, only four out of 3,039 ImPulse Select units were returned because of the provision of oxygen during exhalation. This return ratio has remained consistent. There has not been a month where more than two ImPulse Select units were returned due to the provision of oxygen during exhalation.[159]

Specifically, the roughly 0.3% of the users of the ImPulse Select who receive oxygen during exhalation do so because of their unusual breathing pattern, such as excessive exhaling or hyperventilation.[160] These are the only reasons of which AirSep is aware that will cause a patient to receive oxygen during exhalation.[161] When an AirSep customer calls to complain that

**148.** Greene Tr. 2/7:108; Bliss Tr. 2/8:118.

**149.** Greene Tr. 2/7:108-09.

**150.** Bliss Tr. 2/8:118-19.

**151.** Bliss Tr. 2/8:123.

**152.** Kumar Tr. 2/11:4.

**153.** Green Tr. 2/7:65; Plaintiff's Resp. to Defendant's Req. to Admit, Admission No. 35; Bliss Tr. 2/8:37 Klimaszewski Tr. 2/9:183.

**154.** McCombs Tr. 2/8:246; Alessi Tr. 2/8:220.

**155.** PX 55, p. 3 (AIR-02427, ¶¶ 2-3); Alessi Tr. 2/8:217-18, 219.

**156.** Alessi Tr. 2/8:220-21.

**157.** Alessi Tr. 2/8:223.

**158.** Alessi Tr. 2/8:222, 219-20.

**159.** Alessi Tr. 2/8:224-25.

**160.** Alessi Tr. 2/8:221.

**161.** Alessi Tr. 2/8:225.

an ImPulse Select is providing oxygen during exhalation, the customer is forwarded to the product manager who explains that 0.3% of the population may have a breathing pattern that is not conducive to use with the ImPulse Select.[162]

Although there is no AirSep literature where the average human breathing rate is referred to as anything but 20 breaths per minute,[163] Mr. Bliss' charts for breathing frequencies of 35 breaths/min., 40 breaths/min., and 60 breaths/min. demonstrate the ImPulse Select providing oxygen during exhalation at flow setting 6.[164] Mr. Bliss' charts for breathing frequency were tested at an Inspiration over Exhalation (I/E) ratio of 1 to 2.[165]

Patients with restrictive lung disease are candidates for an ImPulse Select OCD device.[166] According to an article by Dr. Tobin, approximately five percent of patients with restrictive lung disease have an inspiratory time of less than 0.5 seconds.[167] These patients tend to breathe faster with more time spent inhaling and have an I/E ratio of 1 to 2 or 1 to 2.5.[168] The average inspiration period for restrictive lung disease patients is 0.96 seconds with a standard deviation of 0.24.[169] Statistical analysis predicts that only 2.28% of these patients would have an inspiration period less than .5 second which is the longest pulse setting on the ImPulse Select. Also, only about 10% of the users of the ImPulse Select have restrictive lung disease. Hence, plaintiff argues that only 0.228 percent of the users of the ImPulse Select would use the ImPulse Select in a manner that does not practice the method of claims 3 to 5.[170]

Chronic obstructive pulmonary disease (COPD) patients, however, are also candidates for an Impulse Select OCD device, and these patients may have I/E ratios of 1 to 3 or 1 to 4.[171] With these I/E ratios, the inspiration time is shorter and the inspiration peak on the charts is narrower.[172] Thus, at only 30 breaths per minute and an I/E ratio of 1 to 4, the pulse delivered by the ImPulse Select would extend beyond the inspiration period.[173]

Nevertheless, a more typical patient with a one second inspiration period using the ImPulse Select would never be provided oxygen during the exhalation period and would appear to practice the method of claim 3 of the '303 patent.[174] Only under the above-discussed unusual circumstances involving the ImPulse Select operating in Mode B at setting 6 and the patient breathing at a rate in excess of about 30-35

162. Alessi Tr. 2/8:223-24.

163. Alessi Tr. 2/8:217.

164. PX 37, Tab 9. No tests were performed on an in vivo respiratory system. Bliss Tr. 2/8:113. Also, there was a five millisecond variance in the data collected by Mr. Bliss in the charts at Tab 9 of his expert report. Bliss Tr. 2/8:116. This variance is not referred to anywhere in the report. Bliss Tr. 2/8:116. I find 1/200 of one second too insignificant a variance to affect the validity of his conclusions.

165. Bliss Tr. 2/8:113. At 35 breaths per minute and an I over E ratio of 1 to 2, the ImPulse Select delivers a pulse which extends into exhalation or terminates coincidentally with the beginning of exhalation. Bliss Tr. 2/8:114. The data shows a positive flow of oxygen through the oxygen cannula after the cessation of inhalation. Bliss Tr. 2/8:116. At 40 breaths per minute and an I over E ratio of 1 to 2, the ImPulse Select delivers a pulse which clearly extends into exhalation. Bliss Tr. 2/8:115.

166. Bliss Tr. 2/8:108.

167. Bliss Tr. 2/8:110.

168. Bliss Tr. 2/8:111.

169. PX 37, Tab 8; Martin J. Tobin, M.D. et al., "Breathing Patterns," Chest, Vol. 84, No. 3, pp. 286-293, Table 2 at p. 287.

170. Bliss Tr. 2/8:144-45.

171. Bliss Tr. 2/8:112.

172. Bliss Tr. 2/8:120.

173. Bliss Tr. 2/8:121.

174. Kumar Tr. 2/11:93-94.

breaths per minute will a patient using the ImPulse Select receive oxygen during expiration.[175]

Turning to the technical reasons why the ImPulse Select can deliver a dose of oxygen during expiration, the monostable vibrator used in the ImPulse Select's control circuit provides a signal to the valve for a fixed duration which is unaffected by anything in the patient's breathing pattern once it starts to deliver.[176] Because the duration of the pulse is fixed, if a patient starts exhaling before the pulse actually ends, the dose will be partially delivered during exhalation.[177] The ImPulse Select will therefore deliver a dose of oxygen to a patient while the patient exhales if the inhalation time is less than pulse delivery time.[178] Providing a dose during exhalation and having the dose extend beyond inspiration are characteristics of the device as a result of the design of the circuit.[179]

The ImPulse Select can also pulse a dose that begins during exhalation. The balancing circuit responds to high pressure in the tubing. Usually, that high pressure is generated when the valve opens. In some cases, however, a patient will generate a high enough pressure during exhalation to cause the balancing circuit to be activated.[180] Once this happens, the balance becomes upset.[181] This condition will be interpreted by the circuit as an inhalation, causing triggering to occur and oxygen to be delivered. This pulsing is also due to the structure of the balancing circuit.[182]

In view of these facts, Mr. Kumar's professional and expert opinion, reached with a reasonable degree of professional certainty, is that the method used by the accused device does not infringe Claim 3 of the '303 Patent, either literally or under the doctrine of equivalents.[183]

### (C.) The FDA Investigation

The Food and Drug Administration ("FDA") has regulatory authority over OCDs and their manufacturers.[184] In early 1999, the FDA contacted AirSep in follow-up to a customer's comment under the MEDWATCH program that the ImPulse Select device's propensity to fire upon exhalation had caused a hypoxic condition with certain patients.[185]

The FDA sent AirSep a copy of the MEDWATCH report on or about March 3, 1999, and also visited AirSep in February/March of 1999. Priest Tr. 2/9:63-4. The FDA also initiated an investigation of AirSep. Priest Tr. 2/9:63. The FDA investigated the design operation, the inspection criteria, and manufacturing with respect to the ImPulse Select. Priest Tr. 2/9:66. Mr. Priest informed the FDA that ImPulse Select is designed to provide pulses of oxygen only on inhalation and not on exhalation, and only in a single pulse.[186] The FDA issued its observations report, to which AirSep responded.[187] AirSep was not

**175.** Bliss Tr. 2/8:38-45

**176.** Messner Tr. 2/8:180-1; Klimaszewski Tr. 2/9:184.

**177.** Klimaszewski Tr. 2/9:183.

**178.** McCombs Tr. 2/9:220; Kumar Tr. 2/11:4.

**179.** McCombs Tr. 2/9:220-25.

**180.** Klimaszewski Tr. 2/9:183.

**181.** Klimaszewski Tr. 2/9:183-84.

**182.** Klimaszewski Tr. 2/9:184. There was also testimony that the ImPulse Select can deliver a pulse of oxygen upon exhalation even where $T_1$ is a half a second and $T_2$ is one second, Kumar Tr. 2/11:96-97, because the ImPulse Select can double pulse. Kumar Tr. 2/11:96.

**183.** Kumar Tr. 2/11:4-5. *But see* Bliss Tr. 2/8:46-47; Messner 2:8/162-63 (contrary opinions).

**184.** Priest Tr. 2/9:62.

**185.** Priest Tr. 2/9:62-63.

**186.** Priest Tr. 2/9:90, 92, 94-95.

**187.** Priest Tr. 2/9:66-7; PX 58. AirSep's quality assurance field failure report details that the problem reported was pulses on exhalation, sporadic, inconsistent and double pulsing. Priest Tr. 2/9:96. The report also states

required to change the design or the mechanics of the ImPulse Select.[188]

#### iv. Equivalence of Fluidic Control Versus Electronic Control

Defendant argues that the use of the ImPulse Select does not practice a method with a step of "using *timing means* to predetermine a duration $T_1$" because the timing means of the ImPulse Select uses an electronic resistor-capacitor ("RC") circuit rather than a fluidic RC circuit.[189] Plaintiff, however, contends that use of the ImPulse Select infringes claim 3 of the '303 patent because its electronic timing means[190] is essentially the same as the fluidic timing means disclosed in the specification of the '303 patent.[191] According to plaintiff, the fluidic timing means of the '303 patent and the electronic RC timing means of the ImPulse Select perform identical functions in substantially the same way, and an electronic timing circuit could be substituted for the fluidic timing circuit disclosed in the '303 patent.[192]

Fluidic control circuits were designed to be the equivalent of electronic control circuits.[193] Indeed, in the late sixties to seventies, fluidics was a very important science[194] and was thought of as a technology that was going to "take over the control systems world."[195] When fluidics was first developed, it was intended that fluidics and electronics would be used for the same purposes, although fluidics proved impractical in some applications.[196] Researchers were applying fluidics to a wide variety of applications, numerous papers were published on the subject, and researchers even tried to make a fluidically controlled computer, which failed to attain success because of its unwieldy size.[197] The science of fluidics ultimately died out as electronic circuits became much less susceptible to heat, more efficient, more reliable, and

that no problems were found and no corrective action is required. Priest Tr. 2/9:96.

**188.** Priest Tr. 2/9:67.

**189.** Kumar Tr. 2/11:5-6. The ImPulse Select device has no fluidic control components. McCombs Tr. 2/9:205. Instead, it uses an electronic PC board which, according to defendant's expert, is a totally different structural construction. Kumar Tr. 2/11:6.

**190.** An RC electronic circuit determines the ImPulse Select's pulse delivery time. Bliss Tr. 2/8:125. Control of the ImPulse Select is accomplished by an electronic circuit, and no fluidic control circuit components are used in the ImPulse Select. The on/off switch, the A/B mode switch, the selector switch, and the LED indicators are mounted on the circuit board. Power is supplied to the circuit board either by a D-sized battery or an external power source. PX 64. The circuit of the ImPulse Select is embodied in DX 29. Klimaszewski Tr. 2/9:176. The circuit has a pressure sensor, an amplifier circuit, the decision-making circuit, a programmable array logic chip, logic gates, and selector switches. Klimaszewski Tr. 2/9:177. Control of the ImPulse Select is accomplished by an electronic circuit. PX 64.

**191.** Greene Tr. 2/7:67; Kumar Tr. 2/10:247-48; Kumar Tr. 2/11:94-95; PX 153.

**192.** Messner Tr. 2/8:159-161.

**193.** Greene Tr. 2/7:67. Fluidic control components may sometimes be utilized in place of electronic components, although an electronic circuit may be more reliable in certain applications. McCombs Tr. 2/9:205, 218-220. These circuits differ principally in that, instead of fluid flow, an electronic circuit incorporates a flow of electrons. As a general matter, "both fluidic circuits and electronic circuits involve efforts and flows and have no moving mechanical parts." Messner 2/8:167. However, fluidic timing circuits *can* utilize mechanical moving parts, as the '303 Patent does in the form of an elastomeric balloon. Messner 2/8:167. Most fluidic circuits are bleeding systems. Kumar Tr. 2/10:250. The principle of fluidics is flowing pressurized gas or a fluid and passing it through small openings and causing pressure drops. Kumar Tr. 2/10:250. In order to cause a pressure drop, the system must vent some of the pressurized gas. Kumar Tr. 2/10:250.

**194.** Greene Tr. 2/7:111

**195.** Kumar Tr. 2/10:245-46.

**196.** McCombs Tr. 2/9:219.

**197.** Kumar Tr. 2/10:246, 247, 251.

more desirable from size and operational standpoints.[198]

Fluidic circuits are not interchangeable with electronic circuits because fluidic circuits are different in reliability, accuracy, controllability, and function.[199] In selected applications of information processing and timing, however, fluidics can perform the same function as electrical control systems.[200] In fact, there was expert testimony that fluidic timing means are structurally and functionally equivalent to electronic timing means for the purposes of OCDs.[201] At the time the application for the '303 patent was filed, however, it would have been impractical to use an electronic timing means for this type of portable OCD due to the lack of sufficient electronic sensor technology as well as the increased size that would have been necessary to house an electronic timing means.[202]

The structural construction of the claimed timing means in the '303 patent is a fluidic device that uses fluidic resistors or needle valves and a capacitor which is a movable diaphragm.[203] The capacitance of the timing means is a variable capacitance, such as an elastomeric balloon.[204] A fixed volume capacitance could not adequately perform this function and would be incompatible with the low pressures used in the fluidic logic circuit discussed herein.[205] The capacitance of the ImPulse Select, in contrast, is an electrical capacitor.[206] According to plaintiff's own expert, Mr. Bliss, an elastomeric balloon does not share a single structural similarity with an electrical capacitor.[207]

The resistance described in the '303 Patent is not an electrical resistor, but a variable orifice or needle valve.[208] According to Mr. Bliss, there is not one structural similarity between the electronic resistor of the ImPulse Select and the fluidic resistor in the '303 Patent.[209]

198. Greene Tr. 2/7:112. Electronics also provide more repeatable and certain results, although this is not a reason why fluidics died out. *Id.*

199. McCombs Tr. 2/9:219-20. Thus, an electronic circuit cannot be substituted for a fluidic timing circuit in every application. Messner Tr. 2/8:160. A fluidic RC circuit is not as reliable as an electronic RC timing circuit because fluidic timing mechanisms are more susceptible to temperature variations and pressure variations because the fluidics are based on gas flow. Kumar Tr. 2/10:248-49. Gas is more susceptible because gas expands and contracts in response to temperature variations. Kumar Tr. 2/10:248. In addition, gas is subject to other mechanical factors. Kumar Tr. 2/10:249. Further, it is very difficult to maintain constant pressure throughout a system, which will affect the reliability of the fluidic timing circuit. Kumar Tr. 2/10:249. A fluidic circuit cannot accurately control a time interval over a long period reliably. McCombs Tr. 2/9:220.

200. Messner Tr. 2/8:156. Defendant's technical expert, Sam Kumar, agreed that the following fluidic timer components can be implemented in an electronic timer: flip-flop, NOR gate, back pressure switch, NAND gate, proportional amplifier, and Schmitt trigger. Kumar Tr. 2/11:94-95. Mr. Kumar also conceded that fluidic and electronic timers are similar technologies, and that there are resistive capacitor timers in both. Kumar Tr. 2/11:95. One cannot, however, simply go to a store and purchase a one-ohm fluidic resistor or a fluidic fifteen-microfarad capacitor. Such devices must be calculated, designed and experimented with individually. Greene Tr. 2/7:111.

201. Kumar Tr. 2/10:247-248. The only difference cited by Mr. Kumar is that electronic timing circuits may be more reliable under certain conditions. Kumar Tr. 2/10:248-49.

202. Greene Tr. 2/7:68-69.

203. Kumar Tr. 2/11:5-6

204. Bliss Tr. 2/8:90, 126; PX 1. An elastomeric balloon is a moving mechanical part because its volume varies as it expands. Bliss Tr. 2/8:91; Messner 2/8:166.

205. Bliss Tr. 2/8:90; PX 1.

206. Bliss Tr. 2/8:126.

207. Bliss Tr. 2/8:127.

208. Bliss Tr. 2/8:125.

209. Bliss Tr. 2/8:126.

Ohm's Law states that volts equals current times resistance, and most electronic circuits perform pursuant to Ohm's law. Using a linear version of Ohm's law, the relationship between voltage and current will be linear as well.[210] The RC circuit of the ImPulse Select is a linear device such that the linear version of Ohm's law applies.[211]

In contrast, the relationship between pressure and flow in a fluidic circuit, in many cases, is not linear.[212] Specifically, the relationship between pressure and flow in the fluidic circuit described in the '303 Patent may not be linear.[213]

### v. Whether the Sequence of Steps of the ImPulse Select Matches the Sequence of Steps Required by the '303 Patent

Before using the ImPulse Select, the patient selects either mode "A," mode "B" or continuous flow.[214] The user then selects a pulse length via one of six positions of the rotating switch on the ImPulse Select. This pulse length setting is used over and over in modes A and B to predetermine the length of the pulse of oxygen initiated by sensing inspiration.[215] Thus, when using the ImPulse Select, a patient first *selects* the timing means to predetermine the duration $T_1$.[216] A user of the ImPulse Select does not change the mode A or B or the selector switch between breaths,[217] nor

would it be practical or even reasonable, for a patient to reset the duration of $T_1$ on every breath.[218]

Defendant argues that use of the ImPulse Select does not practice the method of claim 3 of the '303 patent because the timing means of the ImPulse Select is set-- once-- prior to the start of the inspiration period,[219] and because the use of the ImPulse Select does not practice a method with a step of "automatically repeating steps (1), (2), and (3) for a plurality of consecutive inspiration periods."[220] By contrast, defendant points out that the first step in utilizing the method of Claim 3 is the sensing of inspiration, then, as the second step, timing means are used to predetermine the duration $T_1$.[221]

Specifically, in the '303 Patent fluidic circuit, when negative pressure is sensed, there is a signal applied to the fluidic loop, otherwise the air jet is vented to the atmosphere. Thus, if no negative pressure is applied to the fluidic circuit, there is no delivery of oxygen.[222] The resistance and the balloon capacitor together balance the pressure in the fluidic loop and shut off the flow of oxygen before the end of inspiration; once the negative pressure signal travels all the way around the circuit, the signal will again vent to atmosphere (as if the patient were exhaling) and no oxygen

**210.** Messner Tr. 2/8:168.

**211.** Messner Tr. 2/8:169.

**212.** Messner Tr. 2/8:170.

**213.** Messner Tr. 2/8:170. However, Dr. Messner cannot definitively state that the relationship is not linear without knowing more about the device. Messner Tr. 2/8:171. Dr. Messner has never performed a prior art search in the field of fluidics technology. Messner Tr. 2/8:178. Further, Dr. Messner did not review any of the patents or other publications listed on the face sheet of the '303 Patent. Messner Tr. 2/8:178-79. Finally, Dr. Messner did not review the prosecution (file) history of the '303 Patent in connection with preparing his report. Messner Tr. 2/8:165.

**214.** Bliss Tr. 2/8:127-28.

**215.** Bliss Tr. 2/8:30-32, 127.

**216.** Bliss Tr. 2/8:128, 132.

**217.** Bliss Tr. 2/8:130-31.

**218.** McCombs Tr. 2/8:248. A patient would not have any reason to change the setting on the ImPulse Select between each breath. McCombs Tr. 2/8:248.

**219.** Kumar T2. 2/11:8. A user of the ImPulse Select preselects the time duration and then the inhalation cycle starts. Kumar Tr. 2/11:8.

**220.** Kumar Tr. 2/11:92-93.

**221.** Bliss Tr. 2/8:128, 129.

**222.** Bliss Tr. 2/8:133.

will be delivered.[223] Thus, no respirating gas is applied to the patient during expiration.[224] The next dose is delayed until the patient begins inhaling again. A patient using the ImPulse Select need not intervene to cause the initiation of any of the first three steps of claim 3 of the '303 patent, as they are automatically repeated.[225] Thus, the repeated steps required by claim 3 are inspiration, timing means, delivery, whereas defendant contends its product operates in the order timing means, inspiration, delivery, with only the last two steps repeated.

I am persuaded that *using* a timing means to predetermine $T_1$ means that the time is predetermined before the valve is activated, not that the patient *selects* the timing means by resetting the knob on every breath.[226] The ImPulse Select performs the former function of *using* timing means every time the unit senses a breath, because the pre-selected resistor and capacitor in the timing circuit predetermine the time that the valve will be on.[227] Nothing in claim 3 requires the *resetting* of the period $T_1$ on every breath, nor does the specification of the '303 patent makes any such suggestion.[228] Thus, the ImPulse select performs the same steps in the same order as set forth in claim 3: inspiration, timing means, delivery, with all three steps repeated.

## vi. Does the Accused Device Meet the "At Least As Great A Rise" Limitation of Claim 3?

Claim 3 of the '303 Patent requires that a device utilizing the method produce at least as great a rise in the partial pressure of said gas in blood interfacing with said respiratory system as the continuous application of said gas at a lower rate R2 for the duration $T_2$.[229]

It is very difficult to ascertain the equivalency of the therapeutic effect of OCD devices without testing the OCD device on the patient at each activity level.[230] Mr. Bliss did not perform any tests on the ImPulse Select device to determine if the limitation of producing at least as great a rise in the partial pressure of said gas in blood interfacing with said respiratory system as the continuous application of said gas at a lower rate R2 for the duration $T_2$ was met.[231]

Nevertheless, based on a bench flow test, Bliss opined that the ImPulse Select in mode B is not as efficacious as continuous flow at sixteen breaths per minute and lower. At thirteen breaths per minute, no data were taken but his expectation was that the difference would be greater between the efficacy of the ImPulse Select

---

**223.** Bliss Tr. 2/8:134-35.

**224.** Bliss Tr. 2/8:135.

**225.** Bliss Tr. 2/8:36-37.

**226.** Bliss Tr. 2/8:130.

**227.** Bliss Tr. 2/8:131-132; Greene Tr. 2/7:69. Thus, I do not credit Kumar's testimony that a method utilizing the ImPulse Select device does not automatically repeat the steps of sensing, using timing means and supplying oxygen for a plurality of consecutive inspiration periods. Kumar Tr. 2/11:8. Kumar admitted that if "using timing means to predetermine a duration $T_1$ for which a dose of respirating gas" does not require resetting the duration of $T_1$ after the start of every breath, this limitation in claim 3 is literally satisfied by the use of the ImPulse Select.

Kumar Tr. 2/11:8-9, 91. He also admitted that the steps of the method utilizing the ImPulse Select are repeated but disputed only their order, contending that the timing means is used first. Kumar Tr. 2/11:9.

**228.** Kumar Tr. 2/11:92.

**229.** Bliss Tr. 2/8:139. The only example given in the '303 Patent is a breathing rate of ten breaths per minute. Bliss Tr. 2/8:101; PX 1.

**230.** Bliss Tr. 2/8:97. Within a particular individual and patients as a whole, there is a wide variety of breathing patterns. Bliss Tr. 2/8:103. These variances in an individual occur when patients talk, when they exert themselves, and when they are exposed to obnoxious stimuli. Bliss Tr. 2/8:104.

**231.** Bliss Tr. 2/8:139.

and that of continuous flow.[232] At ten breaths per minute, he testified that the fraction of inspired oxygen would be the same as it is at fifteen breaths per minute and would be less than the fraction of inspired oxygen of continuous flow.[233] Interestingly, Figure 4 of Mr. Bliss' article plots the fraction of inspired oxygen for respirations of 15-26 breaths per minute, and shows the ImPulse Select (operating in "B" mode at setting 2) always providing *more* oxygenation than continuous flow oxygen at 2 liters per minute. I infer from this that breathing rates under 15 breaths per minute are uncommon and clinically insignificant. Thus, I find this evidence inconclusive at best.

### vii. AirSep's Non-Infringement Opinion Regarding the '303 Patent

AirSep first received notice of Sunrise's charge of infringement regarding the '303 Patent when it received the complaint in this action.[234] Upon receiving notice of Sunrise's charge of infringement of the '303 Patent in the complaint, AirSep immediately communicated with Mr. Kareken, a patent attorney with the firm of Jaeckle, Fleischman & Mugel, and commissioned an opinion regarding whether the ImPulse Select infringed the '303 Patent.[235] Mr. Kareken performed an analysis of the '303 Patent as respects the ImPulse Select device and rendered an opinion in draft form on September 21, 1999, finalizing the opinion on December 2, 1999.[236] AirSep relied upon Mr. Kareken's unequivocal opinion of noninfringement in continuing to sell and manufacture the Impulse Select device.[237]

### viii. Has Any Other Person Used the ImPulse Select in Violation of the '303 Patent?

Defendant contends that Sunrise adduced no evidence, testimonial or documentary, that any other entity or person employs a method using the ImPulse Select that would constitute an infringement of Claim 3 of the '303 Patent.[238] In its response, plaintiff asserts that this contention is unsupported, and indeed, Mr. Bliss testified that ImPulse Select users infringe Claim 3.[239]

### ix. Did AirSep Intend Any Entity to Use the ImPulse Select in Violation of That Patent?

Defendant contends that Sunrise adduced no evidence, testimonial or documentary, that AirSep had any actual intent to cause any person or entity to employ a method using the ImPulse Select that would constitute an infringement of Claim 3 of the '303 Patent.[240] In its response, plaintiff asserts that this contention is unsupported, but cites no evidence to the contrary.

### b. The '224 Patent

### i. AirSep's Development of the ImPulse and ImPulse Select

AirSep developed the ImPulse with a company called Medisonic.[241] The development process began sometime between late 1994 and early 1995, and the ImPulse was commercially available in November 1996.[242]

The ImPulse is a small, lightweight device that provides up to four settings for a

---

**232.** Bliss Tr. 2/8:98; *see also infra*, § F(2)(b)(ix).

**233.** Bliss Tr. 2/8:99-100.

**234.** Priest Tr. 2/9:80.

**235.** Priest Tr. 2/9:80-81.

**236.** Priest Tr. 2/9:81-82.

**237.** Priest Tr. 2/9:82.

**238.** *Cf*, Trial Testimony, 2/7 -- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**239.** Bliss 2/8:24-47.

**240.** *Cf. id.*

**241.** Priest Tr. 2/9:28; McCombs Tr. 2/9:206.

**242.** Priest Tr. 2/9:28.

patient to use while ambulating.[243] It has a selector switch with an off position and four other selections. When set at the first position, the ImPulse device pulses one out of every four breaths; at the second position, it pulses every other breath; at the third, the device pulses every three out of four breaths; and at the fourth position, it delivers a pulse on every breath.[244]

The ImPulse uses oxygen supply tubing with a volume of 35 milliliters connected to the male fitting on the side at one end; on the other end, the tubing is connected to a pressure regulator on the cylinder of oxygen.[245] This supply tubing caused complaints and problems because some customers would use their own tubing not purchased from AirSep or the supply tubing would become disconnected.[246]

Even during the time it was developing the ImPulse, AirSep had a number of ideas and concepts and improvements that it wanted to make to the next generation product. However, AirSep had to make a decision to stop development and finalize the design and manufacture the product. In addition, AirSep wanted to enter the marketplace, demonstrate a device's success, generate profits, and then invest those profits in a second generation conserving device. Thus, AirSep first contemplated a follow-on product even prior to the release of the Impulse.[247] The features contemplated at the time included selectability, multiple modes of conservation offered in one device, an all-in-one integrated conserving device regulator (following

the example of the OMS 20/50), and reduced power consumption.[248]

Six or seven months after the introduction of the ImPulse device, AirSep began its formal design process of the product that would become the ImPulse Select. The project became formalized in June 1997 because AirSep wanted to expand sales, improve contributions of that product to the company's revenue and improve profitability. Development of a new product is an extremely expensive, time consuming, and resource consuming process.[249]

A development meeting was held in June/July 1997 to identify features wanted in the new product and assign responsibility for investigating the feasibility of those features.[250] The primary goals of the meeting were to decide the aesthetics and design of the unit.[251] Subsequent to the design meeting, AirSep's research and development group investigated the proposed features by determining whether the features could actually be produced and manufactured; some features, it was found, could be incorporated while others could not.[252]

AirSep determined that the supply tubing could be eliminated so long as its volume was incorporated into the next generation ImPulse.[253] AirSep also experimented with the feasibility of making a pressure regulator that would enable a volume of oxygen to be included.[254] In addition, the circuitry of the ImPulse Select had to be reevaluated component by component in

**243.** Priest Tr. 2/9:28.

**244.** Mizerkiewicz Tr. 2/9:138.

**245.** Mizerkiewicz Tr. 2/9:137, 138.

**246.** Mizerkiewicz Tr. 2/9:139.

**247.** Priest Tr. 2/9:34.

**248.** Priest Tr. 2/9:36.

**249.** Priest Tr. 2/9:39.

**250.** McCombs Tr. 2/8:235; Priest Tr. 2/9:40, 43; Mizerkiewicz Tr. 2/9:139.

**251.** Priest Tr. 2/9:41.

**252.** Mizerkiewicz Tr. 2/9:141.

**253.** Mizerkiewicz Tr. 2/9:141-2.

**254.** McCombs Tr. 2/8:238. One specific vendor, Tony Staub, was contacted to see if a cost effective pressure regulator could be machined. Mizerkiewicz Tr. 2/9:142. AirSep in fact had a prototype regulator manufactured by Tony Staub in December 1997. Mizerkiewicz Tr. 2/9:145.

order to reduce power consumption.[255] Once the features were decided upon, AirSep contacted vendors who could assist AirSep in the manufacture of the device.[256]

The feature of supplying oxygen on every breath was added to the ImPulse Select because OCD patients in the marketplace have different preferences.[257] Two clinical studies showed that these patients tended to have a preference for either the "A" or "B" mode of delivery. Thus, in order to satisfy more customers in the marketplace, AirSep integrated both modes of delivery into the product.[258]

As finally implemented, the ImPulse Select provides clinicians the opportunity to select from two modes of conservation, a feature the Sunrise EX 2000 does not have.[259] The ImPulse Select also has double the battery life expectancy of the EX 2000 and the capability of AC adaptation, another feature the EX 2000 lacks.

**PX 64, Figure 1.**

### ii. Structure and Operation of the ImPulse Select

The ImPulse Select has a housing including a central cavity. The post of the oxygen tank is inserted into the central cavity of the ImPulse Select and the hous-

255. Klimaszewski Tr. 2/9:175.

256. Mizerkiewicz Tr. 2/9:138. AirSep also contacted Nottingham Spirk in August of 1997 to assist AirSep with the design of the plastic enclosure design. Mizerkiewicz Tr. 2/9:143.

257. Alessi Tr. 2/8:189; McCombs Tr. 2/8:240-41.

258. Alessi Tr. 2/8:189; McCombs 2/8:240-42.

259. Priest Tr. 2/9:55-56.

ing is removably secured to the oxygen tank by aligning pins and a fastener knob. The external elements of the ImPulse Select include an on/off switch, a pressure gauge, a rotatable selector knob that allows the patient to change the intermittent oxygen flow settings, light emitting diode (LED) indicators, a battery test button, a switch to allow the user to select either an intermittent or continuous flow of oxygen, an external power supply connector, a battery compartment, and an outlet fitting to enable delivery of oxygen to the patient through a cannula. Inside the battery compartment are the battery, battery connectors, and a mode switch that allows the user to select between the "A" and "B" mode of intermittent oxygen flow.[260]

An oxygen pressure regulator is mounted in the bottom portion of the housing. The regulator supports the electronic circuit board and the pressure gauge, and contains the switches and flow control circuit components, as well as the complementary wiring and leads necessary to enable the circuit. The pressure regulator includes first and second chambers, a piston, regulator springs, and a cap. The first chamber is fluidically connected to the oxygen tank post, and the regulator spring and piston control the pressure of the supplied oxygen. The second chamber is connected to the first chamber through a passageway and maintains a predefined volume of oxygen at a pre-set pressure. Operatively connected to the second chamber is a solenoid valve that is activated by the electronic circuit board to provide intermittent oxygen flow. Also connected to the second chamber is a bypass valve that, when activated, provides continuous oxygen flow to the patient. The second chamber includes a port which is fluidically connected to the outlet fitting, which is, in turn, attached to the cannula or other type of oxygen delivery device.[261]

The operation of the ImPulse Select device is controlled solely through the use of electromechanical devices. The on/off switch, the A/B mode switch, the selector switch, and the LED indicators are mounted on the circuit board, and power is supplied to the circuit board either by a D-sized battery or an external power source.[262] The circuit of the ImPulse Select is embodied in Defendant's Exhibit 29, and has a pressure sensor, an amplifier circuit, a decision-making circuit, a programmable array logic chip, logic gates, and selector switches.[263]

The pressure sensor is connected to the patient's cannula and monitors its pressure. Upon detection of a pressure change, the sensor will generate differential voltage that will be magnified by the amplifier.[264] The signal next goes to the decision-making circuit, which generates a trigger pulse.[265] The trigger pulse flows to the logic gates, which operate to prevent multiple triggering.[266]

The electrical signal then passes through the gates to the monovibrators.[267] One of the two monovibrators generates the six-hundred-millisecond pulse, while the second generates a pulse whose length is dependent upon the position of the two selector switches. Once the combination of switches is selected, a fixed interval is set and the pulse, once it is started, will not be stopped by any other means. This pulse is then sent to the PAL chip, which determines whether or not to open the solenoid

260. PX 64.

261. PX 64.

262. PX 64.

263. Klimaszewski Tr. 2/9:176-77.

264. Klimaszewski Tr. 2/9:178.

265. Klimaszewski Tr. 2/9:179

266. Klimaszewski Tr. 2/9:179. Once the beginning of inhalation is sensed, the gates will prevent another triggering for six hundred milliseconds.

267. Klimaszewski Tr. 2/9:179.

valve.[268] Once the decision to open the solenoid valve is made by the PAL chip, the valve will remain open for the fixed interval determined by the length of the pulse sent from the monovibrator.[269] The ImPulse Select circuit also has a balancing circuit to compensate for the overpressurization caused by the flow of oxygen from the cylinder through the cannula.[270]

A respiratory therapist selects either mode A or B by adjusting a switch in the battery compartment. The battery compartment is closed and the ImPulse Select is placed on the oxygen tank post. The valve on the oxygen tank is then opened. The selector switch is turned to the setting desired, thereby selecting a specific resistance/capacitance circuit. Once the A/B mode switch is selected and a position on the rotatable selector switch is selected, the dose, pulse time and pulse frequency are fixed. The ImPulse Select device was designed by AirSep to provide a certain dose of oxygen over a certain period of time at certain frequencies as shown below.[271]

DOSAGE AND TIMING TABLE FOR
THE IMPULSE SELECT

| Sel. Switch Position | Mode A | | | Mode B | | |
|---|---|---|---|---|---|---|
| | ml | ms | freq. | ml | ms | freq. |
| 1 | 35 | 184 | 1/4 | 16 | 92 | 4/4 |
| 2 | 35 | 184 | 2/4 | 33 | 176 | 4/4 |
| 3 | 35 | 184 | 3/4 | 50 | 260 | 4/4 |
| 4 | 35 | 184 | 4/4 | 66 | 344 | 4/4 |
| 5 | 44 | 230 | 4/4 | 82 | 430 | 4/4 |
| 6 | 52 | 277 | 4/4 | 99 | 500 | 4/4 |

The ImPulse Select has a bypass circuit designed to deliver a continuous flow of oxygen at the rate of 2 liters per minute when it is opened.[272] If the ImPulse Select is in the continuous mode, the oxygen continuously flows through the continuous flow valve to the outlet fitting and then directly to the patient, thereby bypassing the solenoid valve. The continuous flow valve is comprised of a number of component parts, including a valve seat and a valve seal consisting of an O-ring. The valve is closed when the valve stem is not actuated. When closed, the valve seal is pressed against the valve seat, thereby sealing it off and allowing no oxygen to pass through the bypass valve to the outlet port. The plunger biases the valve seal against the valve seat due to the force of the plunger spring against the plunger.[273]

When the valve is open, the valve stem is depressed such that the valve stem shaft, which is integral with the valve stem, in combination with the compressed valve stem spring, exerts a force against the plunger which partially overcomes the biasing force of the plunger spring and pushes the plunger and the valve seal away from the valve seat. This action removes the seal over the valve seat, thus, allowing the flow of oxygen to the outlet port.[274]

An orifice having a diameter of 0.0135 inch in the valve seat of the ImPulse Select bypass valve restricts flow in the bypass circuit to two liters per minute.[275] All oxygen flowing through the bypass circuit must flow through this valve and its 0.0135 inch diameter orifice.[276]

### iii. The Evolution of the Bypass Valve

Defendant's only argument against infringement of claim 1 of the '224 patent is based upon the following claim limitation: "flow restricting means *in series with* said bypass valve to limit oxygen flow through said bypass valve."[277] Prior to consider-

---

268. Klimaszewski Tr. 2/9:180.

269. Klimaszewski Tr. 2/9:181.

270. Klimaszewski Tr. 2/9:182.

271. PX 64.

272. Bliss Tr. 2/8:47-50.

273. PX 64.

274. PX 64.

275. Bliss Tr. 2/8:50-51; Alessi Tr. 2/8:196, 207.

276. Bliss Tr. 2/8:51-52; PX 26.

277. Tr. 2/8:47 (stipulation of counsel) (emphasis added).

ation of the '224 patent, Defendant had built a prototype ImPulse Select that had a Clippard bypass valve with a large exit hole and high flow rate in the bypass circuit.[278] The Clippard valve, which is not used on the production model, was a model MAV-2C which has a flow rate of approximately 80 liters per minute.[279] This bypass valve design also included a 0.0135 inch orifice located in the manifold block downstream from the Clippard valve,[280] which restricted the flow through the circuit to the desired 2 liters per minute.[281] No ImPulse Select that had the downstream orifice was ever sold or sent outside of AirSep.[282] AirSep's technical expert, Sam Kumar, agreed that the initial design of the ImPulse Select with the original Clippard valve and 0.0135 inch diameter downstream orifice comprised a bypass valve "in series with" a flow restricting means.[283]

**Clippard MAV-2C**
**Bypass Valve**

278. Alessi Tr. 2/8:204-205; Kareken Tr. 2/11:121; DX 54.

279. Alessi Tr. 2/8:204, 228; PX 162.

280. Alessi Tr. 2/8:202-203; Kareken Tr. 2/11:122.

281. Alessi Tr. 2/8:199-200, 201, 203, 204-06; Alessi Tr. 2/9:164-168; PX 148. This is roughly the size hole one would select if trying to generate a two liters per minute flow with an inlet pressure of 20 psi. Bliss Tr. 2/8:84.

282. Alessi Tr. 2/9:169.

283. Kumar Tr. 2/11:54-55, 58.

**Downstream Orifice - PX 148.** The orifice was located at the area referred to and signed by the witness.

AirSep first learned of the '224 Patent in the late summer or early fall of 1998, having engaged a company that reviews the patents and public filings of companies and products. Mr. Priest received an abstract or a press release regarding the '224 Patent.[284] Commercial production of the ImPulse Select had not yet begun.[285] AirSep immediately requested a copy of the '224 Patent, then contacted Attorney Ronald Kareken, AirSep's patent counsel, to review the patent and provide an opinion based on an analysis of the '224 Patent in view of the ImPulse Select.[286]

In an attempt to design around the '224 patent, AirSep replaced the Clippard bypass valve, first with a specially requested Clippard valve and later with a custom designed AirSep valve. These special bypass valves incorporated a 0.0135 inch outlet orifice which itself restricts the flow to 2 liters per minute, without the need for a separate orifice downstream.[287] This change was made because the AirSep Vice President Norman McCombs who designed the ImPulse Select had some "concerns,"[288] probably related to the '224 patent. AirSep thus removed the downstream 0.0135 inch orifice from the design at approximately the end of October, 1998.[289]

Mr. Kareken visited the offices of AirSep, talked with developers, and reviewed documents and devices, issuing a written opinion to AirSep on November 10, 1998.[290] His opinion, which was not qualified in any way, was that the ImPulse Select device did not infringe any of the claims of the

284. Priest Tr. 2/9:44-45.

285. Priest Tr. 2/9:45.

286. Priest Tr. 2/9:45-46.

287. The AirSep-designed bypass valve served both the functions of turning the continuous flow circuit on and off, and restricting flow through the continuous flow circuit to two liters per minute. Alessi Tr. 2/8:199-200, 207-08; McCombs Tr. 2/8:251-253.

288. Alessi Tr. 2/8:201; Alessi Tr. 2/9:169-170. Mr. McCombs contacted Clippard, the manufacturer of valve number 1 (DX 54), and requested the manufacturing of a new valve. Kareken Tr. 2/11:122. The second valve is the modified Clippard valve with a very small exit hole. Kareken 2/11:123.

289. Alessi Tr. 2/8:199-200, 201, 204-05, 226-227; Kareken Tr. 2/11:120-22.

290. Priest Tr. 2/9:47-49.

'224 Patent.[291] AirSep relied on Mr. Kareken's opinion in finishing the development and eventual commercial production of the ImPulse Select.[292]

The second, modified Clippard valve is the basis of the first non-infringement opinion rendered by Mr. Kareken on November 10, 1998.[293]

AirSep commissioned a second opinion regarding non-infringement of the '224 Patent in view of the ImPulse Select. Mr. McCombs contacted Mr. Kareken around Christmas time because AirSep had designed a new valve and wanted to ensure that it did not infringe the '224 Patent. This third valve, designed by AirSep, has a central conical section and uses an O-ring for purposes of closing a valve seat, where the 0.0135″ restriction is located. The valve seat thickness is ten thousandths of an inch or ten mils.[294] In view of the change to the device, AirSep requested that Mr. Kareken look at it and opine whether the change would alter his earlier opinion.[295] Mr. Kareken's second opinion, which was dated February 2, 1999, was that the modification, in the form of the third valve,[296] did not change his earlier opinion that the ImPulse Select did not infringe the '224 Patent.[297] The supplemental opinion was also not qualified in any way and AirSep viewed the supplemental opinion to be as strong as the original opinion of non-infringement.[298]

**Third Valve Design, as depicted in PX 64.**

### iv. Definition of Bypass Valve

The EX 2000, the purported commercial embodiment of the '224 Patent, has a bypass valve located under a switch and above a port. This valve has an inlet, an outlet, a valve seal, a valve seat, and a valve actuator.[299] A valve seat is a part of any valve,[300] the elements of which include

291. Priest Tr. 2/9:49.

292. Priest Tr. 2/9:50.

293. Kareken 2/11:123.

294. Bliss Tr. 2/8:82; Alessi Tr. 2/8:207. Ten mils is approximately the thickness of three human hairs. Bliss Tr. 2/8:82.

295. Priest Tr. 2/9:50. AirSep provided Mr. Kareken with the necessary written materials to render an opinion. Priest Tr. 2/9:51.

296. Kareken Tr. 2/11:123-24; DX 56.

297. Priest Tr. 2/9:51; PX 14.

298. Priest Tr. 2/9:52.

299. Greene Tr. 2/7:89-90

300. Greene Tr. 2/7:117.

a valve stem actuating means, a plunger, a seat, an inlet and an outlet.[301] All valves must have an actuation means and something to interrupt or change the flow, as well as a sealing member[302] and a valve seat.[303] The EX 2000 valve seat and inlet duct are in series with the flow limiting valve.[304] The lower O-ring, valve stem and seal assembly are part of bypass valve 30 of the '224 Patent and are in series with the flow limiting valve.[305] The upper O-ring, valve bonnet and valve stem are also components of the bypass valve assembly.[306]

All valves are sized with a flow coefficient.[307] Flow coefficient, the $C_v$, is a measure of how much flow will go through a valve; the higher the $C_v$, the more flow passes through the valve.[308] For a flow restrictor in series with a bypass valve, the flow restrictor would have to be experimented with to obtain the desired flow rate within plus or minus ten percent.[309]

### v. Claim Construction Testimony

"Integral" means "rigidly connected to" or "sharing components with" another part.[310]

### vi. The ImPulse Select's Bypass Valve

The 0.0135 inch diameter orifice of the ImPulse Select bypass valve seat is a "fixed orifice flow restrictor"[311] and therefore a "flow restricting means" within the meaning of that language in claim 1 of the '224 patent.[312] There is no restrictor in the accused device's bypass path that is not a component part of the bypass valve.[313] Rather, the structure in the ImPulse Select that restricts flow is the bypass valve itself.[314] AirSep's technical expert, Sam Kumar, testified that the bypass circuit serves the functions of controlling both the existence (on/off) and rate of flow through it.[315] Thus, it satisfies two elements of claim 1 of the '224 patent,[316] leaving the question whether the means for controlling flow in the binary (on/off) sense is in series with the flow restricting means.

The location of the flow restricting orifice in the bypass circuit does not affect the function of, way of operating, or result provided by the 0.0135 inch diameter orifice. The same size orifice spaced from or at the valve outlet results in the same flow rate.[317] To demonstrate this, a test was performed on the bypass valve to determine the effect of varying the valve seat length. This test was performed by setting up a compressed gas oxygen cylinder and placing an ImPulse Select 20 psi regulator on the cylinder, and an MKS flow meter device was attached to the regulator through tubing.[318] The bypass valves with the varying length valve seats were then inserted into the regulator, the oxygen cylinder was opened and the bypass valve

301. Bliss Tr. 2/8:52.

302. Bliss Tr. 2/8:59.

303. Bliss Tr. 2/8:60. All valves also have an inlet and an outlet. *Id.*

304. Good Tr. 2/10:109; DX 38; DX 39.

305. Good Tr. 2/10:110, 111; DX 38; DX 39.

306. Good Tr. 2/10:111, 112; DX 38; DX 39.

307. Bliss Tr. 2/8:60.

308. Bliss Tr. 2/8:61.

309. Bliss Tr. 2/8:62-63.

310. Good Tr. 2/10:87.

311. Kumar Tr. 2/11:60-61; PX 24, '224 patent, col. 5, ll. 46-50.

312. Alessi Tr. 2/8:209-210, l. 7.

313. Bliss Tr. 2/8:49.

314. Hunter Tr. 2/10:33. Mr. Hunter did not open up the bypass valve but assumed that inside there was an orifice that restricted the flow. Hunter Tr. 2/10:33-34.

315. Kumar Tr. 2/11:57.

316. Greene Tr. 2/7:63-64.

317. Alessi Tr. 2/9:164-168; Kumar Tr. 2/11:56-57, 58.

318. Alessi Tr. 2/9:159.

engaged.[319] The pressure upstream of the bypass valve was held constant. Thirty-three valves, three valves of each valve seat length, were tested with the flow meter for the test to give a better representation of how the valve would operate.[320] A graph was created from the data obtained, which shows that the change in the valve seat length had no impact on the flow rate.[321]

The logical conclusion, then, is that, in the AirSep bypass valve, all of the pressure drop takes place at the entrance to the valve seat[322] and, therefore, the depth of the valve seat does not contribute to the restriction in flow occurring at the entrance to the valve seat.[323] The orifice still controls all flow in the bypass circuit and works the same as when located spaced from the bypass valve.[324]

The constituent salient elements of the bypass valve, that is, the valve sealing member, a valve seat, an inlet, an outlet, and actuator are in series with one another.[325] Accordingly, taken in consideration, with the finding that the thickness or remoteness of the orifice makes no difference in gas flow, it is evident that an orifice for restricting flow through the bypass circuit does not have to be separate from the bypass valve to be in series with the bypass valve. Because flow goes through most of the valve before it enters

the orifice (and then flows only through the orifice), the orifice is in series with the rest of the valve because they are in the same flow path. Otherwise, they have to would be in parallel or not connected at all.[326] Thus, while I agree that the accused device's valve plunger and seal are constituent parts of the bypass valve, but do not and can not constitute the entirety of a valve,[327] I must conclude that when the ImPulse Select bypass valve is open, the remainder of the bypass valve is in series with the valve seat or microduct.[328]

### vii. AirSep's Patents and Patent Applications

AirSep began discussions with Mr. Kareken regarding patenting a number of features of the ImPulse Select OCD because it wanted to protect the aesthetics of the device, its delivery mode selectability, and its newly designed bypass valve.[329] Accordingly, AirSep decided to go forward with the preparation of a design patent and two utility patent applications directed to the aesthetics and technology employed by the ImPulse Select and the bypass valve.[330]

The design patent application was filed on October 27, 1998, and the design patent issued as D 418,559 on January 4, 2000. AirSep is the assignee of that patent. The '224 Patent was disclosed to the U.S. Pat-

**319.** Alessi Tr. 2/9:160.

**320.** Alessi Tr. 2/9:161. The results of the test are embodied in Defendant's Exhibit 27. Alessi Tr. 2/9:160.

**321.** Alessi Tr. 2/9:162. Assuming an application of constant pressure across the valve, controlled variance of the thickness of the valve seat, and a resultant, constant flow of two liters per minute as the thickness of the valve seat was varied, the conclusion must be that the incremental changes in thickness did not change or contribute to the resistance to the flow. Bliss Tr. 2/8:79-80.

**322.** Kumar Tr. 2/10:262, 266.

**323.** Kumar 2/10:265-69.

**324.** Alessi Tr. 2/9:164-68.

**325.** Bliss Tr. 2/8:73.

**326.** Hunter Tr. 2/10:34-36.

**327.** Bliss Tr. 2/8:76.

**328.** McCombs Tr. 2/8:253-54. I note that, during his direct examination concerning infringement under the doctrine of equivalents, AirSep's technical expert, Sam Kumar, could not articulate any functional or structural differences between the ImPulse Select and the claims of the '224 patent other than the assumption that the bypass valve and flow restrictor should be separate structures. Kumar Tr. 2/10:270-72.

**329.** Priest Tr. 2/9:52-53.

**330.** Priest Tr. 2/9:53, 57.

ent and Trademark Office during the prosecution of D 418,559.[331] This patent shows, according to AirSep's Mr. Priest, that the Patent Office found the design of the ImPulse Select to be unique in terms of the way the ImPulse Select looks and is evidence that tends to rebut the charge that Air Sep simply copied the Sunrise EX 2000 outright.[332]

The provisional patent application directed to the technology employed by the ImPulse Select was filed on October 21, 1998, and assigned serial number 60/105,-055.[333] The application was converted to a utility patent application on October 19, 1999.[334] It was assigned serial number 09/420,826 and was pending as of the time of the preliminary injunction hearing.[335] The utility patent application directed to the bypass valve was filed on May 5, 1999, and was assigned serial number 09/305,-604.[336] This utility patent application was also pending as of the time of the hearing.[337] In this patent application, the 0.0135 orifice was referred to as a "microduct" and not a "valve seat."[338] The patent application correctly states that the microduct controls the rate of flow through the bypass valve.[339]

**viii. AirSep's Testing of the EX 2000.**

Joe Priest supplied Norm McCombs with a DeVilbiss unit in August of 1997,[340]

AirSep having purchased an EX 2000 device that month to review it.[341] AirSep periodically purchases or otherwise obtains samples of competitors' products,[342] the primary purpose of which is to educate AirSep's sales force as to the features and benefits of an AirSep product as compared with those of its competitors so that the sales force can more effectively sell AirSep's product to its customers.[343] AirSep tests the competing products to make sure they perform as advertised and communicates the results to its sales department.[344]

AirSep evaluated the DeVilbiss EX 2000 product by making visual observations and opening up the housing.[345] AirSep observed that the DeVilbiss device did not have any way of incorporating a volume of oxygen in the device; because of that, the EX 2000 operated at a higher pressure than that used by AirSep.[346] The testing of the DeVilbiss unit had no effect on the design of the ImPulse Select because the ImPulse Select utilizes much of the technology and features of the original ImPulse.[347] AirSep therefore did not incorporate features of the DeVilbiss PulseDose OCD into the new generation ImPulse,[348] but added additional features such as extending the battery life and including additional modes of delivery.[349]

---

331. Priest Tr. 2/9:54; PX 15.

332. Priest Tr. 2/9:127.

333. Priest Tr. 2/9:59; PX 17.

334. Priest Tr. 2/9:61; Stipulation by Counsel; PX 18.

335. Priest Tr. 2/9:61-62.

336. Priest Tr. 2/9:58; PX 16; McCombs Tr. 2/8:249-50.

337. Priest Tr. 2/9:60.

338. McCombs Tr. 2/8:250-51.

339. McCombs Tr. 2/8:253.

340. McCombs Tr. 2/8:235-36.

341. Priest Tr. 2/9:42-43.

342. Priest Tr. 2/9:41-42; Mizerkiewicz Tr. 2/9:145.

343. Priest 2/9:42.

344. Mizerkiewicz Tr. 2/9:145.

345. McCombs Tr. 2/8:236, 238.

346. McCombs Tr. 2/8:236.

347. Mizerkiewicz Tr. 2/9:146.

348. Mizerkiewicz Tr. 2/9:152. "DeVilbiss setting" is a shorthand for pulsing on every breath. Alessi Tr. 2/8:192.

349. Mizerkiewicz Tr. 2/9:147

### ix. The Bench Study Article and Comparison of the EX 2000 to the ImPulse Select

Figure 3 of Mr. Bliss' article from *Respiratory Care* shows four devices with dose periods less than one second: the ImPulse Select, the Oxymatic 301, the EX-2000, and the O2 Advantage.[350] These devices were tested with a mechanical lung to ensure a level playing field.[351] Figure 4 of Mr. Bliss' article shows that the use of the ImPulse Select in mode "A", the intermittent mode, provides a lower fraction of inspired oxygen at all respiratory rates. The use of the ImPulse Select in mode "B", the "every breath" mode, also provides a lower fraction of inspired oxygen for respiratory rates below 16 breaths/min. Figure 5 of the article shows that the use of the ImPulse Select in either mode A or B provides greater oxygen use efficiency than the remainder of the devices tested.[352] The first four devices on the graph, including the ImPulse Select A and B and the EX 2000, are all operating at or near a hundred percent efficiency, within the experimental error.[353]

Fig. 3. Oxygen delivery flow profile for each demand oxygen delivery system (DODS) model, measured at a setting of 2, respiratory rate = 20/min, and inspiratory-expiratory ratio (I-E) = 1:2. The ImPulse Select model DODS has 2 modes (A and B).

**350.** PX 37, PX 147. *See also supra,* § F(2)(a)(vi).

**351.** Bliss Tr. 2/8:16.

**352.** PX 37, Tab 2.

**353.** Bliss Tr. 2/8:140. The error analysis is not a part of the Bench Study article because it would have added unnecessary length. Bliss Tr. 2/8:140.

Fig. 4. Fraction of inspired oxygen ($F_{IO_2}$) measured for each demand oxygen delivery system (DODS) model and continuous flow oxygen (CFO) during the 3 breathing patterns shown in Fig. 2, as driven by the linked ventilator. Continuous flow oxygen (CFO) was set at 2 L/min, and the DODS models were set at 2.

Fig. 5. Calculated oxygen use efficiency for 7 demand oxygen delivery system models and continuous flow oxygen.

### x. Sunrise's Testing of the Accused Device to Determine Infringement

Mr. Hunter was the only Sunrise employee to analyze the accused device and compare the device to the claims of the '224 Patent.[354] Mr. Hunter's understanding of the claims of the '224 Patent is his alone.[355] Mr. Hunter is not a patent attorney,[356] and did not discuss the claim interpretation used in the memorandum with Dr. Greene or any patent counsel before performing the analysis.[357] Further, Mr.

354. Greene Tr. 2/7:62, 107.

355. Hunter Tr. 2/10:13.

356. Greene Tr. 2/7:107; Hunter Tr. 2/9:244.

357. Greene Tr. 2/7:108; Hunter Tr. 2/10:13, 21.

Hunter did not receive any guidance from anybody as to how to evaluate and test the ImPulse Select.[358] Nevertheless, Mr. Hunter felt comfortable and qualified to perform the testing and evaluation of the Air-Sep unit and compare it to the claims of the '224 Patent in a "non-legalistic" way.[359]

### 3. Validity

#### a. The '303 Patent

#### i. The Disclaimer

United States Patent No. 4,484,578 ("the '578 patent") is a continuation of the '303 patent. As such, its specification is identical to that of the '303 patent.[360] Moreover, the '578 patent was examined and allowed by the same primary examiner as the '303 patent.[361] The '578 patent, which expires after the '303 patent, has never been asserted against AirSep in this lawsuit.[362] Claim 23 of the '578 patent has been disclaimed in its entirety[363] as too broad or otherwise invalid.[364] This disclaimer was filed to prevent the '578 Patent from extending the life of the '303 Patent.[365] Claim 3 of the '303 Patent and Claim 23 of the '528 Patent are identical, with the exception of the word "consecutive" versus "successive." Greene Tr. 2/7:82. The words "consecutive" and "successive" refer to the same concept, for purposes of claim construction.[366] Sunrise admits that claim 23 of the '578 patent may well have been invalid before the disclaimer due to double patenting, but asserts that such double patenting does not affect the validity of the first-to-expire, '303 patent.[367]

#### ii. One of Ordinary Skill in the Art

One of ordinary skill in the art would have a knowledge of fluidics and the knowledge that fluidic components can be used as timers for medical applications.[368] A person in the mid-1970s interested in designing an OCD system would have desired a device that conserves gas and increases the efficiency of the oxygen fed to a patient. The circuit of the Smith reference is relatively general in nature and can be modified to come up with a variety of different systems.[369]

#### iii. The Combination of U.S. Patent No. 2,766,752 (Meidenbaur) and Respiratory Care Applications for Fluidics by Richard K. Smith, Respiratory Therapy, May/June 1973

U.S. Patent Number 2,766,752 ("the '752 patent") entitled "Apparatus for Supplying Gas for Respiration," was issued to P.E. Meidenbaur, Jr. on October 16, 1956 as the result of an application filed November 28, 1952.[370] It discloses two embodiments, neither making use of a timer nor a timing means.[371] The embodiment of the '752 patent first relied upon by AirSep at trial and described with reference to Figs. 6 to 8 is a "rebreather" device in which all of the oxygen supplied to the user is drawn from the oxygen tank. No oxygen from the air is supplied to the user.[372] Thus, use of this embodiment is not a method of "supplying *supplemental* dosages of respirating

358. Hunter Tr. 2/10:15.

359. Hunter Tr. 2/10:20.

360. PX 156.

361. *Compare* PX 1 *with* PX 156; 71, 122.

362. Greene Tr. 2/7:123.

363. Greene Tr. 2/7:80, 122-23.

364. DX 53; Greene Tr. 2/7:80-81.

365. Greene Tr. 2/7:123.

366. As I noted at the hearing, to the extent there is a semantic difference as applied to these facts, it is a Jesuitical one. Judicial Notice, Greene Tr. 2/7:83.

367. Dkt. no. 82, at 11 (responsive brief).

368. Kumar Tr. 2/10:240.

369. Kumar Tr. 2/10:244.

370. Kumar Tr. 2/10:231, DX 49.

371. Greene Tr. 2/7:236.

372. DX 49, col. 7, l. 10 - col. 11, l. 21.

gas."[373] The '752 patent discloses another embodiment described with reference to Figs. 1 to 4 which supplies oxygen during the entire inspiration period without using a timer.[374] This patent constitutes prior art under 35 U.S.C. §102(a).

The '752 Patent, in its second embodiment, teaches one of ordinary skill in the art a method of supplying supplemental dosages of respirating gas to a spontaneously breathing in vivo respiratory system having an inspiration period and an expiration period.[375] The '752 system starts off with an oxygen cylinder 10 to which a fitting 11 is connected. A regulator reduces the cylinder pressure from 2,000 or 2,200 lbs. down to 45 to 50 psi. The oxygen then goes through the passage to elements 14, 15, 16, and 18, where a bypass valve and an orifice are located. Orifice 21 feeds into a predetermined volume 22.[376] The '752 patent, in either embodiment, relies on orifice 21 as shown in Fig. 5 to pass oxygen from chamber 14 to chamber 18 at a controlled rate. The flow through this orifice will take place any time the pressure drop across the orifice is not equalized.[377]

**373.** Kumar Tr. 2/11:69; PX 1, claim 3, first line.

**374.** Kumar Tr. 2/10:236; DX 49, col. 2, l. 59 - col. 7, l. 6.

**375.** Kumar Tr. 2/10:231-32.

**376.** Kumar Tr. 2/10:232; DX 49.

**377.** Kumar Tr. 2/11:79; Bliss Tr. 2/11:128-36.

The '752 OCD has an inlet and an outlet which is connected to a patient through a device that is similar to a cannula. With this device, the patient can cover his mouth and nose and breathe through a mask. The purpose of the '752 device is to deliver a dose of oxygen to the patient based on his respiratory effort. When the patient begins breathing, his breath is sensed in demand chamber 31. As the negative pressure is established, the diaphragm in demand chamber 31 starts to move, causing a connecting rod to tip a seal and open an inlet that is normally shut. As soon as the seal is tipped, a predetermined volume of oxygen stored in passage 22 is instantly delivered to the patient.[378] As the patient keeps inspiring,

**378.** Kumar Tr. 2/10:233; DX 49.

negative pressure stays in the demand chamber and the diaphragm keeps moving.[379]

Oxygen flow, however, slows because the volume in 22 is exhausted. The restrictor 21 retards further flow into chamber 22 so that substantial quantities of oxygen are not passed on to the patient, even during the remainder of inspiration, except for whatever gas can pass through the restrictor during that time. Thus, the diaphragm keeps moving under negative pressure until it hits a hammer-like piece which opens the device to allow atmospheric air to pass through to the patient. Thus, in the '752 OCD, the patient gets only a predetermined quantity of oxygen, the vast majority of it for a short period of time, while receiving mostly atmospheric air for the remainder of the inspiration effort.[380]

In the operation of either embodiment of the '752 patent, during the expiration period when the demand valve is closed, oxygen accumulates in the medium pressure demand storage chamber 22. The volume of gas accumulated (at standard pressure and temperature) is nine cubic inches of oxygen.[381] Thus, if a three-second breathing cycle is assumed (one second inspiration and two seconds expiration) the flow rate through orifice 21 must average 4.5 cubic inches per second (9 cubic inches divided by 2 seconds equals 4.5 cubic inches per second). When the demand valve 45 opens to release the nine cubic inches of oxygen accumulated during the expiration period, the pressure across the orifice 21 will lower and flow will continue through the orifice 21 for the remainder of the inspiration period at a rate *at least* 4.5

cubic inches per second. Orifice 21 merely retards the flow during inhalation by the user.[382] Oxygen is supplied through orifice 21 to the user of the '752 apparatus during the entire inspiration period.[383]

Moreover, as the breathing rate increases, the amount of oxygen supplied to the user by the apparatus of the '752 patent cannot increase beyond the fixed rate permitted by orifice 21.[384] This is a characteristic of oxygen management systems that do not use a timer to control a high flow rate $R_1$ pulse of oxygen. The best illustration of this behavior is Figure 4 of Bliss and McCoy, "A Bench Study Comparison of Demand Oxygen Delivery Systems and Continuous Flow Oxygen," *Respiratory Care,* August 1999, Vol. 44, No 8.[385] As the breathing rate increases for the systems that use a timer (the EX 2000, the ImPulse Select and the Oxymatic 301), the oxygen delivered per breath remains substantially constant. All the other devices supply decreasing amounts of oxygen per breath as the breathing rate increases.[386] Claim 3 of the '303 Patent does not require a uniform supply of oxygen from breath to breath as the breathing rate increases, but it does require "at least as great a rise in the partial pressure of said gas in blood interfacing with said respiratory system" as would be provided by continuous flow gas delivery.

The '752 Patent teaches one of ordinary skill in the art an inspiration period being of a duration $T_2$ during which period a negative pressure relative to ambient pressure exists in an vivo respiratory system at the location at which respirating gas is introduced to said system.[387] In the '752 Patent, for the inspiration period $T_2$, a

---

**379.** Kumar Tr. 2/10:234; DX 49.

**380.** Kumar Tr. 2/10:234; DX 49.

**381.** Bliss Tr. 2/11:128-36; DX 49, col. 5, ll. 45-49 ("approx. 9 cubic inches of oxygen at atmospheric pressure").

**382.** Bliss Tr. 2/11:128-36; DX 49, col. 5, ll. 51-57.

**383.** Bliss Tr. 2/11:131-32, 135-36.

**384.** Bliss Tr. 2/11:133; Bliss Tr. 2/8:19-20.

**385.** Bliss Tr. 2/8:19-20; PX 37, Tab. 2.

**386.** Bliss Tr. 2/8:19-20.

**387.** Kumar Tr. 2/10:234.

negative pressure relative to atmospheric exists in the demand chamber, which continues as long as the inspiration effort lasts.[388] The inspiration period $T_2$ is also the only time oxygen is supplied.[389] The '752 Patent will not allow a pulse of oxygen beyond the inspiratory effort, *i.e.*, into the expiratory effort of the breathing cycle, because the diaphragm and the connecting rod will go back to its original position and shut off the air flow as soon as positive pressure is sensed.[390]

The '752 Patent also teaches to one of ordinary skill in the art an expiration period comprising a positive pressure relative to ambient pressure existing in an vivo respiratory system at the location at which respirating gas is introduced to that system. When the patient using the '752 Patented device starts to exhale, the positive pressure is sensed.[391]

The '752 Patent further teaches one of ordinary skill in the art the step of sensing initiation of the inspiration period. Once negative pressure is sensed, the diaphragm starts to move; this is the sensing mechanism.[392]

In the '752 Patent, before sensing starts, the valve seat is closed and no oxygen is being fed. Inhalation must occur in order for the diaphragm to move and release the oxygen. Thus, the '752 Patent teaches to one of ordinary skill in the art the step of supplying immediately in response to said sensed inspiration a dose of respirating gas to an in vivo respiratory system.[393]

The '752 Patent also teaches one of ordinary skill in the art said dose being supplied substantially at the beginning of said sensed inspiration, said dose of gas being supplied at a rate $R_1$. The rate $R_1$ is delivered by the captured volume of gas in the volume 22. That captured volume or dose is supplied substantially at the beginning of the inspiration cycle.[394] Although the volume of oxygen delivered in the '752 Patent is predetermined, that patent does not teach variable timing, however.[395]

The article entitled Respiratory Care applications for Fluidics by R. K. Smith was published in the Respiratory Therapy Magazine in May/June of 1973.[396] This also constitutes prior art under 35 U.S.C. §102(a).

The Smith reference generally teaches how to use different fluidic components that can be used in a circuit to be able to sense a patient's inhalation pressure and initiate oxygen flow to the patient. It also teaches how to build a timer either on the inspiratory or expiratory side so that one can vary the time using a variable needle valve. The Smith reference discloses that a sensor would be attached to a patient and its output fed another fluidic device called a flip-flop. The output of the flip-flop starts a valve that supplies oxygen, and the same signal that initiates the valve also is fed into a timer. One can set the timing with the variable needle valve so when the time expires, the signal will shut off the gas supply to the patient.[397]

388. Kumar Tr. 2/10:235; DX 49.

389. Kumar Tr. 2/10:23; DX 49.

390. Kumar Tr. 2/10:252.

391. Kumar Tr. 2/10:235.

392. Kumar Tr. 2/10:236.

393. Kumar Tr. 2/10:253.

394. Kumar Tr. 2/10:254.

395. Kumar Tr. 2/10:236.

396. Kumar Tr. 2/10:237; DX 50.

397. Kumar Tr. 2/10:240; DX 50.

*Figure 6: Shows a pressure-cycled circuit with two timers added in order to obtain both inspiration and expiration time override.*

The R.K. Smith article, however, teaches the use of fluidic timers in a ventilator system that supplies all of the patient's oxygen.[398] The Smith reference, like the rebreather embodiment of the '752 patent, does not disclose a method of "supplying supplemental dosages of respirating gas."[399] Moreover, in the various systems described in the article, oxygen is always provided for the entire inspiration period. The fluidic timers disclosed in the R.K. Smith article are used only to override the normal action of the fluidic circuit that awaits and responds to the patient's normal breathing cycle. Thus, if the patient fails to move from inspiration to expiration naturally or from expiration to inspiration naturally, the override timers activate the valve controlling the supply of oxygen to the patient.[400] The timers disclosed in the R.K. Smith article are connected into the fluidic circuit such that a pulse of oxygen less than the full inspiration period can never be supplied.[401]

The Smith reference further shows the use of a balloon as a variable capacitor,[402] such as Defendant's Exhibit 51, to function as a timing device.[403] Defendant's Exhibit 51 has a diaphragm or balloon-like structure which is sandwiched between two metallic parts that are dark in color. The diaphragm is the light-colored piece which has a tab that sticks out.[404]

398. Kumar Tr. 2/10:237.

399. Kumar Tr. 2/10:70-75.

400. Kumar Tr. 2/10:71-73; DX 50.

401. Kumar Tr. 2/11:73-74.

402. Kumar Tr. 2/10:238; DX 50.

403. Kumar Tr. 2/10:238; DX 50; DX 51. DX 51 is a physical exhibit consisting of the fluidic timer depicted in Fig. 7 of the Smith article.

404. Kumar Tr. 2/10:238-38; DX 51.

The Smith reference teaches one of ordinary skill in the art the step of using timing means, although not specifically to predetermine a duration $T_1$ for which a dose of respirating gas is to be supplied to an in vivo respiratory system.[405] The structure in the Smith reference that discloses the timing means is the variable resistor and variable (balloon) capacitor, while the timing means disclosed in the '303 Patent reference is a variable restrictor such as a needle valve and a variable capacitor such as an elastomeric balloon.[406]

The timing means disclosed by the Smith reference is structurally equivalent to but does not perform, for the reasons already discussed, the identical function of the timing means disclosed in the '303 Patent specification.[407] The Smith reference teaches one of ordinary skill in the art a structure which is equivalent to the elastomeric balloon and variable capacitance as disclosed in the '303 Patent. The structure in the Smith reference at Fig. 7 is the diaphragm which is sandwiched between the metal.[408] The diaphragm expands and contracts like a balloon because there is a small chamber where the diaphragm, which is made of a flexible membrane such as rubber, is located and in which it can move.[409]

The '752 Patent in combination with the Smith reference also hints at the idea of setting duration $T_1$ less than the duration $T_2$,[410] but, because the '752 Patent provides *some* oxygen during the entire inspiration and the timers in the Smith reference do not teach delivering oxygen only for a portion of inspiration, these two sources do not teach the concept outright. In addition, the '752 Patent provides a short burst of gas for technical, not therapeutic, reasons, so it does not show the motivation to employ that concept that the '303 Patent teaches. Thus, I conclude, contrary to Kumar's testimony, that the '752 Patent and the Smith reference do not teach one of ordinary skill in the art a pulse dose duration less than the total inspiratory effort.[411]

I also note that there is no simple way to take a fluidic timer from the R.K. Smith article and install it in the apparatus of the '752 patent. Even if somehow a timer were to be installed in the apparatus of the '752 patent, a true pulse dose system would not be provided because orifice 21 of the '752 patent would still allow a limited amount of oxygen to flow for the entire duration of inspiration, which would cease flowing only when expiration caused the diaphragm to move the rod and seal the valve, again trapping a predetermined volume to be delivered at the beginning of the next inspiration. The timers of the R.K. Smith article could not be used with the '752 patent without redesign and modification of the apparatus described in the '752 patent.[412]

There is also no factual evidence in the record of a suggestion in the prior art or other motivation for the person of ordinary

405. Kumar Tr. 2/10:239-40.

406. Kumar Tr. 2/10:241.

407. Kumar Tr. 2/10:241-42.

408. Kumar Tr. 2/10:242.

409. Kumar Tr. 2/10:243.

410. Kumar Tr. 2/10:251. Kumar's testimony, that the '752 Patent teaches that when inhalation is initiated, a dose of oxygen is given for short period of time which is less than the total inspiratory effort, Kumar Tr. 2/10:252, is demonstrably incorrect given that oxygen flows (albeit at a low rate) through the restrictor and into the demand chamber as long as inspiration continues. At most, it teaches a method akin to the CR50 OCD depicted in PX 147, Fig.3, which delivers a short burst of oxygen followed by a reduced flow for the rest of inspiration. That is not what the '303 Patent teaches.

411. Kumar Tr. 2/10:252. Because both the '752 patent and the R.K. Smith article teach apparati that supply oxygen during the full duration of inspiration, I must also conclude that neither suggests supplying oxygen for less than 0.25 of the inspiration period (claim 4) or less than 0.5 second (claim 5).

412. Kumar Tr. 2/11:86-88.

skill to pick and choose from the '752 patent and the R.K. Smith article to construct an apparatus, the operation of which would practice the method of claims 3 to 5 of the '303 patent.[413] Defendant claims that the motivation to one of ordinary skill in the art to combine the Meidenbaur and Smith references is that one who was trying to design an oxygen dosing system would look to Meidenbaur because that patent teaches the idea of giving doses of oxygen at the initiation of inspiratory effort and then shutting off the supply of oxygen for the remainder of inspiration.[414] The Meidenbaur system, however, is implemented in a 1950s style, which is cumbersome, non-portable and mechanical.[415] The Smith reference teaches an updated physical mechanism to accomplish the initiation and hints at how to go beyond curtailing the flow to shut off the gas supply altogether before the end of inspiration.[416] But again, even if one examined both of these pieces of prior art, there would be no motivation to produce a system that delivers the entire dose in a short burst at the beginning of inspiration, as defendant has pointed to no evidence that such a dosing protocol was desirable or had any commercial demand. As defendant's expert himself pointed out, although the '752 Patent and the Smith references were available, there was no commercial impetus to combine them, as medical companies in the 1970s were focusing on ventilators and oxygen concentrators. Portable oxygen delivery systems only became commercially important in the early 1980s.[417]

Moreover, the '752 patent and R.K. Smith article are no closer prior art than was before the patent examiner when the '303 patent application was submitted. The Auerbach *et al.* article cited by the examiner and explained at col. 1, ll. 9-26 of the '303 patent is as pertinent as the '752 patent. Like the '752 patent, in the devices tested by Auerbach, "the oxygen supplied for the full duration of the inspiration tend[ed] to commence with a surge in the pattern of flow."[418] The devices as disclosed in the '752 patent had been known in the art for years. The '303 patent also acknowledges that fluidic circuits had been employed in "prior art ventilators," of which the R.K. Smith article is merely one example,[419] and fluidic timing means had been available at least as early as the early 1970s. The dosing method set forth in claims 3 to 5 of the '303 patent, however, still remained for Dr. Durkan to invent in about 1980.[420]

### b. The '224 Patent

### i. One of Ordinary Skill in The Art

One of ordinary skill in the art is an imaginary person who has, at the time a product or a component is designed, access to all the records from the past, whether those records be patents or articles. In other words, one of ordinary skill in the art has a warehouse of information available to him or her to use to solve the particular problem in a particular field.[421] More specifically, in the time frame of 1994 through 1996, one of ordinary skill in the art of building or designing an oxygen delivery system would have at least the following attributes: some mechanical skills; exposure to basic pneumatic compo-

413. DX 49; DX 50.

414. Kumar Tr. 2/10:243-45.

415. Kumar Tr. 2/10:245.

416. Kumar Tr. 2/10:243-44. In addition, the Smith reference teaches that the fluidic components described can be used in systems such as air oxygen mixers, blood pump controls, tidal volume sensors, cardiac augmentation systems, liquid level controls and blood oxygenators. Kumar Tr. 2/10:244.

417. Kumar Tr. 2/11:98-99.

418. PX 1.

419. PX 1, col. 1, ll. 27-36.

420. Kumar Tr. 2/11:88-90.

421. Kumar Tr. 2/10:180.

nents such as regulator and compressor fittings, valves, solenoid valves, and tubing; three to five years of experience; knowledge of testing and flow and pressure sensing. A mechanical engineering degree would not be required.[422] In the art of oxygen delivery systems, one of ordinary skill in the art would know that the main consideration is to reduce weight and bulkiness, conserve oxygen and reduce power consumption.[423] In addition, a person of ordinary skill in the art would have some experience in building pneumatic manifolds.[424] Such a person would also be familiar with applications relative to oxygen delivery systems such as medical, scuba diving, mountain climbing and aviation.[425] This person could also have existed in the 1950s as well as the 1990s.[426]

### ii. The OMS 20/50 Reference (Claim 1)

The OMS 20/50 is an oxygen management system that is connected to a compressed oxygen cylinder and delivers a controlled flow of oxygen to a patient.[427] Sunrise manufactured and sold the OMS 20/50 OCD prior to developing the EX 2000 and prior to submitting a patent application, serial no. 651,273, directed to the technology of the EX 2000.[428] Sunrise sold the OMS device from the time Sunrise purchased PulsAir to about the summer of 1997.[429] The OMS 20/50 device constitutes prior art under 35 U.S.C. §102(a).[430]

The OMS 20/50 has a manifold,[431] into the back of which oxygen flows from the regulator.[432] There is an opening in that manifold where there is a fitting which connects to a regulator via tubing.[433] The connector on the input side of the OMS 20/50 was a very short, metallic rigid connector.[434] A tool or a wrench is needed to remove the OMS 20/50 from the regulator.[435] Attached to the manifold is a pulse valve, and there is also a path going to a bypass valve.[436] Oxygen comes out of either of the valves through an orifice into the output.[437] The OMS 20/50, as used with a yoke-type regulator, did not comprise a single manifold block but rather a manifold block for the OMS 20/50 and a separate manifold block for the regulator.[438]

The OMS 20/50 has a sensor that is responsive to inhalation,[439] and a high-pressure solenoid valve.[440] The OMS 20/50 also has a flow restrictor in series with a bypass valve, and a switch to open and close the bypass valve manually.[441] The OMS 20/50 employed internal tubes to con-

---

**422.** Kumar Tr. 2/10:181; Kumar Tr. 2/11:17.

**423.** Kumar Tr. 2/10:182.

**424.** Kumar Tr. 2/10:182-83.

**425.** Kumar Tr. 2/10:183.

**426.** Kumar Tr. 2/11:15.

**427.** Kumar Tr. 2/10:184.

**428.** Greene Tr. 2/7:40. PX 127 is an OMS 50 oxygen conserving device.

**429.** Greene Tr. 2/7:44. PulsAir sold the OMS 50 and the OMS 20 before Sunrise's purchase of PulsAir's assets in 1994. Greene Tr. 2/7:39-40.

**430.** DX 40; Greene Tr. 2/7:40, 49.

**431.** Good Tr. 2/10:70.

**432.** Hunter Tr. 2/10:6. A pressure regulator fastened to the oxygen cylinder is needed to allow the OMS 20/50 to function. Greene Tr. 2/7:96; Hunter Tr. 2/10:7. The regulator used with the OMS 20/50 has a pressure relief valve. Greene Tr. 2/7:96.

**433.** Good Tr. 2/10:71.

**434.** Good Tr. 2/10:72.

**435.** Good Tr. 2/10:73.

**436.** Greene Tr. 2/7:95.

**437.** Hunter Tr. 2/10:7.

**438.** Greene Tr. 2/7:40-41.

**439.** Greene Tr. 2/7:80; Hunter Tr. 2/9:246; Good Tr. 2/10:78.

**440.** Greene Tr. 2/7:95; Good Tr. 2/10:78.

**441.** Greene Tr. 2/7:95-96.

nect its various internal components.[442] The OMS 20/50 is attached to a regulator, either directly or through a flexible hose or other fittings.[443] The EX 2000, in contrast, is an OMS 20/50 with, among other innovations, an integral regulator.[444] It has a manifold block with various pneumatic passageways which eliminate the need for internal tubing for the conveyance of gas.[445]

The OMS 20/50 and the external regulators used with it, however, are separate devices. The OMS 20/50 can be used with many different regulators, including those which utilize long tubing to connect the OMS 20/50 to the regulator.[446] Sunrise did not make regulators for use with the OMS 20/50; instead, this OCD was used with regulators made by other companies.[447] Moreover, the OMS 20/50 did not have to be used with a yoke-type regulator which slides over the top of the post valve.[448] Thus, the OMS 20/50 does not include a regulator and a pressure relief valve as required by claim 1 of the '224 patent.[449]

In sum, the OMS 20/50 was not connected directly to an oxygen cylinder post and cannot be directly mounted on an oxygen cylinder post as required by claim 1 of the '224 patent.[450] Only the separate regulator was connected directly to the post.[451] Put in terms of the claims language, the OMS 20/50 does not have a manifold block having an opening adapted to receive an oxygen cylinder post, nor does it have any mating connection for an oxygen cylinder post, as required by claim 1 of the '224 patent.[452]

In addition, the prior art contains no specific suggestion that the combination of the OMS 20/50 and the yoke-type regulator be modified in the ways necessary to provide the subject matter set forth in claim 1.[453] Merely fusing the manifold block of the OMS 20/50 to the manifold block of the yoke-type regulator would not result in the subject matter of claim 1. Further modification would be required to mount the bypass valve on the manifold block to eliminate the tubing connections and replace the tubing with internal passageways. Still further, the compact arrangement of the element mounted on the donut-shaped manifold block would not have been provided.[454] Nor is any evidence of a motivation to combine and then modify the OMS 20/50 and yoke-type regulator found in the record. To the contrary, the OMS 20/50 as made had the capability of being used with many different regulators, a feature that was surrendered by the configuration of the EX 2000 made according to claim 1.[455]

Thus, I conclude that the OMS 20/50 device does not teach to one of ordinary skill in the art an oxygen management device adapted to be mounted on a post on a compressed oxygen cylinder for delivering a controlled flow of oxygen to a pa-

**442.** Greene Tr. 2/7:42-43.

**443.** Greene Tr. 2/7:97.

**444.** Hunter Tr. 2/10:7. The design project was for an integrated system consisting of an OMS 20/50 and a regulator. Good Tr. 2/10:51.

**445.** Good Tr. 2/10:57.

**446.** Kumar Tr. 2/11:37-39.

**447.** Greene Tr. 2/7:40-41.

**448.** The OMS 20/50 was connected to the external regulator through various adaptors including hoses. There are approximately 50 inventory part stocking numbers (SKUs) for the OMS 20/50 due to the various different regulators to which it could be attached. Greene Tr. 2/7:41-42.

**449.** Kumar Tr. 2/11:45-46.

**450.** Kumar Tr. 2/11:39-40.

**451.** Good Tr. 2/10:77.

**452.** Kumar Tr. 2/11:40.

**453.** DX 49; DX 50.

**454.** Kumar Tr. 2/10:39-41.

**455.** Greene Tr. 2/7:41-42.

tient.[456] Nor does the OMS 20/50 teach a *manifold block* having an opening adapted to receive a post on an oxygen cylinder.[457] In addition, the OMS 20/50 device does not teach a manifold block opening having an oxygen connection adapted to engage and seal to a mating connection on an oxygen tank post.[458]

The OMS 20/50 device also does not teach means for securing a manifold block to an oxygen cylinder post, although the design of a yoke-type regulator does. The threaded T-handle secures the yoke to the oxygen post,[459] and this arrangement would show a person skilled in the art how a manifold block could be similarly attached. The securing means described in the '224 specification at Column 4, lines 46 through 55, is also a T-shaped threaded handle, and the respective means disclosed in the patent specification and the regulator's T-handle perform the identical function.[460]

Moreover, the OMS 20/50 device does not teach to one of ordinary skill in the art a bypass valve on the manifold arranged in parallel with the solenoid-operated flow control valve. The OMS 20/50 does have a manual valve that switches the bypass valve and is arranged in parallel with the solenoid valve.[461] The OMS 20/50, however, has a bypass circuit comprising lengths of tubing external to the manifold block in which the bypass valve and flow restricting orifice were located.[462] Thus, it does not teach placing the bypass valve on the manifold block itself.

Neither the various pressure regulators used with the OMS 20/50, nor the OMS 20/50 device itself, teach to one of ordinary skill in the art a pressure regulating means on said manifold block for reducing the pressure of oxygen received from a cylinder to a predetermined low level.[463] The means disclosed in the '224 Patent specification at Column 4, line 66 through Column 4, line 7, is a pressure regulator 28 which reduces the relatively high pressure of gas from the gas cylinder 11 to a relatively low operating pressure. The structure of the pressure regulating means on the OMS 20/50 is the external regulator. The pressure regulating means on the OMS 20/50 and the means disclosed in the '224 Patent specification are structurally equivalent and perform an identical function,[464] but the key innovation is the placement of the regulator on the manifold block, making the device more compact and eliminating the need for external tubing. This is simply not shown by the OMS 20/50.

The OMS 20/50 device does teach to one of ordinary skill in the art an overpressure relief valve on the manifold block, although it is a distinctly "low-tech" means of implementing one. The flexible plastic tubing on the OMS 20/50 manifold will simply burst or come off in response to overpressurization.[465]

The OMS 20/50 device also teaches a solenoid-operated flow control valve on said manifold block arranged for initiating

**456.** *Contra* Kumar Tr. 2/10:184.

**457.** *Contra* Kumar Tr. 2/10:185. Kumar testified that the manifold block includes the regulator that is attached to the cylinder. Kumar Tr. 2/10:189. I reject this contention, as the OMS was a separate product from the regulator.

**458.** *Contra* Kumar Tr. 2/10:189-90. I recognize that the yoke-type regulator has an oxygen connection which is adapted to seal to a mating connection on the oxygen tank post. Kumar Tr. 2/10:190. But this is not a "manifold block opening" because the yoke is not a

manifold, except in the most degenerate sense that it connects the post to the regulator.

**459.** Kumar Tr. 2/10:190.

**460.** Kumar Tr. 2/10:191; PX 24.

**461.** Kumar Tr. 2/10:193.

**462.** Greene Tr. 2/7:42-43.

**463.** Kumar Tr. 2/10:191.

**464.** Kumar Tr. 2/10:192.

**465.** Kumar Tr. 2/10:192.

and interrupting the delivery of oxygen from the cylinder to a patient. The structure in the OMS 20/50 is a solenoid valve.[466]

The OMS 20/50 further teaches a flow restricting means in series with said by-pass valve limit said oxygen flow through said bypass valve. The flow restricting means in the OMS 20/50 consists of a small fitting which is screwed on to the manifold block; when this fitting is unscrewed, it reveals a restricting orifice.[467] This orifice is connected by tubing directly to the bypass valve.[468] The flow restricting means disclosed in the '224 Patent specification is a manually adjustable needle valve or a variable orifice. This orifice is structurally equivalent to the flow restricting means described in the '224 Patent.[469]

The OMS 20/50 device also teaches means for manually opening and closing the bypass valve. The means disclosed in the '224 Patent at Column 6, line 60 is valve stem 49 that operates the bypass valve.[470] The structure is a switch that pushes on a piston that opens and closes the bypass valve, while the structure on the OMS 20/50 is a toggle switch. The two respective switches are structurally equivalent and perform an identical function.[471]

The OMS 20/50 device teaches to one of ordinary skill in the art a control means responsive to inhalation by a patient for opening the solenoid-operated flow control valve to deliver a dose of oxygen to a patient.[472] The OMS 20/50 has a pressure transducer that senses the inhalation and triggers the solenoid valve, and the control means disclosed in the '224 Patent specification is a pressure sensor that senses inhalation and triggers the solenoid valve. The structure of the control means disclosed in the '224 Patent is structurally equivalent to the control means found on the OMS 20/50 and the structures perform an identical function.[473]

What the parties refer to as 510(k) notifications are submittals of engineering and clinical information which are provided to the FDA to permit that agency to assess the safety and effectiveness of a new product with regard to a predicate product which is already on the market.[474] Such a notification was submitted for the EX 2000 to allow the FDA to judge its safety and effectiveness relative to that of the OMS 20/50. In this document, Sunrise set forth that the EX 2000 provided the same safety and effectiveness as the OMS 20/50. The other differences between the OMS 20/50 and the EX 2000 were not included in the 510(k) because they were not essential to the demonstration of substantial equivalence for safety and effectiveness.[475]

Sunrise, in its 510(k) Notification to the Food and Drug Administration, stated that: "The PulseDose series devices are fundamentally repackaged versions of the OMS 20 and 50, DeVilbiss current oxygen management system. There are no significant changes in the materials or features. Therefore, based on the above-mentioned similarities, especially the dosage methodology, the PulseDose Series devices and

466. Kumar Tr. 2/10:193.

467. Kumar Tr. 2/10:194.

468. DX 45.

469. Kumar Tr. 2/10:194-95.

470. Kumar Tr. 2/10:195.

471. Kumar Tr. 2/10:196.

472. Kumar Tr. 2/10:196, 209.

473. Kumar Tr. 2/10:197.

474. Greene Tr. 2/7:55-56.

475. Greene Tr. 2/7:56-59. A 510(k) notification was not submitted for the ImPulse Select since the "effect and safety and intended use of the device did not change" from the ImPulse. Alessi Tr. 2/8:228-229. AirSep believed that the addition of the "B" mode did not change the manner of the delivery and conservation of oxygen to patients, and that the "ImPulse Select has the identical intended purpose, delivery and conservation of oxygen to ambulatory oxygen patients" as the ImPulse. Alessi Tr. 2/8:229-230.

the OMS 20 and 50 are substantially equivalent devices."[476] Sunrise also stated that "The gas dose methodology oxygen delivery specifications and performance of the device in the PulseDose series are identical to those of the OMS 20 and 50."[477] It further stated that: "Previous designs of the DeVilbiss OMS 50 and 20 had similar components except for the integral regulator and pressure relief."[478] Gregory Good, a Sunrise employee and one of the inventors named on the '224 Patent, verified to the FDA that these statements were true, accurate and complete.[479]

I place no reliance on the 510(k) notification. Its sole purpose was to demonstrate to the FDA that the EX 2000 was as safe and effective as the OMS 20 and 50. That purpose was accomplished without any discussion of the differences between the two devices as they relate to the '224 patent, as the only issue appears to have been the dosing methodology, something encompassed solely by the '303 patent. The '224 patent makes the EX 2000 a more space-efficient and user-friendly OCD, but simply has no effect on any phase of the OCD's operations that go to clinical safety and effectiveness.

### iii. The Combination of OMS 20/50 Reference and the European Patent (Claims 2-6)

The OMS 20/50 also lacks an annular housing enclosing the manifold block, as required by claim 2 of the '224 patent.[480] Instead, defendant relies upon French-language patent document EP 0629812,[481]

which discloses a cap for a gas cylinder with numerous openings including an opening cut out 12, an opening under handle 22, and opening to permit access to the filling coupling 25, and opening for access to the manometer 5, an opening for access to the medium pressure outlet 6 and an opening for the low pressure outlet 7.[482]

The European Patent teaches one of ordinary skill in the art an annular, doughnut-shaped housing around the integrated components enclosing the top of a gas cylinder, but the housing is nothing more than a glorified bottle cap. The patented device performs no function in the way of processing or delivering the gas, but appears merely to protect the top of the cylinder and provide for its hand-carryability. It is "annular" only to the extent that any aerosol cap is. Moreover, this annular housing, while it might from the drawings of the European patent be said to enclose a manifold block and pressure regulating means, does not enclose an overpressure relief valve, solenoid operated flow control valve, bypass valve, flow restrictor and control means, as required by claim 2 of the '224 patent.[483] Nor does the European patent teach an annular housing having an opening aligned with a manifold block opening and adapted to receive a post on an oxygen cylinder, because, in the gas cylinder depicted, there is no annular manifold block with such an opening; there is merely a post of some sort, and one different from those of the exhibits in this case.[484]

---

**476.** Greene Tr. 2/7:57; PX 154; PX 155.

**477.** Good Tr. 2/10:81; PX 154; PX 155.

**478.** Greene Tr. 2/7:58; PX 154; PX 155.

**479.** Good Tr. 2/10:79, 82-83.

**480.** Kumar Tr. 2/11:43-44.

**481.** DX 48. The European Patent was applied for on June 2, 1994 and claims priority to French patent application, 93 06644, that was

filed on June 3, 1993. The European Patent was published on December 21, 1994. The European Patent constitutes prior art under 35 U.S.C. §102(a).

**482.** Kumar Tr. 2/11:49, 52. AirSep's technical expert, Sam Kumar, did not understand the complete operation of EP 0629812. Kumar Tr. 2/10:213.

**483.** *Contra* Kumar Tr. 2/10:222.

**484.** Kumar Tr. 2/11:49-50.

FIG.1

FIG.4

The OMS 20/50 does not teach one of ordinary skill in the art an oxygen pressure gauge mounted on a manifold block and adapted to indicate the pressure of oxygen in the manifold block from an oxygen cylinder, because the OMS 20/50 contains no pressure gauge.[485] Instead, from simple visual inspection, it is obvious that the pressure gauge is mounted on the external regulator. Thus, I cannot agree with Mr. Kumar's expert opinion that Claim 3 of the '224 Patent is invalid in view of the OMS 20/50 device.[486]

The OMS 20/50 does teach one of ordinary skill in the art a knob extending from the housing for movement between first and second positions, as well as the means for opening a bypass valve when the knob is in the first position and for closing the bypass valve when the knob is in the second position. The knob, here represented by a toggle switch, when it is in one position, opens the valve, and in the other position, closes the bypass valve.[487] The opening means in the OMS 20/50 is a

485. *Contra* Kumar Tr. 2/10:223.

486. Kumar Tr. 2/10:223.

487. Kumar Tr. 2/10:224.

piston element, which is actuated by a cam switch; combined together, they open and close. The opening means disclosed in the '224 Patent is a sloping, lower can surface 50 as shown in Figure 8 of the patent. The sloping cam of the '224 Patent and the cam type of switch of the OMS 20/50 are structurally equivalent and perform an identical function.[488]

The OMS 20/50 device also teaches one of ordinary skill in the art a bypass valve having a valve stem movable between open and closed positions,[489] as well as a valve stem moved by the opening and closing means to the open position when the knob is moved to said first position and to the closed position when the knob is moved to the second position. The OMS has a valve stem, piston-like arrangement that moves from the open to the closed positions.[490]

The OMS 20/50 further teaches a means on the housing for selecting and indicating the effective pulse flow rate delivered to an inhaling patient by the solenoid-operated flow control valve. The OMS 20/50 has a switch on the housing that selects and indicates the dose rate and the means consist of the electronics to which the switch is connected, while the selecting and indicating means disclosed in the '224 Patent are a series of indicators consisting of light emitting diodes. The OMS 20/50 indicators and the selectors and indicators disclosed in the '224 Patent specification are structurally equivalent and perform an identical function.

**488.** Kumar Tr. 2/10:225-26.

**489.** In the '224 Patent the valve stem 49 is shown in Figure 8. Kumar Tr. 2/10:226.

**490.** Kumar Tr. 2/10:227.

**491.** Kumar Tr. 2/11:35-36; DX 46, '627 patent at col. 1, ll. 60-65 and col. 2, ll. 20-25. U.S. Patent Number 3,521,627 was issued to N. Norris Murray on July 28, 1970. Kumar Tr. 2/10:199. The filing date of the patent was January 23, 1968. Kumar Tr. 2/10:199. The '627 Patent constitutes prior art under 35 U.S.C. §102(a).

**492.** Kumar Tr. 2/10:200.

### iv. The Combination of the '627 Patent, the '881 Patent and the European Patent

U.S. Patent No. 3,521,627 ("the '627 patent") is entitled "Automatic Emergency Breathing Oxygen System for Aircraft." It is an emergency system for supplying oxygen for a short period of time when the main oxygen system fails or when an air crewmen ejects from the aircraft.[491]

The '627 Patent teaches one of ordinary skill in the art an oxygen management device adapted to be mounted on a post on a compressed oxygen cylinder for delivering a controlled flow of oxygen to a patient. The manifold can be adapted to receive an oxygen cylinder post for delivering a controlled flow of oxygen to a patient.[492] The cylinder post may be provided with various standard connection configurations, for example, with a conventional CGA 870 connection.[493] One of ordinary skill in the art at the time of the '224 invention would understand that various connection configurations would be oxygen posts with threaded posts, oxygen cylinders with regulators and gauges on them and a CGA type of connection. Such a hypothetical person would not be limited to the CGA 870 connection post.[494]

The '627 Patent teaches one of ordinary skill in the art a manifold block having an opening adapted to receive a post on an oxygen cylinder.[495] The '627 patent dis-

**493.** Kumar Tr. 2/11:19; PX 24.

**494.** Kumar Tr. 2/11:98.

**495.** Kumar Tr. 2/10:200-01. In DX 46, Figure 1, the two oxygen bottles are screwed into the manifold block at the place marked "3." Kumar Tr. 2/10:201. I am not unmindful of plaintiff's argument that this is not a "post" connection as required by claim 1 of the '224 patent because, first, an oxygen cylinder post includes a valve, PX 24, '224 patent, col. 4, ll. 57-62, and second, because the post-type oxygen cylinder can be filled remotely from the location of the manifold block, while the threaded neck connection disclosed in the '627 patent cannot be filled until connected to

closes oxygen supply bottles that have an open neck with external threads ('627 patent, Fig. 2, item 25) that turn into internal threads ('627 patent, Fig. 2, item 24) on a manifold block.

The '627 Patent also teaches a manifold block opening having an oxygen connection adapted to engage and seal to a mating connection on an oxygen tank post. With reference to Figure 2, the oxygen cylinder post 25 can be screwed into this manifold block which has inverted the opening 24.[496]

The '627 Patent further teaches one of ordinary skill in the art a means for secur-ing a manifold block to an oxygen cylinder post received by the opening, but not the same means disclosed in the '224 Patent, that is, a knob with a T-handle that se-cures the block to the manifold.[497] The structural components disclosed in the '627 Patent, in contrast, are the threaded post where the oxygen cylinder is screwed into the manifold.[498] These respective struc-tures are not structurally equivalent.[499]

the manifold block. Kumar Tr. 2/11:29-30. These differences would appear to be trivial and would not, in my estimation, prevent one skilled in the art from concluding that the '627 device could be adapted to a CGA 870 post. Moreover, the '224 patent itself does not limit itself to a CGA 870 post, but refers additionally to "various standard connection configurations[.]" PX 24, col. 4, ll. 57-59.

496. Kumar Tr. 2/10:201.

497. Kumar Tr. 2/10:202.

498. Kumar Tr. 2/10:202-03.

499. Kumar Tr. 2/10:203.

FIG. 2.

INVENTOR
NORRIS N. MURRAY
BY
ATTORNEY

The '627 Patent does teach a pressure regulating means on the manifold block for reducing the pressure of oxygen received from a cylinder to a predetermined low level. The structure in the '627 Patent is the pressure reducing means which reduces the pressure coming from the oxygen bottle to a lower pressure to go into the rest of the circuit, while the means disclosed in the '224 Patent specification is a pressure regulator which reduces the high pressure oxygen to a lower pressure level. The respective pressure regulating means are structurally equivalent and perform an identical function.[500]

The '627 patent, however, does not disclose an over-pressure relief valve on the manifold block.[501] The over-pressure relief valve is described in the specification of the '224 patent as a backup safety device to the pressure regulator set to limit pressures to less than 60 psi in the example given.[502] Instead, defendant relies upon the pressure relief valve 22 of Weigl U.S. Patent No. 3,903,881[503] for a showing of a

500. Kumar Tr. 2/10:203-04.

501. Kumar Tr. 2/10:204

502. PX 4, col. 5, ll. 10-19.

503. DX 47. U.S. Patent Number 3,903,881 was issued on September 9, 1975, and was filed on April 12, 1974. Kumar 2/10:205; DX 47. The '881 Patent constitutes prior art under 35 U.S.C. §102(a).

pressure relief valve. This overpressure relief valve is shown in Figure 1, which vents to the atmosphere and is mounted on manifold block 16.[504]

Valve 22 is not a backup safety device to a pressure regulator but is designed to protect the patient's lungs (rather than the equipment itself) from over-pressure.[505] Nevertheless, the '881 Patent teaches one of ordinary skill in the art an overpressure relief valve on a manifold block.[506] One of ordinary skill in the art would have the motivation to combine the '881 Patent and the '627 Patent because both references are similar respiratory applications. The two systems arose from similar types of problems, so one would have the motivation to look at both patents.[507]

The '627 Patent also teaches a solenoid-operated flow control valve on said manifold block arranged for initiating the delivery of oxygen from the cylinder to a patient. With reference to Figure 2, the '627 Patent shows the solenoid valve that is mounted in line with the pressure regulator and which has an inlet and an outlet in the solenoid function. The solenoid valve is arranged for initiating the delivery of oxygen.[508] The solenoid-operated control valve on the manifold block of the '627 patent, however, can be electrically opened but not electrically closed.[509] Therefore, it is not "arranged for interrupting the delivery of oxygen," as required by the '224 patent.[510]

Moreover, the '627 patent does not disclose a "bypass valve arranged in parallel with a solenoid-operated flow control valve." The fact that the solenoid-operated

valve disclosed in '627 patent can be manually opened does not convert the valve to a bypass valve arranged in parallel.[511] Whether opened electrically or manually, the solenoid valve in the '627 patent supplies oxygen at the same instantaneous flow rate. There is also no parallel flow path.[512] The bypass circuit of the '224 patent, in contrast, is in parallel with the solenoid-operated flow control valve, is arranged with a flow-restricting means and can provide a different instantaneous flow rate than the solenoid-operated flow control valve which it bypasses.[513]

The '627 patent, since it discloses no bypass valve, can likewise have no: (1) bypass valve on the manifold block arranged in parallel with the solenoid-operated flow control valve; nor (2) flow restricting means in series with the bypass valve to limit oxygen flow through the bypass valve; nor (3) means for manually opening and closing said bypass valve.[514] Finally, the '627 patent does not disclose a "control means responsive to inhalation by a patient for opening said solenoid operated flow control valve to deliver a dose of oxygen to a patient."[515]

The OMS 20/50, however, teaches one of ordinary skill in the art a control means responsive to inhalation by a patient for opening said solenoid operated flow control valve to deliver a dose of oxygen to a patient.[516] The OMS 20/50 discloses a pressure sensor as the control means, which is the same control means disclosed in the '224 Patent The respective means are structurally equivalent and perform an

504. Kumar Tr. 2/10:206.

505. Fig. 1 of DX 47; DX 47, col. 4, ll. 21-24.

506. Kumar Tr. 2/10:205.

507. Kumar Tr. 2/10:206.

508. Kumar Tr. 2/10:206-07.

509. Kumar Tr. 2/11:24-26.

510. Kumar Tr. 2/11:26-27.

511. Kumar Tr. 2/11:27-29.

512. Kumar Tr. 2/11:27-28.

513. Kumar Tr. 2/11:32.

514. Kumar Tr. 2/11:27-31.

515. Kumar Tr. 2/11:32-33.

516. Kumar Tr. 2/10:209.

412

identical function.[517]

Claim 2 of the '224 patent is dependent on claim 1. In addition to the elements of claim 1, the subject matter of claim 2 includes: (1) an annular housing enclosing said manifold block, said pressure regulating means, said over-pressure relief valve, said solenoid-operated flow control valve, said bypass valve, said flow restrictor and said control means, and (2) wherein said annular housing has an opening aligned with said manifold block opening and adapted to receive a post on an oxygen cylinder.[518] Mr. Kumar's professional and expert opinion is that Claim 2 of the '224 Patent is invalid in view of the OMS 20/50 device, the '627 Patent, the '881 Patent, and the European Patent.[519]

I agree that one of ordinary skill in the art would be motivated to combine these references because the '627 Patent teaches about integrating components and it solves the problems of having individual components loosely assembled. The European Patent shows that the integrated components could be assembled and put into a doughnut shaped housing. The '881 Patent has structures similar to those of the '627 Patent, so one of ordinary skill in the art would be motivated to combine the references.[520]

The '627 Patent teaches one of ordinary skill in the art an oxygen pressure gauge mounted on said manifold block and adapted to indicate the pressure of oxygen in said manifold block from an oxygen cylinder; the specification describes a pressure gauge 27 mounted on the manifold.[521]

The '627 Patent also teaches one of ordinary skill in the art a knob extending from the housing for movement between first and second positions. The '627 Patent describes a pin that comes out of the central plunger of this valve and which is equivalent to a knob. The '627 Patent further teaches a means for opening the bypass valve when the knob is in the first position and for closing the bypass valve when the knob is in the second position. When the knob of the '627 Patent is pushed in, it is in the first position where it is closed. When the knob is pulled, it is in the second position where the valve is open.[522] The means for opening and closing the bypass valve disclosed in the '224 Patent is a knob that opens and closes, which is structurally equivalent to the '627 Patent mechanism for opening and closing the bypass valve and performs an identical function.[523] Mr. Kumar's expert opinion is that Claim 4 of the '224 Patent is invalid in view of the '627 Patent, the '881 Patent, and the European Patent.[524]

The '627 Patent also teaches a bypass valve that has a valve stem movable between opened and closed positions, disclosing a valve stem 40 that can go from closed to open.[525] The '627 Patent likewise teaches a valve stem that is moved by the opening and closing means to the open position when the knob is moved to the first position and to the closed position when the knob is moved to a second position. In the '627 Patent, the first position is when the knob is pulled and the valve is open. The knob is detented such that when the knob is pushed back in, it goes to the other detent in the closed position. Mr. Kumar's expert opinion is that Claim 5 of the '224 Patent is invalid in view of the '627 Patent.[526]

517. Kumar Tr. 2/10:210.

518. PX 24.

519. Kumar Tr. 2/10:215.

520. Kumar Tr. 2/10:216

521. Kumar Tr. 2/10:216.

522. Kumar Tr. 2/10:217.

523. Kumar Tr. 2/10:218.

524. Kumar Tr. 2/10:220.

525. Kumar Tr. 2/10:218.

526. Kumar Tr. 2/10:219.

### v. Other Indicia of Obviousness

Sunrise also did not adduce any direct technical evidence, testimonial (expert or lay) or documentary, showing that the '303 Patent or the '224 Patent are not invalid.[527] Specifically, Mr. Bliss, in the direct and rebuttal testimony elicited by Sunrise, did not opine that the '303 Patent or the '224 Patent were valid, whether or not over the references cited against validity by Air-Sep.[528] Nevertheless, when the EX 2000 manufactured according to claim 1 of the '224 patent was introduced to the market, it was an instant commercial success, immediately replacing the OMS 20/50.[529]

Sunrise sold approximately 4,000 oxygen conserver units from July to December 1996 (Q1 and Q2 of FY97), the six-month period preceding the introduction of the EX 2000. These units comprised OMS 20/50 products.[530] Sunrise sold approximately 4,000 oxygen conserver units in the period January to March 1997 (Q3 of FY97), of which about 95% were EX 2000 units.[531] Sunrise sold approximately 8,000 oxygen conserver units in the period April to June 1997 (Q4 of FY97) and the number increased steadily to over 10,000 for the period July to September 1997 (Q1 of FY 98), almost all of which were EX 2000 units.[532] Thus, the EX 2000 was a tremendous commercial success.[533]

Moreover, those of ordinary skill in the art were in place all during the period of time the OMS 20/50 was being marketed but none proposed the subject matter set forth in claim 1.[534] Finally, the need for portability of respirator devices did not suddenly arise at the time of the invention set forth in the '224 patent, but had existed for years.[535]

### c. Sunrise's Patent Search -- EX 2000

Oliver Todd, Sunrise's patent counsel, performed a patent search with respect to the application of the EX 2000.[536] Some of the patents revealed in the search and reviewed by Todd were those of Dr. Tiep. and Puritan Bennett.[537]

### 4. Enforceability

### a. Patent Misuse -- The Puritan Bennett License -- The '303 Patent

Sunrise has not engaged in a pattern of licensing its products.[538] Prior to the introduction of the EX 2000, Sunrise had investigated the possibility of licensing the '303 patent, but had at that time only a small share of the OCD market.[539] PulsAir Anstalt sued Puritan-Bennett for infringement of a number of patents, including the '303 patent. This lawsuit was pending when Sunrise purchased the assets of PulsAir Anstalt,[540] but Sunrise settled it in 1995. As part of this settlement, Puritan-Bennett was given a single, specific product license under the various patents, in-

---

527. *Cf*. Trial Testimony, 2/7-- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

528. Bliss Tr. 2/9:3-58, 142-50; Bliss Tr. 2/11:128-33.

529. Greene Tr. 2/7:59; Kocinski Tr. 2/7:135-36.

530. Kocinski Tr. 2/7:132-135; PX 141.

531. Kocinski Tr. 2/7:134-135.

532. Kocinski Tr. 2/7:Kocinski Tr. 2/7:136; PX 141.

533. Kumar Tr. 2/11:51-52.

534. Kumar Tr. 2/11:14-17.

535. PX 5, col. 2, ll. 9-13; PX 8, col. 1, ll. 56-58; PX 9, col. 2, ll. 27-29; PX 14, col. 1, ll. 33-43.

536. Good Tr. 2/10:49-50.

537. Good Tr. 2/10:50-54.

538. Greene Tr. 2/7:45-46.

539. Greene Tr. 2/7:45; Kocinski Tr. 2/7:159-60.

540. Greene Tr. 2/7:10.

cluding the '303 patent.[541] Puritan-Bennett made one license payment of $25.00 under this agreement before it changed its product design to one which did not come under the licensed patents. During the license negotiations, both parties understood that the license would be of very limited duration until Puritan-Bennett changed its design.[542]

Specifically, the license agreement with Puritan Bennett covers four (4) patents: the '303 Patent, the '398 Patent, the '578 Patent, and the '387 Patent,[543] all of which expire at different times.[544] Yet, the term of the license runs until the date of the expiration of the last to expire patent, and the royalty provisions do not diminish over the course of the license.[545] From this, defendant argues that Sunrise misused the '303 patent by using it in a scheme to derive licensing revenues from patents that would come to be expired.

Sunrise did not condition the license to Puritan-Bennett upon an agreement that the royalty would not change regardless of the expiration of some of the licensed patents. Indeed, this issue was never even discussed between those parties, who negotiated the license with the knowledge and intent that it would only generate royalties for a very short time until Puritan-Bennett introduced its redesigned product.[546] Under the license, Puritan Bennett paid $10,000 as a one-time license fee

and $25.00 in royalties.[547] There is no evidence that plaintiff profited from any patent by extending it through the license beyond its statutory life.[548]

Other than the settlement license with Puritan-Bennett, the '303 patent has never been licensed,[549] and the '224 patent has never been licensed under any circumstances.[550] Further, Sunrise does not wish to license either the '224 or the '303 patent because it enjoys a dominant market position and has the capacity to meet any increased demand for the EX 2000.[551] Presently, Sunrise is only running a single production shift of five days a week. Sunrise thus has two additional shifts available on those five days, as well as two additional days of capacity per week. Sunrise's suppliers also have sufficient capacity to meet increased demand.[552]

### b. Inequitable Conduct - The '224 Patent

A two-page advertisement of the OMS 20/50 was submitted to the Patent and Trademark Office by the Applicants as part of the Applicants' Information Disclosure Citation.[553] The advertisement was one of five references listed on the information disclosure citation. Only one page of the advertisement showed a picture of the OMS 20/50, a regulator and an oxygen cylinder. Still, the OMS 20/50 used with a yoke-type regulator mounted on a post valve was before the patent examiner.[554]

541. Sunrise took over and accepted the duties of this license from DeVilbiss. Greene Tr. 2/7:73.

542. Greene Tr. 2/7:46-48.

543. Greene Tr. 2/7:72.

544. Judicial Notice -- Stipulation between counsel.

545. Greene Tr. 2/7:73.

546. Greene Tr. 2/7:119, 120.

547. Greene Tr. 2/7:47.

548. I recognize that if Puritan-Bennett were to produce one of the licensed products today, Sunrise would expect to be paid for the man-

ufacture and sale of that product. Greene Tr. 2/7:73. The fact remains, however, that Puritan-Bennett has not produced such a product and there is no evidence it has any desire or intention to produce one.

549. Greene Tr. 2/7:48-49.

550. Greene Tr. 2/7:54.

551. Greene Tr. 2/7:70-71.

552. Greene Tr. 2/7:70.

553. Good Tr. 2/10:113; DX 40.

554. PX 163; DX 40, file history of the '224 patent, pp. S-05910 to S-05911.

On the original product brochure of the OMS 20/50, a copy of which was provided to the examiner of the '224 patent, the OMS 20/50, the external regulator, and oxygen tank with post are plainly visible.[555] The patent Examiner was aware of and considered the OMS 20/50 device, used with an attached regulator, during the prosecution of the '224 patent.[556] Yet, the patent examiner never rejected claim 1 or any other claim based upon the known combination of the OMS 20/50 and the yoke-type regulator called to his attention by Sunrise.[557]

Defendant correctly notes that the advertisement of the OMS 20/50 submitted to the U.S. Patent and Trademark Office does not show the opening in the manifold where the oxygen comes into the manifold or the short metal tubing connecting the OCD to the regulator.[558] It claims that a decision--impliedly a strategic one--was made to submit the OMS 20/50 advertisement instead of other available literature on the OMS 20/50, including the patient manual, even though the OMS 20/50 patient manual is a better reference for teaching someone unfamiliar with the technology about the features and operability of the OMS 20/50 device.[559] My examination of both documents, however, reveals that with respect to features relevant to

**555.** Kumar Tr. 2/11:64-65; PX 163.

**556.** PX 24, cover page.

**557.** DX 40, file history of the '224 patent.

**558.** Good Tr. 2/10:115; DX 40.

**559.** Good Tr. 2/10:116.

the patentability of the '224 subject matter, the OMS 20/50 product brochure which was submitted to the patent examiner contains more relevant information than the OMS 20/50 patient manual, which contains neither relevant pictures nor diagrams.[560] There was nothing inequitable about plaintiff's choice to submit the advertisement rather than the patient manual.

### 5. Prior Adjudication/Reissue and Reexamination

Sunrise admits that there has been no prior adjudication of validity of the '303 Patent[561] and that the '303 Patent has not been the subject of a reissue[562] or reexamination proceeding in the U.S. Patent and Trademark Office.[563] Sunrise has also adduced no evidence, testimonial or documentary, that the public has acquiesced to the validity of the '303 Patent.[564] Sunrise makes the same admissions with respect to the '224 patent.[565]

**560.** *Compare* PX 163 *with* DX 36. PX163 was admitted into evidence, contrary to defendant's argument, dkt. no. 87, at 13, that it was not. Tr. 2/11:101.

**561.** Greene Tr. 2/7:74; Plaintiff's Responses to Defendant's Requests to Admit, Admission No. 6.

**562.** Greene Tr. 2/7:74; Plaintiff's Responses to Defendant's Requests to Admit, Admission No. 7.

**563.** Greene Tr. 2/7:74; Plaintiff's Responses to Defendant's Requests to Admit, Admission No. 8.

**564.** *Cf.* Trial Testimony, 2/7-- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-

### G. Irreparable Harm

### 1. Sunrise's Allegations of Lost Market Share and Price Reduction

#### a. Alleged Price Reduction

Sunrise sold approximately 4,000 OMS 20/50 oxygen conserver units in the period July to December 1996 (Q1 and Q2 of FY97), the six-month period preceding the introduction of the EX 2000.[566] Sunrise sold approximately 4,000 oxygen conserver units in the period January to March 1997 (Q3 of FY97), about 95% of which were EX 2000 units.[567] Sunrise sold approximately 8,000 oxygen conserver units in the period April to June 1997 (Q4 of FY97) and the number increased steadily to over 10,000 for the period July to September 1997 (Q1 of FY 98); substantially all of these sales were EX 2000 units.[568] The EX 2000 was the single largest profit margin product sold by any of Sunrise's divisions.[569]

127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**565.** Greene Tr. 2/7:74-75; Plaintiff's Responses to Defendant's Requests to Admit, Admission No. 3-5; *Cf.* Trial Testimony, 2/7-- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**566.** Kocinski Tr. 2/7:132-33, 135; PX 141.

**567.** Kocinski Tr. 2/7:134 -35.

**568.** Kocinski Tr. 2/7:136; PX 141. The OMS 20/50 was sold only until Summer, 1997. *See* n. 56 and acc. text.

**569.** Kocinski Tr. 2/7:149-50.

Sunrise Conserver Units Sold

PX 141.

Sunrise's sales of oxygen conserver units dropped back to 8,500, however, in the period October to December 1998 (Q2 of FY 99), during which period the AirSep ImPulse Select was announced.[570] Sunrise's customers, including Lincare, informed it that unless Sunrise dramatically lowered the price of its EX 2000, they would begin to purchase the ImPulse Select because they regarded it as a lower priced copy of the EX 2000.[571] Sunrise's sales remained at or near 8,000 units per quarter for 1998 (Q3 of FY99 to Q2 of FY00); indeed, Sunrise has stabilized the decline in sales volume subsequent to the introduction of the ImPulse Select, but only because Sunrise lowered its price.[572]

Sunrise's data for the number of conserver units sold includes the OMS 20/50, the Walkabouts, and the EX 3000,[573] some of

570. PX 141.

571. Easley Tr. 2/10:152-53.

572. Kocinski Tr. 2/7:136-37; PX 141.

573. Kocinski Tr. 2/7:133-35. Walkabouts are configured EX 2000 systems, meaning they contain other related components, such as the oxygen cylinder. Kocinski Tr. 2/7:33.

418

which are individual units and some of which are EX 2000 units configured with oxygen cylinders and carrying bags.[574] As already noted, the OMS 20/50 was phased out by the summer of 1997, while the EX 3000 has sold less that 500 units since its introduction.[575] I find the inclusion of these items to be insignificant for purposes of determining the existence *vel non* of irreparable harm.[576]

Sunrise's evidence of its average selling price excludes, as it should, intercompany and "zero dollar" complimentary transfers, as well as services and warranty items.[577] This price evidence also properly includes configured EX 2000 systems, and--less fortunately--negligible sales of items that do not contain the commercial embodiment of the '224 Patent, for instance, the OMS 20/50 and the EX 3000.[578]

PX 142.

574. Kocinski Tr. 2/7:204.

575. Kocinski Tr. 2/7:135.

576. I leave open, however, the question of how this data should be treated if and when Sunrise is entitled to an accounting.

577. Kocinski Tr. 2/7:141, 203; PX 143; PX 144. The issue is how many EX 2000-based OCDs Sunrise is able to sell and at what price. Promotional, warranty and intercompany transfers shed little if any light on that question.

578. Kocinski Tr. 2/7:135, 146; PX 143; PX 144.

The average selling price of the EX 2000 for the calendar year 1997, the first year of EX 2000 sales, was $385 per unit,[579] while the average selling price in February 2000 (when the preliminary injunction hearing was held), was $298.[580] The average selling price of the EX 2000 has continually decreased starting in Q2 of FY99, the quarter in which the AirSep ImPulse Select was introduced.[581]

Sunrise's conserver revenue in the six-month period July to December 1996 (Q1 and Q2 of FY97) based upon sales of the OMS 20/50 was about 2.5 million dollars.[582] Its conserver revenue in the period January to March (Q3 of FY97), the first quarter in which the EX 2000 was sold, rose to near 3 million dollars per quarter. In the period April to June (Q4 of FY97), conserver revenue rose to 3.5 million dollars.[583] Sunrise's conserver revenue from July 1997 to June 1998 (FY 1998) was 17 million dollars.[584] This comprised 20% of the division's revenue and was the division's most profitable product.[585]

PX 143.

**579.** Kocinski Tr. 2/7:140-42, 148; PX 144; PX 145.

**580.** Kocinski Tr. 2/7:142.

**581.** Kocinski Tr. 2/7:140-41; PX 144; PX 145. Medicare reimbursements have not caused a decrease in the prices of OCDs. In fact, these Medicare cuts increased the sales of OCDs. Kocinski Tr. 2/7:152-54; Priest Tr. 2/9:40.

**582.** Kocinski Tr. 2/7:146; PX 142.

**583.** PX 142.

**584.** Kocinski Tr. 2/7:145-46.

**585.** Kocinski Tr. 2/7:146.

The fiscal year 1998 revenues generated by the EX 2000 were $8,910,412.00.[586] If one includes the entire conserver segment, including configured devices, the revenues are approximately $17,000,000.00.[587] The net revenues for the Respiratory Products Division for fiscal year 1998 were $90,000,-000.00.[588] The Home Health Care Group revenues for fiscal year 1998 were around $350,000,000.00, while Sunrise Medical's revenues for fiscal year 1998 were $650,-000,000.00 to $675,000,000.00.[589]

PX 144.

The conserver segment includes the EX 2000, the EX 3000 and OMS 20/50 sales, and accounted for 18.9 percent of the Respiratory Products Division revenues for fiscal year 1998.[590] The conserver segment revenues accounted for 4.9 percent of the Home Health Group revenues, and 2.6 percent of Sunrise Medical's revenues, for fiscal year 1998.[591]

586. Kocinski Tr. 2/7:178. This evidence may have been derived from DX 7, dkt. no. 85, at 7, an exhibit of questionable reliability as I note *infra* at nn.609-19, 633 and accompanying text. Plaintiff, however, has not argued in its exceptions that I should adopt any other figure. In the absence of a well-supported alternative, I will rely on this evidence.

587. Kocinski Tr. 2/7:180.

588. Kocinski Tr. 2/7:178-79.

589. Kocinski Tr. 2/7:179.

590. Kocinski Tr. 2/7:180.

591. Kocinski Tr. 2/7:181.

Sunrise EX2000 (with $0 Sales) Average Selling Price

PX 145.

The EX 2000 revenues for fiscal year 1999 were $8,177,581.00,[592] while the conserver segment sales as a whole (again, including configured devices) were approximately $13,000,000.00.[593] The Respiratory Products Division revenues were $90,000,000.00, the Home Health Care Group's revenues were $355,000,000.00 and Sunrise Medical's revenues were $660,000,000.00.[594] The conserver segment revenues accounted for 14.4 percent of the Respiratory Products Division revenues for fiscal year 1999.[595] The conserver segment revenues accounted for 3.7 percent of the Home Health Group revenues, and 1.97 percent of Sunrise Medical's revenues for fiscal year 1999.[596]

The ImPulse Select is purchased by the same home care dealers that purchase the EX 2000.[597] At least one customer has terminated its OCD business with Sunrise subsequent to the introduction of the Im-Pulse Select[598] and it will be virtually impossible for Sunrise to increase the price of the EX 2000 from the level to which it has fallen due to the sales of the ImPulse

**592.** Kocinski Tr. 2/7:182; DX 8; note 586, *supra.*

**593.** Kocinski Tr. 2/7:147, 183.

**594.** Kocinski Tr. 2/7:183.

**595.** Kocinski Tr. 2/7:183.

**596.** Kocinski Tr. 2/7:183-84.

**597.** Priest Tr. 2/9:107-08; Kocinski 2/7:143.

**598.** Kocinski Tr. 2/7:195.

Select.[599] AirSep, on the other hand, projects that sales of the ImPulse Select will increase in 2000.[600] AirSep's 2000 production and sales goals for the ImPulse Select are 1500-2000 per month.[601]

The Respiratory Products Division of Sunrise is located only in Somerset, Pennsylvania, and is the only Sunrise division located there.[602] As a result of the decrease in pricing and sales volume of the EX 2000 caused by the sales of the ImPulse Select, Sunrise has been forced to lay off 35 to 40 employees from its Somerset, Pennsylvania location. This represents more than 10% of the Somerset work force. Sunrise acknowledges, however, that these were layoffs of supervisors who were cut in a streamlining move due to unacceptable revenues and not workers who actually make the EX 2000.[603] I do not find this inconsistent with Sunrise's assertion that the price and volume problems of the EX 2000 caused the layoffs, as reduced revenues often cause businesses to cut fixed overhead costs because the line personnel who actually make the product cannot be cut without affecting output.

Although Sunrise now projects sales of conserver units for the calendar year 2000 to be 10 million dollars or less,[604] Sunrise believes that it would have been grossing twenty- to twenty-four million dollars in sales.[605] No evidence, market studies or accounting studies were submitted by Sunrise in support of this projection[606] and hence I will discount it.

Sunrise runs various and different promotions throughout various times of the year.[607] Consequently, the EX 2000 selling price fluctuates and is affected by many different factors.[608] To put it simply, Sunrise's data is not perfectly tailored to the needs of this case. Even so, for present purposes, I find it worthy of credit and will consider it with respect to the existence *vel non* of irreparable harm.

| | Net Sales | Net Quantity Shipped | ASP |
|---|---|---|---|
| FY1997-P7 | $115,744 | 263 | $440.09 |
| FY1997-P8 | $363,405 | 856 | $424.54 |
| FY1997-P9 | $265,005 | 654 | $405.21 |
| FY1997-P10 | $465,454 | 1136 | $409.73 |
| FY1997-P11 | $489,027 | 1189 | $419.29 |
| FY1997-P12 | $772,861 | 1886 | $409.79 |
| FY1998-P1 | $763,806 | 1861 | $410.43 |
| FY1998-P2 | $830,717 | 2014 | $412.47 |
| FY1998-P3 | $580,870 | 1429 | $406.49 |
| FY1998-P4 | $909,802 | 2302 | $395.22 |
| FY1998-P5 | $538,805 | 1346 | $400.30 |
| FY1998-P6 | $612,623 | 1499 | $408.69 |
| FY1998-P7 | $714,429 | 1750 | $408.25 |
| FY1998-P8 | $637,462 | 1570 | $406.03 |
| FY1998-P9 | $662,505 | 1660 | $401.52 |
| FY1998-P10 | $1,037,828 | 2604 | $398.55 |
| FY1998-P11 | $896,465 | 2568 | $349.09 |
| FY1998-P12 | $752,100 | 3398 | $221.34 |
| FY1999-P1 | $922,692 | 2987 | $308.90 |
| FY1999-P2 | $707,107 | 1815 | $389.59 |
| FY1999-P3 | $777,037 | 2065 | $376.29 |
| FY1999-P4 | $681,040 | 1868 | $364.58 |
| FY1999-P5 | $605,229 | 1723 | $351.28 |
| FY1999-P6 | $524,163 | 1396 | $375.47 |
| FY1999-P7 | $870,478 | 2267 | $383.98 |
| FY1999-P8 | $525,340 | 1400 | $375.24 |
| FY1999-P9 | $590,946 | 1658 | $356.42 |
| FY1999-P10 | $751,344 | 2140 | $351.10 |
| FY1999-P11 | $767,565 | 2339 | $328.16 |
| FY1999-P12 | $454,642 | 1471 | $309.07 |

DX 7.

Defendant's Exhibit 7 shows a period-by-period listing of Sunrise's sales, quantity shipped, and average selling price. It spans from FY97, period seven through FY99, period twelve. From FY98, period nine through FY99, period one, the average selling price declined from $401.52 to $308.90 (a total of $92.62). Factors affect-

599. Kocinski Tr. 2/7:143-44.

600. Priest Tr. 2/9:70.

601. Priest Tr. 2/9:103.

602. Kocinski Tr. 2/7:205.

603. Kocinski Tr. 2/7:151-52.

604. Kocinski Tr. 2/7:147.

605. Kocinski Tr. 2/7:147.

606. Kocinski Tr. 2/7.

607. Kocinski Tr. 2/7:175.

608. Kocinski Tr. 2/7:189-90.

ing these numbers are large intercompany shipments and promotions, which were not accounted for in Defendant's Exhibit 7.[609] Mr. Kocinski, it should be noted, did not prepare Defendant's Exhibit 7[610] and Sunrise does not rely upon it.[611]

Defendant's Exhibit 8 is a sales volume and average selling price analysis in a different format, which has the EX 2000 listed individually on it.[612] After an examination of Defendant's Exhibit 8, Mr. Kocinski determined that Defendant's Exhibit 7 was, in fact, a sales volume and average selling price analysis for the EX 2000.[613] Defendant's Exhibit 9 is a volume sales price report for the EX 2000, dated January 10, 2000.[614] Defendant's Exhibit 7 is a temporal subset of Defendant's Exhibit 9.[615]

Sales Net Discount Allowed - Net Units

| | FY1999-P1 | FY1999-P2 | FY1999 P3 | FY1999-P4 | FY1999-P5 | FY1999-P6 | FY1999 P7 | FY1999-P8 | FY1999 P9 | FY1999-P10 | FY1999-P11 | FY1999 P12 | FY99 Net Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hideaway | $ 91,363 | $ 90,267 | $ 107,050 | $ 90,237 | $ 115,869 | $ 77,903 | $ 78,964 | $ 49,615 | $ 2,892 | $ 55,145 | $ 55,645 | $ 94,325 | $ 918,620 |
| EX2000D | $ 922,692 | $ 707,107 | $ 777,017 | $ 681,040 | $ 605,229 | $ 524,181 | $ 870,473 | $ 525,740 | $ 590,840 | $ 751,344 | $ 767,565 | $ 454,442 | $ 8,177,585 |
| Walkabout | $ 446,066 | $ 470,092 | $ 345,874 | $ 387,883 | $ 418,893 | $ 260,771 | $ 471,338 | $ 360,700 | $ 69,165 | $ 366,073 | $ 252,605 | $ 216,335 | $ 4,676,284 |

Quantity Shipped

| | FY1999-P1 | FY1999-P2 | FY1999-P3 | FY1999-P4 | FY1999-P5 | FY1999 P6 | FY1999-P7 | FY1999-P8 | FY1999-P9 | FY1999-P10 | FY1999-P11 | FY1999-P12 | FY99 Units Shipped |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hideaway | 152 | 134 | 155 | 147 | 215 | 118 | 125 | 74 | (7) | 180 | 103 | 117 | 1,511 |
| EX2000D | 2,997 | 1,815 | 2,005 | 1,868 | 1,723 | 1,396 | 2,287 | 1,400 | 1,858 | 2,140 | 2,339 | 1,471 | 23,129 |
| Walkabout | 944 | 902 | 746 | 783 | 969 | 512 | 939 | 749 | 104 | 850 | 643 | 508 | 8,751 |

ASP

| | FY1999-P1 | FY1999-P2 | FY1999-P3 | FY1999 P4 | FY1999-P6 | FY1999-P6 | FY1999-P7 | FY1999-P8 | FY1999-P9 | FY1999-P10 | FY1999-P11 | FY1999-P12 | FY99 ASP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX2000D | $108.90 | $389.59 | $376.29 | $364.69 | $351.29 | $375.47 | $383.68 | $375.24 | $356.42 | $351.10 | $328.16 | $309.07 | $ 353.59 |

**DX 8.**

Although the time periods for Defendant's Exhibit 7 and 9 overlap, they depict different quantities shipped, net sales and average selling prices for those same periods.[616] Thus, defendant contends that Sunrise's demonstrative exhibits are "based on suspect information" since the charts, both produced by Sunrise, supposedly from the same data sets and covering the same period of time, show different numbers.[617]

609. Kocinski Tr. 2/7:167-70. FY97, period seven is January 1997. FY99, period twelve is June 1999. Kocinski Tr. 2/7:168-69.

610. Kocinski Tr. 2/7:167.

611. In Mr. Kocinski's deposition, he testified that the price decrease for the time period covered by FY98, period nine through FY99 period one, was due to invoicing errors with Lincare. At the hearing, however, Mr. Kocinski recalled that testimony and then testified that the invoicing errors were not the biggest piece of the price decline during that period. He then testified that the invoicing errors did not affect the average selling price of the EX 2000, although it did affect the price of the configured products which utilize the EX 2000. Kocinski Tr. 2/7:172. Mr. Kocinski believes that there was some confusion as to whether Defendant's Exhibit 7 related only to EX 2000 products. Given plaintiff's lack of reliance on this exhibit, I attach no significance to this alleged change in testimony.

612. Kocinski Tr. 2/7:173-74.

613. Kocinski Tr. 2/7:174.

614. Kocinski Tr. 2/7:184.

615. Kocinski Tr. 2/7:185. Sunrise's counsel prepared DX 9 from a raw database sent to him by Sunrise, and it is authentic, Kocinski Tr. 2/7:186, although its methodology too is questionable. [Editor's Note: this exhibit was not included for publication.]

616. Kocinski Tr. 2/7:187-88.

617. Kocinski Tr. 2/7.

Defendant points out that Sunrise did not submit any evidence showing how its sales numbers in terms of revenues, average price or number of units, shown in its demonstrative exhibits, were calculated. The simple answer to this is that these are internal Sunrise documents upon which plaintiff does not rely, and the methodology used to produce them was different from that used to prepare plaintiff's sales volume and price exhibits. Moreover, the methodology in the Sunrise documents defendant stakes so much on is demonstrably incorrect, as it includes intercompany sales, which were excluded from the exhibits prepared by plaintiff.[618] Accordingly, I find that Defendant's Exhibits 7-9 do not impeach plaintiff's sales figures.

The EX 2000's average selling price has fluctuated prior to, and subsequent to, the introduction of the ImPulse Select. That average price ranged from $202.68 to $483.44 during the period immediately surrounding the introduction of the ImPulse Select.[619] There is also evidence that Sunrise's average selling prices were declining slightly prior to the introduction of the ImPulse Select.[620] Sunrise's selling price as of the hearing was $298.00,[621] though historically Sunrise has priced its products somewhat higher when they have been first introduced to market, because it gives Sunrise the flexibility to later reduce the price to an amount which Sunrise expects the average selling price to be.[622] Like nearly all businesses in a free market, Sunrise charges a higher price for its products when they are differentiated and it can do so.[623] Generally, however, Sunrise is unable to raise its prices because the market for its products does not react well to price increases.[624]

Sunrise's dealer price list dated September 6, 1999, shows that the EX 2000's retail price is $750.00 and the dealer and package price is $540.00. Sunrise's October 12, 1998 dealer price list shows that the EX 2000's retail price is $879.00 and the dealer and package price is $510.00. Sunrise's February 1, 1998 dealer price list shows that the EX 2000's retail price is $879.00 and the dealer and package price is $510.00. Thus, Sunrise's published dealer price shows an increase in the dealer price of the EX 2000 from the introduction of the ImPulse Select to the present.[625] Only three percent of EX 2000 sales, however, are made at list price,[626] so I attach no significance to the fact that the published dealer price rose.

The Mobility Division of Sunrise HHG is 50 percent larger in terms of revenues than the Respiratory Products Division.[627]

---

**618.** Kocinski Tr. 2/7: 176-78.

**619.** DX 7; DX 8; DX 9; PX 143; PX 144; PX 145. Defendant points out that Sunrise's average selling price in March 1999, five months after the introduction of the ImPulse Select, was $483.44, the highest average selling price in the history of the product. In addition, defendant contends, Sunrise's average selling prices went up following the introduction of the ImPulse Select. In DX 7, the EX 2000 average selling price went from $351.26 to $383.98 in the two months following the introduction of the ImPulse Select, and the EX 2000 sales volume went from 1723 to 2339 in the six months following the introduction of the ImPulse Select. In DX 9, the EX 2000 average selling price went from $343.73 to $483.44 in the four months following the introduction of the ImPulse Select, and the EX 2000 sales volume went from 1766 to 2469 in the eight months following the introduction of the ImPulse Select. Given the methodological problems already adverted to with respect to DX 7-9 and the lack of any explanation why they are reliable, I find both of them, and the conclusions defendant draws from them, unpersuasive.

**620.** Kocinski Tr. 2/7:190; DX 7; DX 8; DX 9; PX 143; PX 144; PX 145.

**621.** Kocinski 2/7:142.

**622.** Kocinski 2/7:144.

**623.** Kocinski 2/7:206.

**624.** Kocinski 2/7:143-44.

**625.** Kocinski Tr. 2/7:163-66.

**626.** Kocinski Tr. 2/7:166.

**627.** Easley Tr. 2/10:120-21.

In April/May of 1999, the relative revenue volume of the stationary oxygen products relative to the gaseous ambulatory products was that stationary products accounted for 40 to 50 percent more revenue than the gaseous products.[628] The oxygen group of the Respiratory products division had revenues of $40 to $55 million in sales while the aerosol unit had revenues of $30 to 40 million, and the remainder of the revenues came from the sleep division.[629]

Dr. Greene testified that the EX 2000 sales started out virtually at triple the number of sales of the OMS 20/50,[630] that is, that Sunrise was selling ten to eleven thousand units a year in 1996 (approximately 800 to 1000 units per month).[631] Dr. Greene did not, however, perform any calculations or prepare any documents to demonstrate the alleged growth of the sales of the EX 2000.[632] Defendant contends that plaintiff's documents do not support Dr. Greene's assertion of triple the number of sales. The EX 2000 first began sales in period 3 of fiscal year 1997, and Defendant's Exhibit 9 shows that for the remainder of the fiscal year 1997, Plaintiff sold only 6,120 units (approximately 680 units per month), over 4,000 units *less* per year than the OMS 20/50. Defendant's Exhibit 7 shows that for the remainder of the fiscal year 1997, Plaintiff sold only 5,984 (approximately 998 units per month), over 5,000 units *less* per year

than the OMS 20/50. In addition, Dr. Greene did not perform any calculations, nor does he have any documents, to support his testimony about an alleged reduction in price, or decline in sales, of the EX 2000 that resulted from the introduction of the ImPulse Select.[633] For the methodological reasons already stated, however, I decline to credit Defendant's Exhibits 7-9 or the conclusions defendant draws from them, but I do credit Dr. Greene's testimony.

**b. Alleged Reduction in Market Share**

Sunrise believes that its market share for the OMS 20/50 was twelve to fifteen percent of the market,[634] and that it will be very difficult for Sunrise to regain the market share that it has lost.[635] Sunrise, however, does not have any market studies and did not perform any market research to support its claim to this market share.[636] Rather, Sunrise's market share claim is an estimate, because there were other players in the OCD market at the time.[637] Sunrise also estimates that it had grown to a sixty-five percent market share prior to the introduction of the EX 2000, but that number is likewise merely an estimate.[638]

Mr. Kocinski never testified as to what Sunrise's market share was subsequent to the introduction of the ImPulse Select.[639] Sunrise's market share was computed during 1999; however, Mr. Easley has no recollection of the market share number and cannot recall the market share data for the years 1996 through 1999.[640]

---

628. Easley Tr. 2/10:123.

629. Easley Tr. 2/10:124.

630. Greene Tr. 2/7:59.

631. Greene Tr. 2/7:44.

632. Greene Tr. 2/7:105.

633. Greene Tr. 2/7:106.

634. Greene Tr. 2/7:44, 113; Kocinski Tr. 2/7:137.

635. Kocinski Tr. 2/7:139-40; Priest Tr. 2/9:106.

636. Greene Tr. 2/7:113-14; Kocinski Tr. 2/7:199.

637. Greene Tr. 2/7:114. No one is ever sure of their market share down to the tenth of a percentage point. Kocinski Tr. 2/7:200. Sunrise's calculations of market share, like everybody's, are WAGs, Kocinski Tr. 2/7:202, otherwise known as "wild ass guesses."

638. Kocinski Tr. 2/7:138.

639. Kocinski Tr. 2/7:138-40.

640. Easley Tr. 2/10:141-42.

Sunrise's comparison of its market share with Chad discounts the other players in the marketplace to approximately one to three percent.[641] Competitors, however, keep their sales confidential; thus, any estimate of market share for the years 1995 through 1999 would be conjecture.[642] Sunrise does not possess sufficient information to state the total value of the OCD market for the years 1995 through 1999.[643] Sunrise believes that the introduction of the ImPulse Select has turned its EX 2000 into a commodity product,[644] but introduced no evidence from customers of either Sunrise or AirSep to support this contention.[645]

## 2. Sunrise's Reputation and Goodwill

Sunrise does not believe that the quality of the ImPulse Select will reflect on Sunrise, one way or the other,[646] nor does it contend that the ImPulse Select is an inferior product such that its continued sale will harm the goodwill and reputation of Sunrise.[647] Nor is Sunrise being precluded from the OCD market because of AirSep's presence in the marketplace.[648] Finally, Sunrise did not adduce any evidence that other potential infringers are likely to be encouraged to infringe either the '224 or '303 Patents if an injunction does not issue.[649]

**641.** Kocinski Tr. 2/7:199-200.

**642.** Kocinski Tr. 2/7:200-01; Plaintiff's Responses to Defendant's Second Set of Interrogatories, Interrog. No. 15.

**643.** Kocinski Tr. 2/7:201-02; Plaintiff's Responses to Defendant's Second Set of Interrogatories, Interrog. No. 18.

**644.** Kocinski Tr. 2/7:139.

**645.** Kocinski Tr. 2/7; cf. Trial Testimony, 2/7--2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**646.** Kocinski Tr. 2/7:194.

**647.** Plaintiff's Responses to Defendant's Second Set of Interrogatories, Interrog. No. 30.

## 3. Sunrise's Patent Policies

Sunrise is not a company that is heavily weighted with intellectual property and is staking its financial future on its patent rights.[650] Sunrise does not account for the fees paid to patent counsel in its accounting of costs of various products,[651] and does not place a value for its patents on its books and records.[652]

## 4. The Annual Report

Sunrise's 1999 annual report states that it is "a party to various legal proceedings arising in the ordinary course of business. We do not believe that the outcome of any of these actions will have a material adverse effect upon our financial position or results of operations."[653] This report was prepared and issued after the filing of the instant lawsuit.[654] The report also states that Sunrise "currently hold[s] patents associated with some existing products and ha[s] filed applications for additional patents covering some of [its] newer products. Although some of these patents can provide a meaningful competitive advantage in a particular product market, overall management does not consider the ownership of patents essential to [Sunrise's] current or future market position."[655]

**648.** Kocinski Tr. 2/7:195; Plaintiff's Responses to Defendant's Second Set of Interrogatories, Interrog. No. 34.

**649.** Cf. Trial Testimony, 2/7-- 2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**650.** Kocinski Tr. 2/7:162.

**651.** Greene Tr. 2/7:114.

**652.** Greene Tr. 2/7:88; Kocinski 2/7:198-99.

**653.** Kocinski Tr. 2/7:160-61; Easley Tr. 2/10:147; PX 101.

**654.** Kocinski Tr. 2/7:197.

**655.** Kocinski 2/7:162; Easley Tr. 2/10:148.

Sunrise competes primarily on the basis of competitive prices, product features, performance, quality, breadth of full-line product offering, customer service and delivery, sales force support, and the strength of its independent dealer network. None of the factors upon which Sunrise states it competes refers directly to patents or trademarks.[656]

### 5. Market Life of Sunrise's Products

The market life of the OCDs like the EX 2000, the EX 3000, the Hideaway or the Walkabout from their point of introduction is approximately twenty years.[657] The products that DeVilbiss had been selling are products that have a very long life cycle.[658] Sunrise does not contend that the technology will have bypassed the patent by the time this litigation is finished,[659] and did not adduce any evidence showing that there is a high rate of change in the field of OCDs. Sunrise further did not adduce any evidence that shows that a substantial amount of research is being done in the field of oxygen conserving devices or that there has been or will be a decline in available research and development money as a result of lost sales.[660]

### 6. Sunrise's Delay in Bringing the Action

Sunrise first became aware of the existence of the ImPulse Select in November 1998.[661] Sunrise charged AirSep with in-fringement of the '224 Patent on November 13, 1998, after viewing the device from a distance at a trade show, and without testing the accused device.[662] No photographs, drawings, or prototypes were in Sunrise's possession when Sunrise charged AirSep with infringement, and no notes were taken during Sunrise's first viewing of the AirSep OCD. Sunrise, however, was not able to obtain an ImPulse Select for testing until late January 1999.[663]

Sunrise charged AirSep with infringement of only the '224 Patent in its charge letter; at that time, AirSep was unaware of what other patents Sunrise might assert against it.[664] AirSep understood, however, that if it did not cease and desist marketing the ImPulse Select, Sunrise might take legal action against it. AirSep already had in its possession Mr. Kareken's first opinion of non-infringement with respect to the '224 Patent. AirSep responded accordingly to the November 13, 1998 letter[665] and never received any further communication from Sunrise prior to being served with this lawsuit in June of 1999.[666] There was a period of seven months between Sunrise's charge of infringement and the filing of its complaint, and there were at least fifteen months between the introduction of the ImPulse Select and the preliminary injunction hearing.[667]

Sunrise explains that after obtaining an ImPulse Select unit, Sunrise tested the

**656.** Kocinski Tr. 2/7:198.

**657.** Easley Tr. 2/10:125-26.

**658.** Easley Tr. 2/10:126.

**659.** Plaintiff's Responses to Defendant's Second Set of Interrogatories, Interrogatory No. 49.

**660.** *Cf.* Trial Testimony, 2/7-2/11; PX 1-19, 21-33, 37-38, 44-47, 52, 54-55, 57-58, 60, 63-64, 66-67, 71-72, 75-77, 101, 104, 110, 125-127, 129, 137-139, 141-142, 144-161, and DX 1 through 56.

**661.** Greene Tr. 2/7:60.

**662.** DX 20; Easley Tr. 2/10:135; Greene Tr. 2/7:104; Hunter Tr. 2/10:18; Priest Tr. 2/9:78.

**663.** Greene Tr. 2/7:60-61. Sunrise received an ImPulse Select device three to four weeks before Mr. Hunter tested the device and prepared a memorandum on February 26, 1999. Hunter Tr. 2/10:16-17.

**664.** Priest Tr. 2/9:78.

**665.** Priest Tr. 2/9:79; DX 21.

**666.** Priest Tr. 2/9:80.

**667.** Greene Tr. 2/7:105.

device for infringement of both the '224 and '303 patents, then forwarded its findings to its outside patent counsel to obtain his opinion as to whether these patents were infringed by the ImPulse Select.[668] Following the receipt of the opinion that the ImPulse Select infringed both patents, Sunrise was required to obtain corporate approval for the filing of a lawsuit and had to interview and retain trial counsel, who in turn had to determine whether it believed that infringement existed prior to commencing the lawsuit.[669]

**668.** Greene Tr. 2/7:61-62. *But see* Hunter Tr. 2/10:30-31 (testimony that no one at Sunrise tested the ImPulse Select for infringement of the '303 Patent).

### 7. Sunrise's Lost Profits

Sunrise's conserver segment gross profits in the period July to December 1996 (Q1 and Q2 of FY97) based on the OMS 20/50 sales were about 500 thousand dollars per quarter. Those gross profits for calendar year 1997 were about 6.7 million dollars. In the quarter before the introduction of the AirSep ImPulse Select conserver, segment gross profits were 2.5 million dollars, as shown on PX 150. Segment gross profits for calendar year 1998 were 8.5 million dollars, and, for calendar year 1999, were 5.7 million dollars.

**669.** Greene Tr. 2/7:61; Kocinski Tr. 2/7:158-59.

Conserver Segment GP

PX 150.

In the fiscal year prior to the introduction of the ImPulse Select, the EX 2000 accounted for 18-20% of the gross revenue and 40-45% of the gross profit of the Res-

piratory Products Division of Sunrise.[670] In 1998, the profit margin on sales of the EX 2000 was approximately 68%.[671] Prior to the introduction of the ImPulse Select, the EX 2000 was the company-wide Sunrise product that had the highest profit margin.[672]

Mr. Kocinski is responsible for the profits and losses of the Respiratory Products Division.[673] He performed some initial calculations regarding the profits lost by Sunrise due to the alleged infringement of AirSep and came up with an estimated range of numbers between fifteen and twenty million dollars.[674] His lost profits analysis included the difference between Sunrise's conservatively projected growth versus the alleged decline, gap of revenue and price erosion effects over two to three years.[675]

## 8. Non-Commercialization of the '303 Patent

Claim 3 of the '303 Patent requires that the dose interval always be less than the inspiratory period.[676] The OMS 20/50 can provide a dose of respirating gas during exhalation if its pressure sensor is not zeroed properly.[677] The EX 2000 and EX 3000 can also provide a dose during exhalation if the user "fools" the sensor by turning the device on during exhalation.[678] Indeed, all oxygen conservation devices can trigger a dose improperly if fooled in this way.[679] Sunrise has received complaints from time to time about OCDs not triggering 'correctly, but, when Sunrise tests them, the devices pass as non-defective.[680] There is no assumption that the person using the device has an abnormal breathing pattern of some sort.[681]

Defendant contends that Sunrise has not commercialized the '303 Patent inasmuch as the OMS 20/50, the EX 2000 and the EX 3000 do not employ the method of the '303 Patent because each of these devices provides a dose of oxygen during exhalation.[682] I reject this contention on factual grounds; all defendant has shown is that a user can trick the devices into not conforming with the method of the '303 patent by creating abnormal conditions not present when the OCDs are used as directed. This does not mean that those devices do not practice the method of the patent in their normal usage.

670. Kocinski Tr. 2/7:154-56.

671. Kocinski Tr. 2/7:155.

672. Kocinski Tr. 2/7:156, 204.

673. Kocinski Tr. 2/7:195. Pat Jensen left the employ of Sunrise before Greg Good was laid off in February of 1997. Good Tr. 2/10:69. Yet, Mr. Kocinski testified that he fired Pat Jensen as one of his first actions as director of the Respiratory Products Division in 1998. Kocinski Tr. 2/7:202. These two assertions are irreconcilable. In addition, Mr. Kocinski did not assume the position of director or president of the Respiratory Division until April 1999. Easley Tr. 2/10:119; Kocinski Tr. 2/7:128. Nevertheless, after observing the demeanor of this witness, I have no reason to believe that any error in his testimony stemmed from lack of candor or willful prevarication. Hence, I will credit his testimony to the extent it is uncontroverted.

674. Kocinski Tr. 2/7:196; Easley Tr. 2/10:149. Mr. Kocinski is capable of performing lost profits analyses, and would have been able to come up with a sound determination. Easley Tr. 2/10:150. The profits lost by Sunrise are calculable, within a range. Kocinski Tr. 2/7:196.

675. Kocinski Tr. 2/7:205.

676. Greene Tr. 2/7:94.

677. Greene Tr. 2/7:113; Hunter Tr. 2/10:8.

678. Hunter Tr. 2/10:9.

679. Hunter Tr. 2/10:8-9.

680. Hunter Tr. 2/10:10.

681. Hunter Tr. 2/10:12.

682. Defendant also argues that these devices fail to practice the method of the '303 Patent because they use electronic as opposed to fluidic timing means, Dkt. no. 87, at 12. I need not and do not reach this issue.

### 9. AirSep's Ability to Meet a Judgment

AirSep has the ability to satisfy a judgment of $10 million, although it would cause the company financial hardship. AirSep's conservative estimation of its book value is thirteen to fourteen million dollars, and AirSep could liquidate some assets and utilize the remaining ones to borrow against from a bank. In addition, there are other avenues that AirSep could take to raise the money to satisfy the judgment.[683]

### H. Balance of Hardships

AirSep is a privately held company with three major businesses: a medical products group, an industrial group, and an electronics division. The medical products group has two subdivisions: the therapeutic products group and the diagnostic group.[684] AirSep's total revenues for 1996, 1997, 1998, and 1999 were $59 million, $62 million, $74 million, and $71 million, respectively. AirSep made a pretax profit of $1 million in 1999.[685]

The largest product group within the medical product group is oxygen equipment. Included within that group are oxygen conserving devices, CPAP devices, and ultrasonic nebulizers.[686] AirSep's 1999 sales of oxygen concentrators (a different product than OCDs) generated gross revenues of $35-$40 million.[687]

The first OCD offered by AirSep was the ImPulse,[688] which is still being sold to a very limited degree.[689] Impulse sales have deteriorated because AirSep introduced the ImPulse Select which has capabilities beyond the ImPulse model.[690]

Gross sales revenue for the ImPulse in 1998 was $4,437,647,[691] and the gross profit derived from its sales was $2,648,000.[692] The ImPulse device is and was competing in the marketplace with the EX 2000 from 1996 to the present.[693] Indeed, the ImPulse's sales were extremely successful; the product "ramped up" quite quickly in sales and AirSep derived a significant amount of profitability from this OCD.[694]

The ImPulse Select became commercially available in November, 1998,[695] after a product development effort costing between $1-$1.5 million.[696] The gross sales revenue for the ImPulse Select in 1999, including the sales revenue derived from approximately 1,000 ImPulse units, was $6,367,000.[697] The gross profit was $3,400,000,[698] while AirSep's pre-tax profits for 1999 were approximately $1 million. Thus, if the Impulse Select had not been marketed, AirSep contends it would have had a $2.4 million pre-tax loss.[699] But, this analysis ignores the profitability of the old ImPulse; as Sunrise points out, sales of the ImPulse Select in 1999 accounted for only $700-$750 thousand in increased gross profit for AirSep over the sales of ImPulse in 1998.[700] Still, it is evident that the ImPulse Select provides a substantial portion of AirSep's total profits.

**683.** Priest Tr. 2/9:76.

**684.** Priest Tr. 2/9:26.

**685.** Priest Tr. 2/9:98.

**686.** Priest Tr. 2/9:27.

**687.** Priest Tr. 2/9:98-99.

**688.** Priest 2/9:27.

**689.** Priest 2/9:28.

**690.** Priest Tr. 2/9:29.

**691.** Priest Tr. 2/9:30. There were *de minimis* amounts of ImPulse Select sales. Priest Tr. 2/9:30.

**692.** Priest Tr. 2/9:33.

**693.** Priest Tr. 2/9:32-33.

**694.** Priest Tr. 2/9:33.

**695.** Priest Tr. 2/9:43.

**696.** Priest Tr. 2/9:44.

**697.** Priest Tr. 2/9:68, 101.

**698.** Priest Tr. 2/9:68, 70.

**699.** Priest Tr. 2/9:70.

**700.** Priest Tr. 2/9:103.

Approximately ten percent of AirSep's overall revenues were derived from the Impulse Select device in 1999, with approximately fifteen to twenty percent of the medical products division derived from it.[701] The ImPulse Select is one of AirSep's best profit generators, and disproportionately contributes a larger percentage of profit than almost any other product line at AirSep.[702] Absent an injunction, the ImPulse Select will provide a larger proportion of both AirSep's overall and medical division revenues in 2000 than it did in 1999, as well as a disproportionate share of AirSep's overall profitability.[703]

Virtually all of AirSep's ImPulse customers switched to and bought ImPulse Select devices in 1999. Thus, AirSep increased its revenues from $4.4 million to $6.4 million. To the extent, then, that Sunrise is contending that its sales were affected by more than $2 million, those losses must logically have resulted from some competition other than AirSep's.[704]

All of AirSep's ImPulse customers chose to migrate to the ImPulse Select, and some of them increased their business and purchased more ImPulse Select OCDs.[705] Indeed, the vast bulk of the increase in units from the ImPulse (10,500) to the ImPulse Select (17,628) came from existing AirSep customers, who bought more product because, with the changes in Medicare reimbursement policy, OCDs have been an increasing purchase item for most customers.[706] One of these customers is Medmar,

which was an ImPulse customer and went over to the ImPulse Select almost immediately upon its availability. The revenues from Medmar for the ImPulse Select in 1999 were more than the revenues from Medmar for the ImPulse in 1998.[707]

Some of AirSep's customers probably purchase products from AirSep's competitors as well.[708] The only three competitors of any significance in the OCD market are, Sunrise, Chad and Mallinckrodt.[709]

AirSep does not keep track of its market share. Instead, its marketing strategy is based on sales dollars and not market share percentage,[710] as reports of market share tend to be grossly inaccurate.[711] For example, some of the reports that have attempted to estimate AirSep's revenues or unit volume have been off by as much as a hundred percent or more with respect to actual revenues and unit volumes. Private companies do not report this information, and even public companies do not break down their public information as to individual product lines.[712]

Chad is a representative company from which to obtain some insight as to how much sales volume exists for conserving devices.[713] Chad's revenues are almost exclusively due to one product line, OCDs, with some cylinders and bags as well as big systems.[714] Sunrise, a publicly traded corporation, does not report its unit sales volume on any of its respiratory products, including OCDs. Mallinckrodt, another publicly traded company, does not report to the level of detail that would assist in

---

**701.** Priest Tr. 2/9:68-69.

**702.** Priest Tr. 2/9:69.

**703.** Priest Tr. 2/9:70.

**704.** Priest Tr. 2/9:71-72.

**705.** Priest Tr. 2/9:72.

**706.** Priest Tr. 2/9:107.

**707.** Priest Tr. 2/9:73.

**708.** Priest Tr. 2/9:108.

**709.** Priest Tr. 2/9:73.

**710.** Priest Tr. 2/9:73-74.

**711.** Priest Tr. 2/9:74, 131.

**712.** Priest Tr. 2/9:74.

**713.** Priest 2/9:133.

**714.** Priest Tr. 2/9:74, 132-33.

the calculation of an accurate market share percentage.[715]

If this court were to issue an injunction, within one to two weeks, AirSep would be forced to lay off twenty-five to fifty people.[716] The initial layoffs would be comprised of personnel dedicated to the ImPulse Select product, including production and engineering employees.[717] There are approximately twelve to fifteen AirSep employees who are dedicated to the ImPulse Select.[718] AirSep would then select people who render ancillary services and have a significant part of their time dedicated or contributing to the ImPulse Select.[719] In a six-to nine-month period, AirSep would expect to lay off anywhere from 50 to 60 people, and perhaps as many as 100 or more employees.[720] The layoffs would come from throughout the organization because of the disproportionate contribution to the company's profits that the ImPulse Select provides.

A preliminary injunction was entered against AirSep in November 1997, after a finding that it infringed Respironics' patents. The injunction barred AirSep from selling its bi-level device for use in the treatment of obstructive sleep apnea, but, as Sunrise points out, AirSep did not go out of business as a consequence. To the contrary, AirSep's gross revenue increased from $62 million in 1997 to $74 million in 1998 despite the entry of the preliminary injunction in the *Respironics* case.[721]

Sunrise also notes that AirSep had 550 employees in 1997, but only 420 employees in 1998,[722] indicating that the number of AirSep employees has been decreasing anyway.[723] It appears to this court, however, that the decrease may have been the result of the injunction in the *Respironics* case.

If an injunction issues, some customers may penalize AirSep because those customers are committed to the current product which would be taken away from them.[724] In addition, AirSep would be unable to honor some of its promotions where it has bundled the ImPulse Select with other products, offered special pricing, discounts or special volumes. AirSep also offers a two-year parts and labor warranty and a replacement warranty with the device, a warranty that AirSep would be unable to honor if an injunction should issue.[725]

Of course, it is unknown what product customers would actually purchase instead of the ImPulse Select.[726] It is fair to infer, however, that AirSep would probably lose a number of its customers who would not switch back to the ImPulse. In addition, the lead time for AirSep to gear back up to production on the ImPulse product would be at least twelve to eighteen weeks, and perhaps as long as six months. Most of AirSep's customers could probably not wait that long for the ImPulse product and would turn to another supplier.[727]

Wooing a lost customer back is often very difficult. Once a customer decides to use a particular product in quantity, they train their personnel on that product.[728]

**715.** Priest Tr. 2/9:75.

**716.** Priest Tr. 2/9:83.

**717.** Priest Tr. 2/9:84, 108.

**718.** Priest Tr. 2/9:108.

**719.** Priest Tr. 2/9:84.

**720.** Priest Tr. 2/9:83.

**721.** Priest Tr. 2/9:13, 83, 115.

**722.** Priest Tr. 2/9:4.

**723.** Priest Tr. 2/9:83-84, 112-13.

**724.** Priest Tr. 2/9:85.

**725.** Priest Tr. 2/9:86.

**726.** Priest Tr. 2/9:104-07.

**727.** Priest Tr. 2/9:104-05.

**728.** Priest Tr. 2/9:106.

Thus, switching costs could prevent a defecting customer from returning, even if the deal were otherwise favorable.

### I. False Patent Marking

The EX 3000 OCD, through its instruction booklet, is marked with U.S. Patent Number 5,755,224,[729] but the EX 3000 does not use the technology of the '224 Patent[730] because it lacks an integral regulator.[731] Patent numbers are marked on a device to apprise people that it contains proprietary technology[732] and to indicate that the patent discloses and claims the device that is marked with that patent.[733]

## CONCLUSIONS OF LAW

### II. JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(a), and 1338(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c). The United States Court of Appeals for the Federal Circuit has jurisdiction over any appeals arising from this case, and thus Federal Circuit decisional law is binding on this court as to substantive matters. *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n. 12, 7 U.S.P.Q.2d 1191 (Fed. Cir.1988); *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579, 219 U.S.P.Q. 686 (Fed.Cir.1983).

### III. STANDARDS FOR ISSUING A PRELIMINARY INJUNCTION

■ The patent statute, specifically at 35 U.S.C. § 283, states that "[t]he several courts having jurisdiction of cases under this title may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." A "preliminary injunction is not to be routinely granted." *High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1554, 33 U.S.P.Q.2d 2005 (Fed.Cir.1995). Accordingly, such relief must be thoroughly justified. *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 977, 41 U.S.P.Q.2d 1185 (Fed.Cir. 1996).[734] The party moving for a preliminary injunction must demonstrate "four factors: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if the injunction were not granted; (3) the balance of the hardships; and (4) the impact of the injunction on the public interest." *Bridwell*, 103 F.3d at 973; *Hybritech*, 849 F.2d at 1451; *see also T.J. Smith & Nephew, Ltd. v. Consol. Med. Equip., Inc.*, 821 F.2d 646, 647, 3 U.S.P.Q.2d 1316 (Fed. Cir.1987); *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1269, 225 U.S.P.Q. 345 (Fed.Cir.1985).

No one of the four factors predominates. Rather, the court should weigh all the various factors in relation to each other. *Hybritech*, 849 F.2d at 1451; *Smith Int'l*, 718 F.2d at 1579. Although no one factor is dispositive, the absence of a sufficient showing as to any one may, depending on the circumstances, preclude preliminary injunctive relief. *See Bridwell*, 103 F.3d at 973-74.[735] No injunction, however, can issue without a threshold showing on the first

---

**729.** Hunter Tr. 2/10:23.

**730.** Kocinski Tr. 2/7:135.

**731.** Hunter 2/10:23.

**732.** Hunter Tr. 2/10:21-22; Good Tr. 2/10:74.

**733.** Good Tr. 2/10:74.

**734.** "However, statements [in prior caselaw] that a preliminary injunction is a drastic and extraordinary remedy do not imply that it must be rare or practically unattainable, only that it is not granted as a matter of right[.]" *Id.*

**735.** "[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors.... Similarly, a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted by the non-movant." *Id.*

two factors, likelihood of success on the merits and irreparable harm. *See Vehicular Tech. Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1088, 46 U.S.P.Q.2d 1257 (Fed.Cir.1998).

■ In a patent infringement case, likelihood of success on the merits requires a showing that, in light of the presumptions and burdens that will inhere at trial on the merits, it will likely prove three components: title to the patent, infringement and validity. First, the patentee must show that it has title to the patent-in-suit. *Film-Tec Corp. v. Allied-Signal, Inc.,* 939 F.2d 1568, 1572-73, 19 U.S.P.Q.2d 1508 (Fed. Cir.1991). Second, the patentee must show that the patent is infringed. *See Vehicular Tech.,* 141 F.3d at 1088; *Reebok Int'l Ltd. v. J. Baker, Inc.,* 32 F.3d 1552, 1555-56, 31 U.S.P.Q.2d 1781 (Fed.Cir.1994) (*citing Hybritech,* 849 F.2d at 1451); *Conair Group, Inc. v. Automatik Apparate-Maschinenbau GMBH,* 944 F.2d 862, 865, 20 U.S.P.Q.2d 1067 (Fed.Cir.1991) ("Demonstrating a probability of success on the merits includes the requirement that the patentee make a showing of a likelihood of proving infringement."); *Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230, 1233, 227 U.S.P.Q. 289 (Fed.Cir.1985). Third, a patent holder must also show that the patent is valid. *See Vehicular Tech.,* 141 F.3d at 1088; *Reebok,* 32 F.3d at 1555-56; *Hybritech,* 849 F.2d at 1451.

A showing of likelihood of success on the issue of infringement requires a comparison of the allegedly infringing device with the properly construed patent claims. *Lund Indus., Inc. v. GO Indus., Inc.,* 938 F.2d 1273, 1275, 19 U.S.P.Q.2d 1383 (Fed. Cir.1991); *Hybritech,* 849 F.2d at 1455 ("Analysis of literal infringement is a two-step process. First, the district court must determine the scope of the patent claims.... Second, the district court must determine whether properly interpreted

claims encompass the accused structure."). If any element of the asserted claim(s) is missing from the accused device, there is no likelihood of success sufficient to support a preliminary injunction. *See, e.g., High Tech,* 49 F.3d at 1555-56 (reversing grant of preliminary injunction where element of claim was missing from accused device).

■ The patent owner fails to make a sufficient showing if the accused infringer raises a "substantial question" regarding ownership, infringement, validity, and enforceability. The movant's burden after rebuttal of these elements is to show that defendant's arguments "lack substantial merit." *See Genentech, Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1364, 42 U.S.P.Q.2d 1001 (Fed.Cir.1997); *New England Braiding Co. v. A.W. Chesterton Co.,* 970 F.2d 878, 883, 23 U.S.P.Q.2d 1622 (Fed.Cir.1992). If the accused infringer asserts a defense, and the patent owner cannot show that that defense lacks substantial merit, a preliminary injunction should not issue. *See Genentech,* 108 F.3d at 1364.

■ If a patent holder makes a "clear showing" of ownership, validity, enforceability, and infringement, the Court may presume irreparable harm. *Roper,* 757 F.2d at 1271-72; *Smith Int'l,* 718 F.2d at 1581. If the patentee does not make such a clear showing but can establish only a "reasonable" likelihood of success on the merits, then he also must make a separate showing of irreparable injury. *See Roper,* 757 F.2d at 1272 & n. 5. Where the presumption of irreparable harm applies, it may not be rebutted by the mere fact that the plaintiff's injuries are fully compensable in money damages. *Bridwell,* 103 F.3d at 975-76. This is so because a patent's value lies in the right it confers upon a patent holder to exclude others from infringing the invention. *Smith Int'l,* 718 F.2d at 1581.[736]

736. "The patent statute provides injunctive relief to preserve the legal interests of the parties against future infringement which

may have market effects never fully compensable in money. 'If monetary relief were the sole relief afforded by the patent statute then

## IV. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Ownership

Patents have the attributes of personal property and can be assigned by an instrument in writing. 35 U.S.C. § 261. A patentee shall have a remedy by civil action for infringement. 35 U.S.C. § 281. Standing is proper if a party comes "forward with the requisite evidence necessary to establish that an assignment, in writing, of the Intellectual Property took place before the lawsuit was filed." *GAIA Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 780, 39 U.S.P.Q.2d 1826, 41 U.S.P.Q.2d 1134 (Fed.Cir.1996), *mandate withdrawn, amended on reh'g on other grounds*, 104 F.3d 1298 (Fed.Cir.), *on reh'g*, 132 F.3d 52, 1997 WL 748148 (Fed.Cir.1997) (TABLE, text in WESTLAW at 1997 WL 748148, LEXIS/NEXIS at 1997 U.S. App. LEXIS 34893).

Assignments of patent rights are governed by 35 U.S.C. § 261, which states, in pertinent part, that "[a]pplications for patent, patents or any interest therein, shall be assignable in law by an instrument in writing." Section 261 further provides that "[a]n assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage." "The recording of a document ... is not a determination by the Office of the validity of the document or the effect that document has on the title to an application, a patent, or a registration." 37 C.F.R. § 3.54. Thus, the mere fact that Sunrise recorded what purports to be an assignment document does not mean, without more, that the assignment was valid or transferred title to the patent.

AirSep argues that there was a break in the chain of title at CryO2 Corporation because no entity assigned the rights, title or interest in and to the '303 Patent to CryO2 Corporation, even though CryO2 purported to transfer the '303 Patent to DOC Technologies. According to AirSep, the issue of whether Sunrise has title to the '303 Patent turns on whether the two 1991 *nunc pro tunc* assignments, one from Kircaldie, Randall & McNab to DOC Technologies, Inc. and the other from Dr. Gerald Durkan to DOC Technologies, Inc. are valid. AirSep contends that such *nunc pro tunc* agreements are invalid and do not work to transfer any right, title or interest to patents; hence, it claims, Sunrise does not own any right, title or interest to the '303 Patent. If the *nunc pro tunc* agreement is invalid, AirSep asserts, DOC Technologies never owned, and Sunrise cannot now own, the '303 Patent. Accordingly, Sunrise would have no standing to bring the instant action for infringement of that patent.

■■■ *Nunc pro tunc* agreements entered into after the commencement of litigation are invalid and do not work to confer standing retroactively. *Gaia*, 93 F.3d at 779 ("The only possible saving grace for Gaia is the *nunc pro tunc* assignment of patent and trademark rights that was executed on October 24, 1994, but was made effective as of August 4, 1991, prior to Gaia's filing of the instant suit.... This agreement is not sufficient to confer standing on Gaia retroactively.").[737] On the other

---

injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts.'" *Hybritech*, 849 F.2d at 1457 (*quoting Atlas Powder*, 773 F.2d at 1233).

737. *See also Afros S.p.A v. Krauss-Maffei Corp.*, 671 F.Supp. 1402, 1445-46, 5 U.S.P.Q.2d 1145 (D.Del.1987) ("The key question is whether a later act can cure a defect in an assignment when the assignment would not have been legally effective at the time the infringement action (or counterclaim) was filed.... Permitting a presently invalid assignment to serve as the basis of a claim under 35 U.S.C. § 281 on the ground that it later "became" valid, which ratification transposes itself back in time, will impermissibly expand the class of persons able to sue for infringement.... Although a subsequent act

hand, a *nunc pro tunc* assignment filed *before* the filing date of the action with an effective assignment date before the action does effect a valid transfer of rights sufficient to confer standing. *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211, 48 U.S.P.Q.2d 1010 (Fed.Cir.1998); *Gaia*, 93 F.3d at 779-80 (Fed.Cir.1996) (*quoting Procter & Gamble*, 917 F.Supp. at 310).

Here, it is clear from the record that the *nunc pro tunc* assignments were executed in 1991, dkt. no. 84, at 32, long before this suit was filed in 1999. There is therefore nothing invalid about the assignments and no gap in the chain of title of the '303 patent. Accordingly, Sunrise, as the assignee of the '303 and '224 patents, has standing to pursue a civil remedy for patent infringement against AirSep.

## B. Infringement

### 1. Claim Construction Principles

#### a. General Precepts

 Claim interpretation is an issue of law to be resolved by the court. *Markman v. Westview Instruments Inc.*, 517 U.S. 370, 372, 390-91, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996). In interpreting a particular claim, the court first examines the intrinsic evidence of record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 U.S.P.Q.2d 1573 (Fed.Cir.1996). In so doing, a court should review the specification and claims of the patent itself, as well as the prosecution history. *Id.* A court is to consider these intrinsic items as the most significant sources in interpreting claim language. *Id.* Therefore, the language of the claim itself is reviewed first. Next, the claims are analyzed in view of the patent specification. Claims are to be interpreted in view of the specification of the patent. *Id.*

 In construing patent claims, its terms are generally given their ordinary and accustomed meaning, unless a particular term of a patent claim has been given a special meaning by the patentee, in which case that meaning shall be ascribed to the particular term. *Id.* The specification of the patent is highly relevant, and usually dispositive, in a claim construction analysis of the meaning of a disputed term. *Id.* The court also must ascribe to any technical term used in a claim "the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578, 38 U.S.P.Q.2d 1126 (Fed. Cir.1996). Moreover, in analyzing claim language, the court must employ "normal rules of syntax," *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1553, 42 U.S.P.Q.2d 1737 (Fed.Cir. 1997), *overruled on other grounds, Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 46 U.S.P.Q.2d 1169 (Fed.Cir.1998) (*en banc*),

---

may effectively ratify a prior invalid act in other areas of the law, I hold that subsequent acts cannot alter the status of an assignment in order to confer standing on a party that otherwise could not bring an infringement claim under United States patent law."), *aff'd mem.*, 848 F.2d 1244, 848 F.2d 1244 (Fed.Cir. 1988); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F.Supp. 305, 310-11, 38 U.S.P.Q.2d 1678 (D.Del.1995) ("As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue.... The court agrees, therefore, that a party must have standing to bring a patent infringement claim at the time it is brought.... The lack of standing is not automatically cured by a subsequent assignment." (but also noting possibility of remediation of defect by amendment of pleading under relation-back rule of Fed. R. Civ. P. 15(c)). *But see Valmet Paper Machinery, Inc. v. Beloit Corp.*, 868 F.Supp. 1085, 1088-90 32 U.S.P.Q.2d 1794 (W.D.Wis. 1994) (reaching contrary conclusion); *cf. Ciba-Geigy Corp. v. Alza Corp.*, 804 F.Supp. 614, 635-37, 26 U.S.P.Q.2d 1321 (D.N.J.1992) (applying relation-back).

because "[a] claim must be read in accordance with the precepts of English grammar," *In re Hyatt,* 708 F.2d 712, 714, 218 U.S.P.Q. 195 (Fed.Cir.1983). Finally, "[w]here there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, ... the notice function of the claim [is] best served by adopting the narrower meaning." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1581, 37 U.S.P.Q.2d 1365 (Fed.Cir.1996).

The Federal Circuit has explained that the specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. As the court has "repeatedly stated, claims must be read in view of the specification, of which they are a part." *Vitronics,* 90 F.3d at 1582 (citation and internal quotation marks omitted). The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always relevant to the claim construction analysis. "Usually, it is dispositive; it is the single best guide to the meaning of the disputed term." *Id.* Further, "a claim interpretation that would exclude the inventor's device is rarely a correct interpretation; such an interpretation requires highly persuasive evidentiary support...." *Modine Mfg. Co. v. United States Int'l Trade Comm'n,* 75 F.3d 1545, 1550, 37 U.S.P.Q.2d 1609 (Fed.Cir.1996).

The prosecution history of a patent contains the complete record of all the proceedings before the PTO, "including any express representations made by the applicant regarding the scope of the claims." *Vitronics,* 90 F.3d at 1582. The prosecution history, therefore, "is often of critical sig-

nificance in determining the meaning of th[ose] claims." *Id.*

■ Only in circumstances where there is some genuine ambiguity in the meaning of a term in the claims after examination of all available intrinsic evidence is examination of extrinsic evidence permissible. *Vitronics,* 90 F.3d at 1584.[738] In most cases, review of the intrinsic evidence will suffice and extrinsic evidence need not be examined. *Id.* at 1583. In using extrinsic evidence, the Federal Circuit has indicated that sources available to the public prior to litigation are preferred to testimony or evidence created for or in anticipation of the litigation. Even when permissible, extrinsic evidence can be used only to assist the court in understanding the claims and may not be used to vary or contradict the claim language. *Id.* at 1584.

In *Vitronics,* the Federal Circuit distinguished between expert testimony on technology versus testimony on claim construction:

> [T]estimony on the *technology* is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the *proper construction* of a disputed claim term, relied on by the district court in this case. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms. Such instances will rarely, if ever, occur.

*Id.* at 1585. In *Bell & Howell Document Mgt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 45 U.S.P.Q.2d 1033 (Fed.Cir.1997), the Federal Circuit condemned the district court's reliance on experts' testimony. "Once a dispute over claim construction arises, 'experts' should also not be heard to inject a new meaning into terms that is inconsistent with what the inventor set

---

**738.** Extrinsic evidence is any evidence external to the patent and its file history, including expert testimony, prior art documents, inventor testimony, dictionaries, technical treatises and articles. *Id.*

forth in his or her patent and communicated, first to the patent examiner and ultimately to the public." *Id.* at 706. Because the patent claims at issue there did not "suffer from the malady of ambiguous intrinsic evidence[,]" the court concluded that resort to the expert testimony was improper. *Id.* at 706-07.

### b. Means-Plus-Function Claims

 Claim 1 of the '224 patent and Claim 3 of the '303 patent contain elements drafted in the form of a means for performing a recited function as permitted by 35 U.S.C. § 112 ¶ 6.[739] Under that statutory provision, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Literal infringement of a § 112 ¶ 6 claim limitation requires that "the accused device employs structure identical or equivalent to the structure disclosed in the patent and that the accused device performs the identical function specified in the claim." *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1350, 51 U.S.P.Q.2d 1385 (Fed.Cir.1999).

A means-plus-function element requires that the recited function be performed "exactly" in the accused device to find literal infringement under 35 U.S.C. § 112 ¶ 6. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934, 4 U.S.P.Q.2d 1737 (Fed. Cir.1987) (*en banc*), *overruled on other grounds, Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 U.S.P.Q.2d 1721 (1993). To determine literal infringement of a § 112

¶ 6 element requires a determination of whether the "way" the accused structure performs the claimed function, and the "result" of that performance, is substantially similar to the way the claimed function is performed by the corresponding structure described in the specification, and its result. *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267, 51 U.S.P.Q.2d 1225 (Fed.Cir.1999).

After it has been determined that the function is performed in the accused device, the analysis under § 112 ¶ 6 shifts to determining the "corresponding structure" for completing that function as described in the patent. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424, 43 U.S.P.Q.2d 1896 (Fed.Cir.1997). In *Abbott Laboratories*, the Federal Circuit held that,

> pursuant to this provision, structure disclosed in the specification is "corresponding" structure only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim. This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112 ¶ 6.

*Id.* Thus, "[u]nlike the ordinary situation in which claims may not be limited by functions or elements disclosed in the specification, but not included in the claims themselves, in writing a claim in means-plus-function form, a party is limited to the corresponding structure disclosed in the specification and its equivalents." *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476, 45 U.S.P.Q.2d 1608 (Fed.Cir.1998); *accord Greenberg v. Ethicon Endo-Sur-*

---

**739.** Specifically, if the word "means" is in the claim limitation, there is a presumption that it is a means-plus-function element to which § 112 ¶ 6 applies. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427, 44 U.S.P.Q.2d 1103 (Fed.Cir.1997). In fact, § 112 ¶ 6 can be invoked even without the use of express "means" language, when the claim element invokes purely functional terms, without the additional recital of specific structure or material for performing that function. *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 531, 41 U.S.P.Q.2d 1001 (Fed.Cir.1996). Although § 112 ¶ 6 is classically invoked when the patent claim recites "means for," use of the language "means to" has also invoked a § 112 ¶ 6 analysis. *See Cybor*, 138 F.3d at 1456-57.

gery, Inc., 91 F.3d 1580, 1582, 39 U.S.P.Q.2d 1783 (Fed.Cir.1996).

Not every structure capable of performing the recited function of a means element will be either disclosed in the patent specification or an equivalent of the disclosed, corresponding structure. Accordingly, §112 ¶ 6 operates as a restriction on claim coverage rather than an expansion of it. *See Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042, 25 U.S.P.Q.2d 1451 (Fed.Cir.1993) ("[T]he section operates more like the reverse doctrine of equivalents than the doctrine of equivalents because it restricts the coverage of literal claim language.").

 Claim 3 of the '303 patent is a process claim, that is, a claim involving a "series of steps." *Ex Parte Murray*, 9 U.S.P.Q.2d 1819, 1820, 1988 WL 252338, 1988 Pat. App. LEXIS 23 (Bd. Pat. App. & Interf. 1988). Where the plain meaning of the claim language indicates a sequential nature to the claim steps and the specification does not suggest otherwise, the steps must be performed in the order written in the claim. *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1375-76, 47 U.S.P.Q.2d 1732 (Fed.Cir.1998).

 Prosecution history should be used in the first instance as a claim construction tool, *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580-81, 6 U.S.P.Q.2d 1557 (Fed.Cir.1988); *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1021-24, 4 U.S.P.Q.2d 1283 (Fed.Cir.1987), independent of any estoppel context. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579, 12 U.S.P.Q.2d 1382 (Fed.Cir.1989). Arguments made during the patent's prosecution history, including those made in connection with a patent application, are relevant in determining the meaning of claim language. *Jonsson v. Stanley Works*, 903 F.2d 812, 818, 14 U.S.P.Q.2d 1863 (Fed.Cir.1990). The file history also limits the interpretation of claims to exclude any interpretation which may have been disclaimed or disavowed during prosecution in order to obtain allowance of the claims. *See Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 820, 12 U.S.P.Q.2d 1508 (Fed.Cir. 1989), *overruled on other grounds, Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 U.S.P.Q.2d 1721 (1993); *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1083, 5 U.S.P.Q.2d 1600 (Fed.Cir. 1988), *overruled on other grounds, Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 U.S.P.Q.2d 1721 (1993); *ZMI*, 844 F.2d at 1580. On the other hand, claims must also be construed to include limitations added through definitions made during prosecution arguments, even though such definitions do not appear in the specification or the claims. *See Key Mfg. Group, Inc. v. Microdot, Inc.*, 925 F.2d 1444, 1448, 17 U.S.P.Q.2d 1806 (Fed.Cir.1991); *E.I. du Pont de Nemours & Co. v. Phillips Pet. Co.*, 849 F.2d 1430, 1438, 7 U.S.P.Q.2d 1129 (Fed.Cir. 1988); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867, 228 U.S.P.Q. 90 (Fed. Cir.1985), *overruled on other grounds, Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068, 46 U.S.P.Q.2d 1097 (Fed.Cir.1998).

### 2. Infringement Principles

 Sunrise contends that AirSep, in manufacturing, selling and offering to sell the ImPulse Select device, infringes both the '303 Patent and the '224 Patent under 35 U.S.C. § 271, and thereby is directly infringing, contributorily infringing and/or inducing the infringement of the '303 Patent and the '224 Patent. Section 271(a) provides, in relevant part, that

> [e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent.

Section 271(b) further recites that "[w]ho-ever actively induces infringement of a patent shall be liable as an infringer[,]" while 35 U.S.C. § 271(c) prescribes, in pertinent part, that

> [w]hoever offers to sell or sells within the United States . . . a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

Infringement need only be established by a preponderance of the evidence. *Smith-Kline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889, 8 U.S.P.Q.2d 1468 (Fed.Cir.1988); *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361, 219 U.S.P.Q. 473 (Fed.Cir.1983).

### a. Literal Infringement

■■■ Under the "All Elements" or "All Limitations" rule, literal infringement requires that each and every element of a claim or its substantial equivalent be found in the accused device. Omission of even a single claimed element precludes a finding of either literal infringement or infringement under the doctrine of equivalents. *Johnston*, 885 F.2d at 1577 & n. 3; *Pennwalt*, 833 F.2d at 935; *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282, 230 U.S.P.Q. 45 (Fed.Cir.1986); *see Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1484, 221 U.S.P.Q. 649 (Fed.Cir.1984). Literal infringement analysis involves two distinct steps: (1) proper interpretation of the asserted claims; and (2) comparison of the properly interpreted claims and the accused product to determine whether infringement exists. *Vitronics*, 90 F.3d at 1580-81; *ZMI*, 844 F.2d at 1578; *see Markman*, 517 U.S. at 384, 116 S.Ct. 1384;

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed.Cir.1990). The first step, claim interpretation, is an issue of law, to be resolved by the court, and the second step, determination of infringement, is an issue of fact. *Markman*, 517 U.S. at 372, 390-91, 116 S.Ct. 1384; *WMS*, 184 F.3d at 1346.

■■■ In addition, the Federal Circuit has determined that to literally infringe under § 112 ¶ 6, "an accused device must (1) perform the identical function claimed for the means element, and (2) perform that function using the structure disclosed in the specification or an equivalent structure." *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 841, 20 U.S.P.Q.2d 1161 (Fed.Cir.1991); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1547, 41 U.S.P.Q.2d 1238 (Fed. Cir.1997) (citing *Valmont*, 983 F.2d at 1042); *Pennwalt*, 833 F.2d at 934. The test for statutory equivalence under § 112 ¶ 6 is whether the accused structure is insubstantially different from the structure disclosed in the specification. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309, 46 U.S.P.Q.2d 1752 (Fed.Cir.1998); *see Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222, 40 U.S.P.Q.2d 1667 (Fed.Cir. 1996) (noting that statutory equivalence under § 112 ¶ 6 and equivalence under the doctrine of equivalents both require insubstantial changes); *Valmont*, 983 F.2d at 1043 ("In the context of section 112 . . . an equivalent results from an insubstantial change which adds nothing to significance to the structure, material, or acts disclosed in the patent specification.").

### b. Doctrine of Equivalents

■■■ If a device does not literally infringe a § 112 ¶ 6 claim element, infringement may nevertheless exist under the judicially created doctrine of equivalents. *WMS*, 184 F.3d at 1352-53. Specifically, an accused device that does not literally infringe under § 112 ¶ 6, because no identity

of function exists, can infringe under the doctrine of equivalents, where substantially the same function is performed. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320-21, 50 U.S.P.Q.2d 1161 (Fed.Cir. 1999).

■ Equivalence will be found when one of ordinary skill in the art would consider that an element of the defendant's product performed substantially the same function in substantially the same way to produce substantially the same result as compared to the corresponding element of the plaintiff's claimed product. Exact identity of function, way and result is not required; substantial identity, that is, objective proof that any differences between the claimed invention and accused device are merely "insubstantial," is sufficient. *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1517-18, 35 U.S.P.Q.2d 1641 (Fed.Cir.1995) (*en banc*), *rev'd on other grounds*, 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 U.S.P.Q.2d 1865 (1997). Indeed, "function-way-result" and "insubstantial differences" are two linguistic formulations of the same test: whether the "accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention[.]" *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37, 117 S.Ct. 1040, 1053, 137 L.Ed.2d 146, 41 U.S.P.Q.2d 1865 (1997).[740]

■ Recognizing "that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement[,]" the Supreme Court in *Warner-Jenkinson* emphasized that the determination of equivalence must be made on an element-by-element basis and not by looking at the invention as a whole, so as to properly limit the scope of the doctrine.

520 U.S. at 29, 117 S. Ct. at 1049. Even so, in the § 112 ¶ 6 context, "[t]he individual components, if any, of an overall structure that corresponds to the claimed function are not claim limitations[,]" and component-by-component dissection is improper. *Odetics*, 185 F.3d at 1268.

### c. Prosecution History Estoppel

■ Prosecution history estoppel can preclude reliance on the doctrine of equivalents based on statements made by the patentee to the United States Patent and Trademark Office ("PTO") during the prosecution of a patent application. Prosecution history estoppel applies when an applicant either makes amendments or adds limitations to a claim in order to overcome the examiner's rejection of it based on the prior art. In essence, that doctrine prohibits an applicant from recapturing, as infringing equivalent subject matter, what he surrendered during prosecution to secure allowance of the claim. *American Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1445-46, 41 U.S.P.Q.2d 1614 (Fed.Cir.1997); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1173, 26 U.S.P.Q.2d 1018 (Fed.Cir.1993). Positions taken before the PTO may also bar an inconsistent position on claim construction under § 112 ¶ 6." *Alpex*, 102 F.3d at 1221.

Whether an amendment during patent prosecution creates an estoppel depends on the reason for the amendment. *Warner-Jenkinson*, 520 U.S. at 30-32, 117 S.Ct. at 1049-50. There, the Supreme Court distinguished amendments made to avoid prior art or address patentability concerns from those made for reasons not related to patentability. *Id.* at 32-34, 117 S.Ct. at 1050-51. The trial court must therefore determine "what subject matter the patentee actually surrendered" during the prosecution of the patent. *Hughes Aircraft Co. v.*

740. The equivalence is determined based upon the knowledge of one of ordinary skill in the art at the time of the alleged infringement, not when the application was filed or when the patent issued. *Id.* at 37, 117 S.Ct. at 1053.

*United States,* 140 F.3d 1470, 1476, 46 U.S.P.Q.2d 1285 (Fed.Cir.1998). The *Hughes Aircraft* court further reasoned that "if the accused device wholly fails to meet a limitation to which the patentee has expressly limited the claims, a finding of equivalence is precluded under prosecution history estoppel." *Id.* at 1477.

█ In situations where the prosecution history does not indicate the reason for an amendment, the Supreme Court in *Warner-Jenkinson* held that a rebuttable presumption applies that the amendment was made substantially for reasons of patentability:

> Where no explanation [for an amendment] is established, however, the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment. In those circumstances, prosecution history estoppel would bar the application of the doctrine of equivalents as to that element.

520 U.S. at 33, 117 S.Ct. at 1051.

█ "[A] method or process claim is directly infringed only when the process is performed." *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 773, 28 U.S.P.Q.2d 1378 (Fed. Cir.1993). The manufacture or sale of equipment to perform a patented process, therefore, is not a direct infringement of the process patent claims. *Id.* at 773-74. A party's act in connection with selling equipment may constitute active inducement or contributory infringement of a method claim under 35 U.S.C. §§ 271(b) and (c), respectively. As in the case of active inducement of infringement under § 271(b), proof of contributory infringement is dependent on a showing of a direct infringement. *Met-Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687, 231 U.S.P.Q. 474 (Fed.Cir.1986).

### 3. Comparison of the '303 Patent Claims to the Accused Method

#### a. Does AirSep Directly Infringe Claim 3 of the '303 Patent Under 35 U.S.C. § 271 (a)?

█ AirSep contends that Sunrise has adduced no proof that AirSep uses the method claimed in claim 3. Dkt. no. 84, at 33. I agree. Instead, the proof adduced was only that AirSep manufactures and sells the ImPulse Select device to home health care equipment providers, who in turn make the ImPulse available to patients having a prescription for oxygen. *Id.*

#### b. Is There Direct Infringement of Claim 3 by Others?

##### i. Literal Infringement

█ Claim 3, Step 3 recites the step of supplying a dose of respirating gas "only for the duration $T_1$." The meaning of Claim 3 and this limitation, in particular, are clear and unambiguous, in view of the claim language itself and other intrinsic evidence. The specification states, in pertinent part, "[t]hus, no respirating gas is applied to the patient during expiration." Resort to extrinsic evidence to interpret Claim 3 in this regard would therefore be improper. *Bell & Howell,* 132 F.3d at 706; *Vitronics,* 90 F.3d at 1584-85.

The ImPulse Select device, however, like the Stewart device and the Invacare Venture device, can and does supply a dose of oxygen when a patient exhales. Dkt. no. 84, at 35 *et seq.* Although very few patients ever experience a pulse of oxygen during exhalation, the fact remains that the ImPulse Select is capable of delivering such a pulse, something the '303 patent states should never happen. I therefore conclude that the ImPulse Select does not meet the claim limitation that $T_1$ be less than $T_2$. The dosing method of the ImPulse Select is simply not the same as the claim limitation of claim 3. Thus, the accused method omits at least one claim limitation recited

in Claim 3 and there is no likelihood of literal infringement of that claim. *Becton Dickinson,* 922 F.2d at 796.

■ Plaintiff, however, argues that merely pointing out certain operating conditions under which the device may not infringe is insufficient to avoid liability if the device infringes under other circumstances. *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.,* 134 F.3d 1085, 1089, 45 U.S.P.Q.2d 1355 (Fed.Cir.1998).[741] As a general principle, this is unassailable. Simply because, under certain operating conditions, a device does not infringe is not persuasive evidence for defendant because "this has little bearing on whether [the accused infringer's device] will avoid infringement under other foreseeable operating conditions." *Id.* Rather, "[f]or a manufacturer [of a device], infringement is determined by the use to which the device may reasonably be put or of which it is reasonably capable." *Huck Mfg. Co. v. Textron, Inc.,* 187 U.S.P.Q. 388, 408, 1975 WL 21108, 1975 U.S. Dist. LEXIS 12539 (E.D.Mich. 1975).

■ Thus, making a device capable of infringing use constitutes infringement even though it may be capable of some noninfringing use, *see Bell Comm. Research, Inc. v. Vitalink Comm. Corp.,* 55 F.3d 615, 622-23, 34 U.S.P.Q.2d 1816 (Fed. Cir.1995); *Kustom Signals, Inc. v. Applied Concepts, Inc.,* 52 F. Supp.2d 1260, 1279 (D.Kan.1999) (citing *Bell,* 55 F.3d at 622-23), and "it is of no moment that in certain modes of operation ... [the accused infringing device] may not operate in a way that would infringe the ... patent. It matters only that the accused device operate in an infringing way at some time[.]" *Inter-*

*spiro USA, Inc. v. Figgie Int'l, Inc.,* 815 F.Supp. 1488, 1512, 27 U.S.P.Q.2d 1321 (D.Del.1993), *aff'd,* 18 F.3d 927, 30 U.S.P.Q.2d 1070 (Fed.Cir.1994). But while true as a basic precept, plaintiff's argument based on this body of law fails to recognize the express claim limitation that the duration $T_1$ is "less than the duration $T_2$," which was reinforced by the patentee's statement in the prosecution history that "gas supply can *never* last longer than the patient's inspiratory effort." The patentee having limited his claim by the express use of the inequality "less than"--confirmed as a matter of claim construction by the use of the word "never" in the prosecution history--Sunrise as assignee cannot now rely on the above-referenced general authorities to assert that this limitation should be of no effect and that infringement should be found merely because *most* users experience no oxygen flow during expiration.

For this reason, *Canon* is distinguishable. There, the claim at issue required an airflow passage and a "first chamber" in the cartridge, while the accused device had a groove in the cartridge that the plaintiff contended acted as the air flow passage. Defendant submitted that under certain circumstances, the groove did not act as an air flow passage and the accused device did not infringe, although in other foreseeable operating circumstances the device could infringe. But there, the patent did not have limitations in the claim or language in the specification supporting a limitation that would exclude the accused device. In addition, there was no prosecution history in which the patentee specifically excluded certain devices or methods by distinguishing them over the prior art and by using the word "never."

---

741. The fact that an accused device that only infringes during certain times of operation nonetheless infringes has been long accepted. If devices "were designed so that they could be operated normally in an infringing way, it would seem to be immaterial that some customers did not choose at times to operate them in that manner." *Stearns-Roger Mfg. Co. v. Ruth,* 87 F.2d 35, 38, 32 U.S.P.Q. 227 (10th Cir.1936). "[A] machine that infringes part of the time is an infringement, although it may at other times be so operated as not to infringe." *Wright Co. v. Herring-Curtiss Co.,* 211 F. 654, 655 (2d Cir.1914).

Claim 3 further recites, in Step 2, that the duration $T_1$ is "less than the duration $T_2$." The meaning of this limitation is clear from the claim language itself and from the specification. As the patentee states,

> an object of this invention is to provide a respirator apparatus and method of operating same wherein respirating gas is supplied to a patient substantially at the beginning of an inspiration and for a time period thereafter *which is a fraction of the duration of inspiration.*

When in use, the accused device's pulse dose interval can be less than, equal to, or greater than $T_2$. Thus, for this additional reason, it is unlikely that there is literal infringement of Claim 3.

■ In addition, Claim 3, Step 2, recites "using timing means to predetermine a duration $T_1$, thereby invoking § 112 ¶ 6. *See In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1542-43, 25 U.S.P.Q.2d 1241 (Fed.Cir.1992) (claim at issue reciting "timing means for detecting each occurrence" interpreted within the context of § 112 ¶ 6). The timing means of the claimed invention is a fluidic circuit. Fluidic (as opposed to electronic) circuits are the only embodiments described in the '303 patent. Specifically, the claimed "timing means" is a variable orifice resistance in combination with a variable capacitance in the form of an elastomeric balloon. This fluidic resistor/capacitor circuit ("R/C circuit") may not exhibit linear characteristics. *See* dkt. no. 84, at 41-45.

The timing means of the ImPulse Select device, in contrast, is an electronic selector switch, the A/B mode switch, a linear electronic R/C circuit, the PAL chip and a pair of monovibrators. The fluidic RC circuit described in the '303 patent is not structurally similar to the electronic resistors and capacitors used in the accused device. *See Odetics*, 185 F.3d at 1267 (while structural identity is not necessary, structural equivalence is required for infringement).

Thus, while I agree as a general matter that fluidics and electronics can be equivalent technologies, in the circumstances of this case I conclude that the timing circuit for predetermining the pulse dose interval of a method utilizing the ImPulse Select is not structurally equivalent to the claimed timing means of the '303 Patent.[742] *See IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1435 (Fed.Cir. 2000) ("[T]wo structures that are equivalent in one environment may not be equivalent in another."). Given the lack of structural equivalence between the claimed "timing means" and the timing circuit of the accused device, and the importance of the timing means to the disclosed invention as a whole, there is likely no literal infringement of Claim 3. *See IMS*, 206 F.3d at 1436;[743] *Chiuminatta*, 145 F.3d at 1306-10 (in a claim reciting means for supporting the surface of concrete in a concrete saw apparatus, the wheels of the accused device held not structurally equivalent to the skid plate described in the patent specification).

The accused device used a floppy disk instead, which the Federal Circuit held was an equivalent structure. It reasoned that the physical characteristics of the interface means were unimportant and incidental to the invention, which was "directed to an apparatus that permits interactive programming of a machine tool." *Id.* at 1436. Here, in contrast, the differences between the structures affect the operation of the claimed method itself, *e.g.*, fixed versus variable capacitance and linearity versus nonlinearity. For this reason, *IMS*, upon which plaintiff relies, is distinguishable.

---

**742.** Kumar Tr. 2/11:5. For that matter, neither is the control system of plaintiff's EX 2000, which also uses electronic circuitry. This raises questions of whether plaintiff has commercialized the '303 patent, but this issue has not been adequately briefed and is unnecessary to my disposition in any event.

**743.** *IMS* involved a means-plus-function claim for a control system for machine tools. One limitation was an "interface means for transferring a control program" to and from an external medium, the corresponding structure of which was disclosed as a tape cassette.

Claim 3, Step 4, calls for automatically repeating Step 2, using timing means to predetermine a duration $T_1$. When the accused device is in use, the pulse dose interval is predetermined via the selector switch, R/C circuit, and monovibrators. A patient or respiratory therapist selects, via a selector switch, a volume of oxygen, either in A or B mode, which includes a specific pulse dose interval. The selection of the desired pulse dose interval is not repeated for each consecutive breath cycle, and from this, defendant argues that there can be no literal infringement of Claim 3 as a matter of law. This limitation of claim 3, however, does not require resetting of the period established by the timing means prior to each use, as I have already found as a matter of fact. Dkt. no. 84, at 48. Accordingly, defendant's argument cannot prevail on this point.

Lastly, Claim 3 recites, in Step 1, the step of sensing inspiration. Step 2 requires the use of timing means. Thus, the onset of the inspiration period must be sensed first; then and only then is the timing means employed to predetermine the duration of the pulse dose interval. In view of this, defendant argues, and I agree, that Claim 3 requires that Step 1 be performed before Step 2. *Mantech*, 152 F.3d at 1376 ("[T]he sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise.... Therefore, we uphold the district court's construction that the process as claimed in this patent must be performed sequentially.") Defendant then argues that, in using the ImPulse Select device, the pulse dose interval is fixed *before* the initiation of the first inspiration of the patient is sensed and there can therefore be no literal infringement of Claim 3. On this, I disagree. Again, it is not required that the timing means be *reset* on each breath, only that it be "used" in the sense of "consulted," "referred to," or "queried." This the ImPulse

Select undeniably does, as the device could not function if the RC circuitry were removed or disabled.

Nevertheless, because the limitations of steps 2 and 3 are not met, I conclude that the ImPulse Select is not likely to literally infringe Claim 3 of the '303 patent.

### ii. Prosecution History Estoppel and Infringement of Claim 3 Under The Doctrine Of Equivalents.

There are limited circumstances under which an accused device could fail to practice a method literally or as a statutory equivalent under § 112 ¶ 6, yet still be found to infringe under the judicially created doctrine of equivalents. No party argues, however, that this case presents such a situation; accordingly, my analysis of literal infringement under § 112 ¶ 6 also disposes of infringement under the doctrine of equivalents. I further note, however, that in addition to the reasons already set forth, infringement under the doctrine of equivalents would also fail on account of prosecution history estoppel.

The Applicant, on what eventually issued as the '303 patent, initially submitted broad claims, which the PTO rejected as obvious in view of the prior art. In response to the Examiner's rejections, the applicant amended his claims to insert narrowing limitations. Dkt. no. 84, at 15-19. More particularly, Claim 3 requires that the dose of respirating gas be supplied "only for the duration $T_1$." The prosecution history clearly demonstrates that the claimed invention does not cover methods utilizing devices that deliver a dose of gas beyond the duration $T_1$, and hence, beyond the duration of inspiration $T_2$, since $T_1$ is always less that $T_2$.

The Applicant's claims as originally filed contained no such limitation, but the Examiner, rejected the claims in view of the patent to Stewart. In reply, Applicant argued that

contrary to the patent's desired time frame for respiration, Stewart supplies

gas even during a time when the patient would otherwise be exhaling. With Applicant's method, on the other hand, gas supply can never last longer then the patient's inspiratory effort.

Following these arguments, the Examiner suggested that the limiting language "said dose being supplied *only* for a duration $T_1$" be added to overcome the prior art. Applicant adopted this suggested limitation.

Claim 3 also requires that the duration $T_1$ be less than the duration $T_2$. The arguments made and positions taken during the prosecution of the application that matured into the '303 patent also clearly demonstrate that Claim 3 is limited in scope to a method which utilizes an apparatus which delivers a pulse of oxygen for a period of time which is always less than the duration of inspiration $T_2$. Applicant, in this regard, stated:

> [P]rior art methods and systems have attempted to supply a patient with supplemental gas either throughout respiration or throughout inspiration upon demand.
>
> . . . . .
>
> Rather than continually supplying a patient with supplemental gas, or rather than just supplying a patient with supplemental gas throughout inspiration, Applicant's method and apparatus capitalize upon the effective early stage inspiratory phenomenon recognized by Applicant. In accordance with this phenomena [sic], Applicant has concluded

that it is more advantageous to apply a greater volume of respirating gas (such as oxygen) per second and to apply the oxygen *only during an effective early stage of inspiration.*

. . . . .

> The pulse has a duration $T_1$ which is *less than* the duration $T_2$ of the inspiration.

(Emphasis added). The claims as originally filed by the Applicant did not have the limitation that duration $T_1$ be less than $T_2$, which was added to overcome Stewart, Myers, and D. Auerbach's article in *Chest.* In a subsequent amendment, the Applicant reiterated that the limitation in the claims that $T_1$ be less than $T_2$ was necessary to overcome prior art references directed to devices and methods that supplied a dose of respirating gas throughout the inspiration period.

The reasons for the aforementioned amendments were to avoid the prior art. Any competitor looking at this history[744] would reasonably conclude that Sunrise had relinquished methods wherein a dose of oxygen is delivered during expiration and the pulse dose duration is equal to or greater than the duration of inspiration. That competitor could reasonably conclude that Sunrise gave up its broadly worded claims in order to procure the patent, and that, accordingly, Sunrise could make no legitimate claim to the aforementioned relinquished subject matter. *See Desper Products,* 157 F.3d at 1339.[745] Sunrise therefore cannot now recapture what was

---

744. "The standard for determining what subject matter was relinquished is an objective one, measured from the vantage point of what a competitor was reasonably entitled to conclude, from the prosecution history, that the applicant gave up to procure issuance of the patent." *Hoganas AB v. Dresser Industries, Inc.,* 9 F.3d 948, 952, 28 U.S.P.Q.2d 1936 (Fed.Cir.1993); *accord Desper Prods., Inc. v. QSound Labs, Inc.,* 157 F.3d 1325, 1338, 48 U.S.P.Q.2d 1088 (Fed.Cir.1998); *Haynes Int'l, Inc. v. Jessop Steel Co.,* 8 F.3d 1573, 1578, 28 U.S.P.Q.2d 1652 (Fed.Cir.1993), *modified on other grounds,* 15 F.3d 1076 (Fed.Cir.1994), 15 F.3d 1076, 29 U.S.P.Q.2d 1958.

745. There, the prior art taught that the "conditioning signal" was not kept separate and apart from the "input signal." The applicants, however, distinguished the claimed invention over prior art during prosecution when applicants' attorney stated that "once the monaural signal is split into the two channel signals, those signals are forever after isolated one from another and are *never* combined or commingled." *Id.* (emphasis added). The court held that applicants explicitly surrendered the teachings of the prior art patent. *Id.*

voluntarily given up during prosecution of this patent application. *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 866-68, 26 U.S.P.Q.2d 1767 (Fed.Cir.1993) (use of phrase "only in a single row" surrendered multiple-row configuration).

### c. Whether AirSep Intentionally Induced Direct Infringement of Claim 3

■ Method claims can be infringed by inducement (35 U.S.C. § 271(b)) or contributorily infringed (35 U.S.C. § 271(c)) by the sale of an apparatus. Nevertheless, absent direct infringement of a patent claim there can be neither contributory infringement nor inducement of infringement. *Met-Coil*, 803 F.2d at 687. Because I have found no likelihood of direct infringement, these claims probably fail for that reason alone.

■ Moreover, "[a] person induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 675, 15 U.S.P.Q.2d 1540 (Fed. Cir.1990). "[A]ctual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement[,]" *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469, 15 U.S.P.Q.2d 1525 (Fed.Cir.1990), and there has been no evidence adduced that AirSep possessed actual intent to cause any act constituting infringement.

### 4. Comparison of the '224 Patent Claims to the Accused Device

### a. Literal Infringement

Literal infringement requires that the accused device embody every limitation of the asserted claim, *i.e.*, the claim must "read on" the accused device exactly. *Johnston*, 885 F.2d at 1580 (citing, *inter alia*, *Townsend Eng'g Co. v. HiTec Co.*, 829 F.2d 1086, [1089, 4 U.S.P.Q.2d 1136] (Fed.Cir.1987)). The claims of the '224 patent require "flow restricting means" and a bypass valve. The structure disclosed in the specification is a flow limiting valve such as a manually adjustable needle valve or a fixed orifice flow restrictor. Moreover, the claims require that the flow restricting means be "in series with" the bypass valve. Hence, a relationship has been defined between these two separate claim elements.[746]

■ The ImPulse Select device does not include both a bypass valve and a separate flow restricting means to limit oxygen flow through the bypass valve. Dkt. no. 84, at 65-65. Specifically, the accused device does not include a separate flow restricting means to limit flow through the bypass valve. Given the complete absence of such a separate and distinct structure, the accused device omits at least one claimed element recited in the '224 Patent and there is no likelihood of literal infringement of these claims as a matter of law.

### b. Doctrine of Equivalents

Under the doctrine of equivalents, the Federal Circuit has held repeatedly that each and every claim limitation must be present at least equivalently in the accused structure. It is only in this way that the accused device could possibly perform substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. In *Becton Dickinson*, the Federal Circuit reasoned that

---

**746.** The claims and limitation at issue are not ambiguous, and the meaning of the claim language is clear from an analysis of the intrinsic evidence. Therefore, any resort to extrinsic evidence to interpret the claims and the relevant limitation would be improper.

*Vitronics*, 90 F.3d at 1585 (The reliance on expert testimony regarding the proper construction of a disputed claim term "will rarely, if ever, occur."); *Bell & Howell*, 132 F.3d at 706.

[o]nly if all limitations of the claim are satisfied at least equivalently can it be found that the two devices work in substantially the same way.

. . . . .

Essentially BD asserts that some of the limitations required for the jacket are not necessary to achieve the end result. That may be true but limitations of the axial extent of the jacket and the forming of an extension of the spring appear to have been necessary for patentability. *But whether necessary or not, after issuance, all limitations in a claim are material and must be met exactly or equivalently in an accused device to find that the accused device works in the same way.*

922 F.2d at 798 (emphasis added, citations and internal quotation marks omitted); *accord Warner-Jenkinson,* 520 U.S. at 29, 117 S. Ct. at 1049; *Valmont,* 983 F.2d at 1043 n. 2; *Pennwalt,* 833 F.2d at 935.

▮▮ It is legal error to ignore claim limitations and merely compare the claimed invention's overall operation with the accused device. *Julien v. Zeringue,* 864 F.2d 1569, 1570-71, 9 U.S.P.Q.2d 1552 (Fed.Cir.1989), *overruled on other grounds, Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1, 26 U.S.P.Q.2d 1721 (1993). The function-way-result analysis under the doctrine of equivalents therefore must employ a limitation-by-limitation comparison rather than a comparison of the device as a whole with a patent as a whole. *See Pennwalt,* 833 F.2d at 935. Furthermore, the doctrine of equivalents cannot be used to circumvent claim limitations spelling out particular relationships between components. *See Dolly, Inc. v. Spalding & Evenflo Cos.,* 16 F.3d 394, 398, 29 U.S.P.Q.2d 1767 (Fed.Cir.1994).

▮▮ Nevertheless, *Dolly* "did not read the doctrine of equivalents out of existence when a claim limitation is not expressly met by an accused device." *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1318, 47 U.S.P.Q.2d 1272 (Fed.Cir.1998). Moreover, "[a]n apparatus claim describing a combination of components does not require that the function of each be performed by a separate structure in the apparatus. The claimed and accused devices must be viewed and evaluated as a whole." *Sun Studs, Inc. v. ATA Equip. Leasing, Inc.,* 872 F.2d 978, 989, 10 U.S.P.Q.2d 1338 (Fed.Cir.1989), *overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1038-39, 22 U.S.P.Q.2d 1321, 1333 (Fed.Cir.1992); *accord Dolly,* 16 F.3d at 398 ("The doctrine of equivalents does not require a one-to one correspondence between components of the accused device and the claimed invention."). One claim limitation may therefore be read upon two elements of the accused structure. *Ethicon,* 149 F.3d at 1320; *accord Dolly,* 16 F.3d at 398 ("Equivalency can also exist when separate claim limitations are combined into a single component of the accused device.").

▮▮ Each of the claims of the '224 patent recites a flow restricting means and a bypass valve. As defendant points out, these claims go even further by reciting a specific *relationship* between these components, that is, that the flow restricting means is "in series with" the bypass valve to limit oxygen flow through it. I have already found as a matter of fact, however, that "when the ImPulse Select bypass valve is open, the remainder of the bypass valve is in series with the valve seat or microduct" containing the flow restricting means. Dkt. no. 84, at 67, as amended. So, while there is probably no literal infringement because there is a lack of identity of structures--a bypass valve and a separate flow restricting means--I find factually that the valve seat is a flow restricting means and an equivalent structure to that of the '224 patent.

During his direct examination concerning infringement under the doctrine of equivalents, AirSep's technical expert, Sam Kumar, could not articulate any functional or structural differences between the ImPulse Select and the claims of the '224 patent other than the assumption of counsel for AirSep that the bypass valve and flow restrictor must be separate and distinct structures.[747] Given my finding that the structures are equivalent, there can be no question but that the bypass system of the ImPulse Select, including both its valve and restricting means, performs exactly the same function in exactly the same way and with the exact same result as set forth in claim 1 of the '224 patent. I must conclude, therefore (because they are merely two ways of saying the same thing), that the ImPulse Select is insubstantially different from the subject matter of claim 1 and hence is likely to infringe under the doctrine of equivalents.

## C. Validity

"A patent is presumed valid, and each claim of a patent is presumed valid independent of the validity of the other claims. 35 U.S.C. § 282. This presumption is procedural, not substantive." *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F.Supp. 397, 400, 12 U.S.P.Q.2d 1608 (D.Del.1989) (citing *T.J. Smith*, 821 F.2d at 648), *aff'd mem.*, 904 F.2d 45, 16 U.S.P.Q.2d 1158, 1990 WL 58393 (Fed.Cir. 1990). Because of this presumption, former Chief Judge Markey once opined that "[a] patent is born valid." *Roper*, 757 F.2d at 1270. It is therefore defendant's burden at the preliminary injunction stage to make an initial showing that the patentee has "no reasonable likelihood of success on the

issue of validity." *Id.* The burden then falls to "plaintiff to show a reasonable likelihood that the attack on its patent's validity would fail." *Drexelbrook*, 720 F.Supp. at 400 (citing cases).[748] Validity, however, remains an issue of law for resolution by the court. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479, 44 U.S.P.Q.2d 1181 (Fed.Cir.1997) (obviousness).

In determining validity, a district court may be called upon to consider the obviousness of certain aspects of the patent-insuit. When the references upon which the assertion of obviousness is based were directly considered by the Examiner during prosecution, the plaintiff's burden is less easily carried. *WMS*, 184 F.3d at 1355 (citing *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1569[, 40 U.S.P.Q.2d 1481] (Fed.Cir.1996)). "Therefore, the challenger's 'burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application.'" *Al-Site*, 174 F.3d at 1323 (*quoting Hewlett-Packard*, 909 F.2d at 1467).[749]

Apart from the presumption, a patent holder seeking a preliminary injunction can make a sufficient showing of patent validity in three ways: (1) a prior adjudication of validity of the patent; (2) public acquiescence to its validity; or (3) direct technical evidence proving its validity. *Smith Int'l*, 718 F.2d at 1578. Sunrise admits that no prior adjudication of validity exists with respect to either the '224 or the '303 Patent. Dkt. no. 84, at 112. Sunrise also adduced no evidence as to any public acquiescence of the validity of either the '303 or the '224 Patents. *Id.* Moreover, Sunrise adduced no direct technical evi-

---

747. Kumar Tr. 2/10:270-72.

748. I take this formulation of these shifting burdens as the equivalent of that set forth in *Genentech*, 108 F.3d at 1364, and *New England Braiding*, 970 F.2d at 883.

749. "The 'presumption of validity under 35 U.S.C. § 282 carries with it a presumption that the Examiner did his duty and knew what claims he was allowing.'" *Al-Site*, 174 F.3d at 1323 (quoting *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1054[, 12 U.S.P.Q.2d 1474] (Fed.Cir.1989)).

dence, opinion or otherwise, that the '303 or the '224 Patents are valid.

### 1. 35 U.S.C. §102--Anticipation

■ "Invalidity based on lack of novelty (often called 'anticipation') requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee." *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302, 36 U.S.P.Q.2d 1101 (Fed.Cir.1995). Anticipation is a question of fact, which is established if every element of a properly construed claim is present in a single prior art reference, enabling "one skilled in the art to make the anticipating subject matter." *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1566, 37 U.S.P.Q.2d 1618 (Fed.Cir.1996); *see Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047, 34 U.S.P.Q.2d 1565 (Fed.Cir.1995); *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1554, 33 U.S.P.Q.2d 1496 (Fed.Cir.1995); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576, 18 U.S.P.Q.2d 1896 (Fed.Cir.1991). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic*, 927 F.2d at 1576.[750] No claim in either the '303 or the '224 patents is anticipated by a single prior art reference; therefore, no claim in either patent is invalid for anticipation.

### 2. 35 U.S.C. § 103--Obviousness

■ A patent is invalid under 35 U.S.C. § 103 if the difference between the subject matter sought to be patented and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art" to which said subject matter pertains. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1376, 51 U.S.P.Q.2d 1948 (Fed.Cir.1999) (quoting 35 U.S.C. § 103(a)); *see Graham v. John Deere Co.*, 383 U.S. 1, 13, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966); *In re Napier*, 55 F.3d 610, 613, 34 U.S.P.Q.2d 1782 (Fed. Cir.1995). Obviousness is a legal conclusion based on several factual inquires: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations of nonobviousness, such as commercial success, long-felt need and failure of others. *See Graham*, 383 U.S. at 17-18, 86 S.Ct. 684; *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050, 5 U.S.P.Q.2d 1434 (Fed.Cir.1988). Where there is no PTO view on obviousness in view of the asserted references, the defendant's task of showing likely invalidity is more easily accomplished. *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 905, 225 U.S.P.Q. 20 (Fed.Cir.1985).

■ To hold a patent claim invalid as obvious based upon multiple prior art references, there must be a "clear and particular" showing of some teaching, suggestion, or reason to combine the references. *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1348-49, 53 U.S.P.Q.2d 1580 (Fed.Cir.2000) (quoting *In re Dembiczak*, 175 F.3d 994, 1000 (Fed.Cir.1999), over-

---

**750.** "The role of extrinsic evidence, in determining anticipation, is to educate the decision-maker to what the reference meant to persons of ordinary skill in the field of the invention...." *Id.* Thus, extrinsic evidence of the knowledge of one of ordinary skill in the art is relevant in situations where "[t]he common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges." *Finnigan Corp. v. International Trade Comm'n*, 180 F.3d 1354, 1365, 51 U.S.P.Q.2d 1001 (Fed. Cir.1999) (quoting *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268-69, 20 U.S.P.Q.2d 1746 (Fed.Cir.1991)). Accordingly, extrinsic evidence may be used to explain but not expand the meaning of a reference. *See In re Baxter Travenol Labs.*, 952 F.2d 388, 390, 21 U.S.P.Q.2d 1281 (Fed.Cir.1991).

*ruled on other grounds, In re Gartside,* 203 F.3d 1305, 53 U.S.P.Q.2d 1769 (Fed. Cir.2000)), *pet. for cert. filed,* No. 99-1629 (Apr. 10, 2000); *accord Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1578-79, 42 U.S.P.Q.2d 1378 (Fed. Cir.1997); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582, 37 U.S.P.Q.2d 1314 (Fed.Cir.1996) ("there must be showing of a suggestion or motivation to modify the teachings" of prior art references). The suggestion to modify the art need not be expressly stated in the references, however. *B.F. Goodrich,* 72 F.3d at 1582. Further,

[w]hen the references are in the same field as that of the applicant's invention, knowledge thereof is presumed. However, the test of whether it would have been obvious to select specific teachings and combine them as did the applicant must still be met by identification of some suggestion, teaching, or motivation in the prior art, arising from what the prior art would have taught a person of ordinary skill in the field of the invention.

*In re Dance,* 160 F.3d 1339, 1343, 48 U.S.P.Q.2d 1635 (Fed.Cir.1998).

On the other hand, the mere fact that all of the prior art is within the same field does not, without more, supply a teaching or motivation to combine. *See Winner,* 202 F.3d at 1349. Benefits lost and gained must be weighed when considering whether one skilled in the art would have traded one benefit for another. *Id.* at 1349-50 & n. 8 The absence of any suggestion to combine disposes in the negative the obviousness determination. *Gambro,* 110 F.3d at 1579. Thus, obviousness will not be found where, without suggestion in the prior art, a dissection and combination is made. Selective hindsight is not a valid method of determining non-obviousness, *In re Dow Chemical Co.,* 837 F.2d 469, 473, 5 U.S.P.Q.2d 1529 (Fed.Cir.1988); "[t]o imbue one of ordinary skill in the art

with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher." *W.L. Gore & Assocs. v. Garlock, Inc.,* 721 F.2d 1540, 1553, 220 U.S.P.Q. 303 (Fed.Cir.1983).

In addressing obviousness, objective evidence in the form of "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, [and copying], might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham,* 383 U.S. at 17-18, 86 S.Ct. 684; *Glaverbel,* 45 F.3d at 1555 (citing *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538-1539[, 218 U.S.P.Q. 871] (Fed.Cir.1983)); *see also B.F. Goodrich,* 72 F.3d at 1582. "Objective evidence of nonobviousness may [additionally] include ... licenses showing industry respect." *WMS,* 184 F.3d at 1359.

### 3. Scope and Content of the Prior Art

Prior art has been defined as "knowledge that is available, including what would be obvious from it, at a given time, to a person of ordinary skill in an art." *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1453, 223 U.S.P.Q. 603 (Fed.Cir.1984). Once the prior art is identified, the focus of the analysis shifts to identifying the differences between the claimed invention and the prior art. *See Gardner v. TEC Sys., Inc.,* 725 F.2d 1338, 1345, 220 U.S.P.Q. 777 (Fed.Cir.1984).

Instantly, one knowledgeable in the art at the time of the '303 and '224 patents would know to look at applications relative to oxygen delivery systems such as medical, scuba diving, mountain climbing and aviation. The parties do not dispute that all of the references asserted by AirSep are within the same field as that of the patented inventions and were patented or de-

scribed in printed publications before the invention by the applicants of the subject matter of the '224 and '303 Patents. It is undisputed, therefore, that the asserted references are, in fact, prior art to the '303 and '224 Patents.

### 4. Level of Ordinary Skill in the Art

■ There are six factors a court should consider in determining the level of ordinary skill in the art: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior art solutions; (4) the rapidity of innovation; (5) the sophistication of the technology at issue; and (6) the educational level of active workers in the field. *See Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,* 796 F.2d 443, 449-450, 230 U.S.P.Q. 416 (Fed.Cir.1986). In this action, one of ordinary skill in the art would not need a college degree although he or she would have three to five years' work experience; some mechanical skills; exposure to basic pneumatic components such as regulator and compressor fittings, valves, solenoid valves, and tubings; knowledge of testing and flow/pressure sensing. This hypothetical person would also know that the main goals in building a portable oxygen system are to reduce weight and bulkiness, conserve oxygen, and reduce power consumption. In addition, one of ordinary skill in the art would have a knowledge of fluidics and the knowledge that fluidic components can be used as timers for medical applications.

### 5. The Lack of Differences Between the Claims and the Prior Art

#### a. Whether Claims 3-5 of the '303 Patent are Invalid Under § 103 as Obvious

#### i. Sunrise's Alleged Admission of Invalidity

■ Sunrise acknowledged to the United States Patent and Trademark Office that Claim 23 of the '528 Patent is "too broad or otherwise invalid." Claim 23 of the '528 Patent and Claim 3 of the '303 Patent are identical in meaning and scope. Thus, according to defendant, the disclaimer[751] of claim 23 of the '528 Patent constitutes an admission that Claim 3 of the '303 Patent is "too broad, or otherwise invalid." Based on that conclusion, defendant urges this court not to enforce the '303 Patent against it. Plaintiff, on the other hand, contends that the disclaimer was filed, not because either Claim 3 or Claim 23 were invalid, but to prevent the later Claim 23 from effecting a double patent of the earlier Claim 3. With that explanation, it argues for a narrow interpretation of the disclaimer that would permit enforcement of Claim 3 of the '303 Patent in this case.

"The basic concept of double patenting is that the *same* invention cannot be patented more than once, which, if it happened, would result in a second patent which would expire some time after the original patent and extend the protection timewise." *General Foods Corp. v. Studiengesellschaft Kohle mbH,* 972 F.2d 1272, 1279-80, 23 U.S.P.Q.2d 1839 (Fed.

---

**751.** "A patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent and Trademark Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him." 35 U.S.C. § 253. The phrase "considered as part of the original patent" in section

253 of Title 35 has been interpreted to mean that the patent is treated as though the disclaimed claims never existed. *Vectra Fitness, Inc. v. TNWK Corp.,* 162 F.3d 1379, 1383, 49 U.S.P.Q.2d 1144 (Fed.Cir.1998) (*citing* 37 C.F.R. § 1.321(a) (1997)), *cert. denied,* 526 U.S. 1160, 119 S.Ct. 2051, 144 L.Ed.2d 217 (1999). "The recording of a disclaimer is not dependent upon actions taken by the PTO." *Id.* at 1382 (*citing* 37 C.F.R. § 1.321(a) (1997)).

Cir.1992). The '578 patent expires after the '303 Patent expires. The disclaimer of claim 23 of the '578 Patent removed that claim from the patent as though the claim never existed and therefore no extension of the protection of the '303 patent beyond its expiration date can occur. Without the disclaimer, however, plaintiff acknowledges that Claim 23 of the '578 patent could have been invalid for double patenting.

On the current state of the record, claim 3 of the '303 patent does not appear to be invalid for double patenting. Even in the absence of the disclaimer of claim 23 of the '578 patent, claim 3 of the '303 patent would not likely be invalid for double patenting because it is the claim that will first expire. Further, the disclaimer of claim 23 of the '578 patent may have no bearing on the validity of any claim of the '303 patent. *Cf. Allen Archery, Inc. v. Browning Mfg. Co.*, 819 F.2d 1087, 1097, 2 U.S.P.Q.2d 1490 (Fed.Cir.1987) ("[T]he failure of a patentee to disclaim an invalid patent claim does not prevent the patentee from enforcing any remaining claims in the *same* patent which are otherwise valid." (Emphasis added, citation omitted.)). For present purposes, it suffices to say that defendant has not made a sufficient showing of invalidity based on the disclaimer to affect plaintiff's likelihood of success on the merits.

### ii. Whether Claims 3-5 are Obvious in View of the '752 Patent (Meidenbaur) over Smith

■■■ When analyzing a patent claim for obviousness the claim should be considered as a whole, but the principal differences between the patented claim and the prior art must be identified. *Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 717, 21 U.S.P.Q.2d 1053 (Fed.Cir.1991) (citing *W.L. Gore*, 721 F.2d at 1548). Once the differences are ascertained, the analysis centers on the ultimate legal question: "whether these differences are such that the invention *as a whole* would have been obvious to one of ordinary skill in the art

at the time the invention was made." *TEC Sys.*, 725 F.2d at 1345.

■■■ The '752 Patent teaches one of ordinary skill in the art the following limitations or elements of Claim 3 of the '303 Patent: (1) a method of supplying supplemental dosages of respirating gas to a spontaneously breathing in vivo respiratory system having an inspiration period and an expiration period; (2) said inspiration period being of a duration $T_2$ during which period a negative pressure relative to ambient pressure exists in said in vivo respiratory system at the location whereat respirating gas is introduced to said system; (3) said expiration period comprising a positive pressure relative to ambient pressure existing in said in vivo respiratory system at the location whereat respirating gas is introduced to said system; (4) sensing initiation of said inspiration period; supplying immediately in response to said sensed inspiration a dose of respirating gas to said in vivo respiratory system; and (5) said dose being supplied substantially at the beginning of said sensed inspiration, said dose of gas being supplied at a rate R1. *See* dkt. no. 84, at 78-80. Moreover, the Smith reference, in combination with the '752 Patent, teaches one of ordinary skill in the art the general use of timing means.

These references, however do not teach the following: (1) the use of timing means to predetermine a duration $T_1$ for which a dose of respirating gas is to be supplied to said in vivo respiratory system; (2) said duration $T_1$ being less than the duration $T_2$ of negative pressure relative to ambient pressure occurring in said in vivo respiratory system during said inspiration period; and (3) said dose being supplied only for the duration $T_1$. Dkt. no. 84, at 82-83. In addition, no motivation to combine these references exists. *Id.* at 84-85.

Accordingly, the combination of the '752 Patent (Meidenbaur) and the Smith reference do not teach each and every element of Claim 3 of the '303 Patent. The differences between the combination and Claim

3 of the '303 Patent are of such significance that the invention as a whole would probably not have been obvious to one of ordinary skill in the art at the time of the invention. Thus, Claim 3 of the '303 Patent is not likely invalid in view of the '752 Patent over the Smith reference.[752]

### b. Whether the Claims of the '224 Patent are Invalid

### i. Whether Claims 1-6 of the '224 Patent are Invalid on the Ground of Anticipation

■ The OMS 50 Reference teaches one of ordinary skill in the art the following limitations of Claim 1 of the '224 Patent: (1) an overpressure relief valve on the manifold block; (2) a solenoid operated flow control valve on the manifold block arranged for initiating and interrupting the delivery of oxygen from the cylinder to a patient; (3) flow restricting means in series with the bypass valve to limit oxygen flow through the bypass valve; (4) means for manually opening and closing the bypass valve; and (5) control means responsive to inhalation by a patient for opening said solenoid operated flow control valve to deliver a dose of oxygen to a patient. Dkt. no. 84, at 90-94. It does not teach, however: (a) an oxygen management device adapted to be mounted on a post on a compressed oxygen cylinder for delivering a controlled flow of oxygen to a patient; (b) a manifold block having an opening adapted to receive a post on an oxygen cylinder; (c) a manifold block opening having an oxygen connection adapted to engage and seal to a mating connection on an oxygen tank post; (d) pressure regulating means on the manifold block for reducing the pressure of oxygen received from a cylinder to a predetermined low level; and (e) a bypass valve on the manifold arranged in parallel with the solenoid operated flow control valve. *Id.* Accordingly, the OMS 50 does not teach each and every element of Claim 1 of the '224 Patent, and that claim is probably not anticipated by the OMS 50 reference.

The OMS 50 Reference does, however, teach one of ordinary skill in the art the following limitations of Claim 4: (1) a knob extending from a housing for movement between first and second positions; (2) means for opening the bypass valve when the knob is in the first position and for closing the valve when the knob is in the second position. *Id.* at 97-98. In this instance, then, I concur with Mr. Kumar's professional and expert opinion and conclude that Claim 4 of the '224 Patent is probably invalid in view of the OMS 50 device.[753]

The OMS 50 Reference also teaches one of ordinary skill in the art the following limitations of Claim 5: (1) a bypass valve having a valve stem movable between open and closed positions; and (2) a valve stem that is moved by the opening and closing means to the open position when the knob is moved to the first position and to the closed position when the knob is moved to the second position. *Id.* at 98. Accordingly, I agree with Mr. Kumar's professional opinion and conclude that Claim 5 of the '224 Patent is likely to be found invalid in view of the OMS 50 device.[754]

The OMS 50 Reference teaches one of ordinary skill in the art the limitation of Claim 6 of means on said housing for selecting and indicating the effective pulse flow rate delivered to an inhaling patient by said solenoid operated flow control valve. Thus, I credit Mr. Kumar's expert opinion and conclude that Claim 6 of the '224 Patent is probably invalid in view of the OMS 50 device.[755]

---

**752.** The same conclusion obtains for Claims 4 and 5. Dkt. no. 84, at 83 n.412.

**753.** Kumar Tr. 2/10:226.

**754.** Kumar Tr. 2/10:227.

**755.** Kumar Tr. 2/10:228.

### ii. Whether the Remaining Claims of the '224 Patent are Invalid Under 35 U.S.C. § 103 in View of the OMS 50 Reference Over the European Patent

The OMS 50 Reference, as discussed *supra*, does not teach one of ordinary skill in the art all of the limitations of Claim 1. Moreover, the European Patent on which defendant relies does not teach one of ordinary skill in the art any of the following limitations of Claim 2: an annular housing enclosing a manifold block, pressure regulating means, overpressure relief valve, solenoid operated flow control valve, bypass valve, flow restrictor and control means. Nor does it teach an annular housing having an opening aligned with a manifold block opening and adapted to receive a post on an oxygen cylinder. Dkt. no. 84, at 96-97. Accordingly, the combination of the OMS 50 reference and the European Patent does not teach each and every element of Claim 2 of the '224 Patent, and Claim 2 is therefore not likely to be invalid.

The combination of the OMS 50 Reference and the European Patent also does not teach one of ordinary skill in the art the limitation of Claim 3 of an oxygen pressure gauge mounted on the manifold block and adapted to indicate the pressure of oxygen in said manifold block from an oxygen cylinder. *Id.* at 97. Therefore, Claim 3 is not likely invalid based on these two references.

### iii. Whether Claims 1-7 of the '224 Patent are Invalid Under 35 U.S.C. § 103 in View of the '627 Patent Over the OMS 50, the '881 Patent or the European Patent

The '627 Patent teaches one of ordinary skill in the art the following limitations of Claim 1 of the '224 Patent: (1) an oxygen management device adapted to be mounted on a post on a compressed oxygen cylinder for delivering a controlled flow of oxygen to a patient; (2) a manifold block having an opening adapted to receive a post on an oxygen cylinder; (3) said manifold block opening having an oxygen connection adapted to engage and seal to a mating connection on an oxygen tank post; and (4) a pressure regulating means on said manifold block for reducing the pressure of oxygen received from a cylinder to a predetermined low level. It does not teach, however: (a) a solenoid operated flow control valve on said manifold block arranged for initiating and *interrupting* the delivery of oxygen from the cylinder to a patient; (b) an *equivalent* means for securing said manifold block to an oxygen cylinder post received by said opening; (c) a bypass valve on said manifold arranged in parallel with said solenoid operated flow control valve; (d) a flow restricting means in series with said bypass valve to limit said oxygen flow through said bypass valve; (e) means for manually opening and closing said bypass valve. *Id.* at 99-104.

The '881 Patent teaches one of ordinary skill in the art the limitation of Claim 1 of an overpressure relief valve on a manifold block. *Id.* at 101-02. In addition, the OMS 50 Reference teaches one of ordinary skill in the art the limitation of Claim 1 of a control means responsive to inhalation by a patient for opening said solenoid operated flow control valve to deliver a dose of oxygen to a patient. *Id.* at 104. Motivation to combine the '881 Patent and the '627 Patent exists. *Id.* at 104-05.

Unfortunately for defendant, however, the combination of the '627 Patent, the '881 Patent and the OMS 50 Reference still does not teach each and every element of Claim 1 of the '224 Patent. In view of the foregoing, I cannot, on this record, concur with Mr. Kumar's professional and expert opinion that Claim 1 of the '224 Patent is invalid in view of the combination of the '627 Patent, the '881 Patent, and the OMS 50 device.

Nor does the combination of the '627 Patent, the '881 Patent, the European Patent and the OMS 50 Reference teach each

and every element of Claim 2 of the '224 Patent. I have already found that claim 2 is probably not invalid in light of the OMS 50 and the European Patent, and nothing in the '627 or '881 patents alters that conclusion. Claim 2 will likely remain valid as well.

The '627 Patent teaches one of ordinary skill in the art an oxygen pressure gauge mounted on said manifold block and adapted to indicate the pressure of oxygen in said manifold block from an oxygen cylinder; the specification describes a pressure gauge 27 mounted on the manifold.[756] Therefore, claim 3 of the '224 Patent is probably invalid in view of the '627 Patent.

### 6. Secondary Considerations of Nonobviousness

■ The patentee bears the burden of establishing that a nexus exists between the objective evidence offered to show non-obviousness and the merits of the claimed features of the invention. *WMS*, 184 F.3d at 1359; *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392, 7 U.S.P.Q.2d 1222 (Fed.Cir.1988). Sunrise did not adduce any evidence, testimonial or documentary, showing a nexus between any secondary consideration of non-obviousness and the merits of the patented features of the invention. Dkt. no. 84, at 106. Thus, defendant's evidence of obviousness (to the extent I credited it) stands unrebutted.

### D. Enforceability

### 1. Whether Sunrise Misused the '303 Patent

■ "The doctrine of misuse exists in patent law to deal with situations in which the patent holder's own conduct is so contrary to law or public policy as to bar recovery in an infringement suit. Patent misuse is an equitable defense to an in-

fringement action...." Philip Abromats, Comment, *Copyright Misuse and Anticompetitive Software Licensing Restrictions:* Lasercomb America, Inc. v. Reynolds, 52 U. Pitt. L. Rev. 629, 636-37 (1991). A package license, however, under which the licensor confers rights under more than one patent, is not unlawful per se or a misuse of the patent, absent coercion. *See Western Electric Co. v. Stewart-Warner Corp.*, 631 F.2d 333, 338, 208 U.S.P.Q. 183 (4th Cir.1980). If one is not compelled to take license to and pay royalties under unused or subsequently-granted patents, no misuse exists. *Turbo Mach. Co. v. Proctor & Schwartz, Inc.*, 241 F.Supp. 723, 729-30, 145 U.S.P.Q. 327 (E.D.Pa.1965), *aff'd*, 362 F.2d 5, 149 U.S.P.Q. 589 (3d Cir.1966).

■ Such a license, however, cannot require royalties to be paid beyond the expiration date of the patents covered by the license. *Brulotte v. Thys Co.*, 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.2d 99, 143 U.S.P.Q. 264 (1964); *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256, 66 S.Ct. 101, 90 L.Ed. 47, 67 U.S.P.Q. 193 (1945). "[A] patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se.*" *Brulotte*, 379 U.S. at 32, 85 S.Ct. 176. "[A]ny attempted reservation or continuation in the patentee[] after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." *Scott*, 326 U.S. at 256, 66 S.Ct. 101. More recently, the Federal Circuit has confirmed in dicta that "[t]he courts have identified certain specific practices as constituting per se patent misuse, including ... arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." *Virginia Panel Corp. v. Mac Panel Co.*, 133 F.3d 860, 869, 45 U.S.P.Q.2d 1225 (Fed.Cir.1997).[757]

---

**756.** Kumar Tr. 2/10:216.

**757.** The Third Circuit has also held in two older cases that a requirement to pay royalties until the last licensed patent expired was pat-

ent misuse. *Ar-Tik Systems, Inc. v. Dairy Queen, Inc.*, 302 F.2d 496, 510, 133 U.S.P.Q. 109 (3d Cir.1962) (cited with approval in *Brulotte*, 379 U.S. at 33-34, 85 S.Ct. 176); *Ameri-*

■ There is also subsequent authority, however, that the royalty rate need not diminish as patents included in a package license expire, as long as the licensee is not coerced. *Well Surveys, Inc. v. Perfo-Log, Inc.*, 396 F.2d 15, 18, 158 U.S.P.Q. 119 (10th Cir.1968) (noting absence of coercion); *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.* 29 U.S.P.Q.2d 1054, 1058, 1993 WL 379548, 1993 U.S. Dist. LEXIS 17101 (N.D.Cal.1993) (*"Brulotte* has been held inapplicable to package licensing agreements containing expired patents if the licensee was not coerced to enter the arrangement. Whether the agreement was the product of unfair patent leverage exerted by the patentee rather than mutual convenience of the parties is a question of fact." (Citing *Well Surveys,* 396 F.2d at 17.)).

■ Here, there is no affirmative evidence of coercion, and it would seem to be the better view that absent strongarm tactics on the part of the licensor, there is little if any opportunity to misuse the patent grant, either under equitable principles or by analogy to antitrust law.[758] Congress appears to have recognized this. By statute, "[n]o patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: ... (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned." 35

U.S.C. § 271(d). This provision removes any *per se* illegality from tying arrangements absent a showing of market power on the part of the licensor.

The evidence established that the license agreement between PulsAir and Puritan Bennett requires royalties to be paid whether or not all of the patents are used. Additionally, the royalty payment provision does not expire until the last licensed patent expires. Sunrise, having assumed the rights and duties of PulsAir under the agreement, considers the license agreement to be in full force and effect, since Sunrise would expect to be paid if Puritan Bennett were to manufacture the otherwise infringing devices today. Thus, Puritan Bennett's use of the '303 patent is tied to its acceptance of a license to other patents or--to the extent those patents have expired--unpatented, public domain material. From this evidence, defendant argues that the license of the '303 Patent to Puritan Bennett constitutes patent misuse, making the '303 Patent unenforceable. I disagree.

Sunrise did not coercively condition the license to Puritan-Bennett upon an agreement that the royalty would not change regardless of the expiration of some of the licensed patents. Indeed, this issue was never even discussed between those parties, who negotiated the license with the knowledge and intent that it would only generate royalties for a very short time until Puritan-Bennett introduced its redesigned product.[759] Under the license, Puritan Bennett paid $10,000 as a one-time license fee and $25.00 in royalties.[760] Although this type of license could potentially have implicated a misuse defense under other circumstances, it must fail here because, as a factual matter, there is no

---

can *Securit Co. v. Shatterproof Glass Corp.*, 268 F.2d 769, 775-77, 122 U.S.P.Q. 167 (3d Cir.1959) (coercive license).

**758.** *See* Abromats, *supra,* 52 U. Pitt. L. Rev. at 637 (noting that courts have applied both

equitable and antitrust rationales in analyzing patent misuse).

**759.** Greene Tr. 2/7:119, 120.

**760.** Greene Tr. 2/7:47.

evidence that plaintiff possessed any market power,[761] or, for that matter, ever profited or attempted to actually profit from any patent by extending it through the license beyond its statutory life.[762] Courts should be wary of finding misuse arising from good-faith, short-term attempts to settle litigation, lest the resulting licenses become a trap for the unwary and the worthy goal of settlement be subjected to "debilitating uncertainty." *Cf. USM Corp. v. SPS Techs., Inc.,* 694 F.2d 505, 512, 216 U.S.P.Q. 959 (7th Cir.1982) (Posner, J.). I therefore conclude it is unlikely there has been misuse of the '303 patent that renders it unenforceable.

## 2. Whether There Was Inequitable Conduct During the Prosecution of the '224 Patent

■■■ A patent is rendered unenforceable when the applicant is found to have acted inequitably in prosecuting the patent before the Patent and Trademark Office. Philip Abromats, *Nondisclosure of Preexisting Works in Software Copyright Registrations: Inequitable Conduct in Need of a Remedy,* 32 Jurimetrics J. 571, 580 (1992). As defined by the Federal Circuit in *Kingsdown Med. Consultants, Ltd. v. Hol-*

*lister Inc.,* 863 F.2d 867, 872, 9 U.S.P.Q. 2d 1384, 1389 (Fed.Cir.1988), "[i]nequitable conduct resides in failure to disclose material information, or submission of false material information, with intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence."[763] Misrepresentations to the U.S. Patent and Trademark Office have been the basis for a finding of inequitable conduct. *See Merck & Co. v. Danbury Pharmacal, Inc.,* 873 F.2d 1418, 1421-22, 10 U.S.P.Q.2d 1682 (Fed.Cir. 1989).

A reference must be "material" in order for its withholding to constitute fraud or inequitable conduct. *Kingsdown,* 863 F.2d at 872. Under Rule 56, "information is material to patentability when it is not cumulative . . . and [it either] establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim[,] or . . . refutes, or is inconsistent with, a position the applicant takes in" asserting patentability or opposing unpatentability. 37 C.F.R. § 1.56 (1999).[764] Information which anticipates a claim is highly material. *Fox Indus., Inc. v. Structural Preservation Sys., Inc.,* 922 F.2d 801, 804, 17 U.S.P.Q.2d 1579 (Fed.

**761.** Nor was evidence introduced defining what the relevant market was.

**762.** I recognize that if Puritan-Bennett were to produce one of the licensed products today, Sunrise would expect to be paid for the manufacture and sale of that product. Greene Tr. 2/7:73. The fact remains, however, that Puritan-Bennett has not produced such a product and there is no evidence it has any desire or intention to produce one.

**763.** That court also noted that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Id.* at 876 n. 15 (quoting *Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422, 7 U.S.P.Q.2d 1158, 1161 (Fed.Cir. 1988)); *see* Abromats, *supra,* 32 Jurimetrics J. at 581 & n.71.

**764.** In *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1257, 43 U.S.P.Q.2d 1666 (Fed.Cir.1997), the Federal

Circuit identified the 1992 Rule 56 definition of materiality as providing the "starting point" for determining whether undisclosed information was material. Before Rule 56 was enacted, "[a] reference [was] deemed material if there was 'a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."'" *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327, 47 U.S.P.Q.2d 1225 (Fed.Cir.1998) (*quoting Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1440[, 17 U.S.P.Q.2d] 1834 (Fed. Cir.1991) (*quoting* 37 C.F.R. § 1.56 (1989))); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1179, 33 U.S.P.Q.2d 1823 (Fed.Cir.1995). It is not clear, and the parties do not argue, whether and how Rule 56 substantively changed the standard for materiality that had been developed in the caselaw.

Cir.1990). Cumulative information is not considered material;[765] however, any information which contains a feature (or particular combination of features) material to patentability not found in the art before the examiner cannot be considered merely cumulative. *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1214, 2 U.S.P.Q.2d 2015 (Fed.Cir.1987) ("[Patentee's] contention that the undisclosed art is merely cumulative is specious. [Patentee] does not dispute that the undisclosed fixtures are the only prior art devices having all four of the structural elements of the claimed invention.").

"One alleging inequitable conduct must prove the threshold elements of materiality and intent by clear and convincing evidence.[766] The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether the equities warrant a conclusion that inequitable conduct occurred." *B.F. Goodrich*, 72 F.3d at 1584 (citations omitted); *Molins*, 48 F.3d at 1178; *see also Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1481-82, 1 U.S.P.Q.2d 1241 (Fed.Cir.1986) ("Materiality and intent must also be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct."). Intent, however, need not be proven by direct evidence. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1189-90, 25 U.S.P.Q.2d 1561 (Fed.Cir.1993) ("[S]moking gun evidence is not required in order to establish an intent to deceive."). Rather, this element of inequitable conduct is generally inferred from the facts and circumstances surrounding the applicant's overall conduct. *See LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076, 22 U.S.P.Q.2d 1025 (Fed.Cir. 1992). A successful showing of inequitable conduct renders the entire patent unenforceable. *Kingsdown*, 863 F.2d at 877, 9 U.S.P.Q.2d at 1392.

■ Defendant contends that Sunrise "buried" a two-page photocopy of an advertisement for the OMS 50 device in a list of less-relevant references in the hopes that the examiner would not notice the more material advertisement.[767] Instead of highlighting the operability and features of the OMS 50 to the examiner, Sunrise allegedly downplayed the importance of the OMS 50 in the hope that the examiner would not take the time and go through the effort of discovering the features and operability of the OMS 50, which the advertisement depicted in an incomplete fashion. *See Fox*, 922 F.2d at 804 (inequita-

---

**765.** "[E]ven where an applicant fails to disclose an otherwise material prior art reference, that failure will not support a finding of inequitable conduct if the reference is 'simply cumulative to other references,' *i.e.*, if the reference teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1574-75, 43 U.S.P.Q.2d 1398 (Fed.Cir.1997) (*quoting Scripps Clinic*, 927 F.2d at 1582).

**766.** "Conduct that requires forfeiture of all patent rights must be deliberate, and proved by clear and convincing evidence." *Scripps Clinic*, 927 F.2d at 1574.

**767.** "Burying" is discouraged by the Manual of Patent Examining Procedure ("MPEP"):

13. It is desirable to avoid the submission of long lists of documents if it can be avoided. Eliminate clearly irrelevant and marginally pertinent cumulative information. If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance.

MPEP § 2004 (7th Ed. 1998). With respect to misrepresenting art before the Examiner, the same section of the MPEP provides that:

7. Care should be taken to see that prior art or other information cited in a specification or in an information disclosure statement is properly described and that the information is not incorrectly or incompletely characterized....

ble conduct found where applicant withheld brochure which anticipated most of the claims of the patent-in-suit).

As I noted, dkt. no. 84, at 111, the two-page advertisement did not disclose key features and components of the OMS 50, such as the opening in the manifold or the short metal tubing connecting the OMS 50 box to the regulator. The evidence, however, establishes that the OMS 50 device does not anticipate Claim 1 of the '224 Patent, and therefore is of limited materiality at best, failing to establish a *prima facie* case of unpatentability under Rule 56, 37 C.F.R. § 1.56.

The evidence also fails to establish a threshold level of intent to mislead the U.S. Patent and Trademark Office. Sunrise made a conscious decision to submit the two-page advertisement, rather than the more detailed operator's manual for the OMS 50, but my own review of both documents revealed that the manual was less relevant on matters of patentability than the advertisement. Dkt. no. 84, at 111-12. Nor do I find intent to mislead in Sunrise's 510(k) notification to the FDA, which stated that the OMS 50 is substantially equivalent to the EX 2000 device, as the two submissions were for entirely different purposes and encompassed entirely different criteria. Dkt. no. 84, at 95.

Accordingly, on this record, I do not conclude that the '224 patent is unenforceable due to inequitable conduct.

## V. IRREPARABLE HARM

When a patent holder fails to make a clear showing of both validity and infringement, irreparable harm may not be presumed. *Nutrition 21 v. United States,* 930 F.2d 867, 871, 18 U.S.P.Q.2d 1347 (Fed. Cir.1991); *Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.,* 74 F.3d 1216, 1222-23, 37 U.S.P.Q.2d 1529 (Fed.Cir.1996); *High Tech,* 49 F.3d at 1556; *see Eli Lilly & Co. v. American Cyanamid Co.,* 82 F.3d

1568, 1578, 38 U.S.P.Q.2d 1705 (Fed.Cir. 1996); *Novo Nordisk, Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1371, 37 U.S.P.Q.2d 1773 (Fed.Cir.1996) (a district court errs by presuming irreparable harm when there is no infringement); *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1570, 27 U.S.P.Q.2d 1136 (Fed.Cir.1993). With respect to the validity portion of that "clear showing," more is required than a mere reliance on the presumption of validity of the patents-in-suit. *See Nutrition 21,* 930 F.2d at 871. The concept that every patentee is always irreparably harmed by an accused infringer's pretrial sales "would . . . disserve the patent system." *Illinois Tool Works, Inc. v. Grip-Pak, Inc.,* 906 F.2d 679, 683, 15 U.S.P.Q.2d 1307 (Fed. Cir.1990).

In this case, plaintiff is not entitled to the presumption of irreparable harm. The '303 patent is not likely to be found infringed at all, and while it is probable that the ImPulse Select will be found to have infringed the '224 patent and plaintiff has mounted a strong defense to most of defendant's invalidity arguments, plaintiff has adduced no affirmative evidence of the '224 patent's validity. Instead, plaintiff relies only on the presumption of validity, which is insufficient to bootstrap it into a presumption of irreparable harm. *See Nutrition 21,* 930 F.2d at 871. Thus, it falls upon plaintiff to make an affirmative showing of irreparable harm.

The evidence establishes that Sunrise's oxygen conserving devices have a very long product life cycle. Dkt. no. 84, at 129. This tends to suggest that Sunrise would not be irreparably harmed by being denied a preliminary injunction and having to wait for a full adjudication on the merits. Air-Sep's financial condition and its ability to satisfy a damage award, as established in the evidence, *id.* at 134, also militates in favor of a finding of no irreparable harm. *See Eli Lilly,* 82 F.3d at 1578.[768] Moreover,

---

**768.** *But cf. Bridwell,* 103 F.3d at 975-76.

Where the presumption of irreparable harm

the evidence demonstrates that Sunrise does not view patents as essential to its current or future market position; to the contrary, the evidence establishes that Sunrise's market position is not primarily derived from its patents, but rather its ability to compete on price and features. Dkt. no. 84, at 127-28.

Sunrise also failed to adduce any evidence at the hearing that, in the absence of an injunction, other potential infringers are likely to be encouraged to infringe either the '224 or the '303 Patent. Sunrise likewise failed to adduce any evidence that it has suffered loss of customers' goodwill or harm to its reputation; to the contrary, it appears that AirSep's ImPulse Select device is not an inferior "knock-off" of Sunrise's EX 2000. *Id.* at 127. Inasmuch as plaintiff is not thereby being deprived of its ability to compete in the marketplace by defendant's product, these factors also point against a finding of irreparable harm.

Finally, Sunrise failed to adduce any evidence that there has been or will be a decline in available research and development money as a result of lost sales. *Id.* at 129. It is not clear whether this is a valid consideration in an irreparable harm analysis. *Compare Bio-Technology Gen'l Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566, 38 U.S.P.Q.2d 1321 (Fed.Cir.1996) (implicitly holding not error to consider), *with Eli Lilly*, 82 F.3d at 1578 (rejecting this factor because any business deprived of funds could make such a claim, converting preliminary injunction into standard remedy). Either way, however, it does not assist plaintiff in making a showing of irreparable harm here.

On the other hand, Sunrise has demonstrated that it has been harmed by price depression and lost profits on account of the sale of the ImPulse Select. *Id.* at 114-15, 131. This evidence, however, establishes that Sunrise was able to quantify its lost profits in view of AirSep's infringing conduct, suggesting that any harm can be remediated in money damages. *See Progressive Games, Inc. v. Bally's Olympia, L.P.*, 967 F.Supp. 193, 200 (S.D.Miss.1997), *appeal dismissed,* 152 F.3d 948, 1998 WL 187515 (Fed.Cir.1998) (preliminary injunction denied; witness for patent owner stated that patent owner was suffering economically and that he could calculate the resulting loss). "[T]here is no presumption that money damages will be inadequate in connection with a motion for an injunction *pendente lite.*" *High Tech,* 49 F.3d at 1556. "[I]f the simple recitation of potential economic injuries like the loss of sales, market share and profits could signify irreparable harm, it would require a finding of irreparable harm to every manufacturer/patentee, regardless of circumstances." *Eli Lilly & Co. v. American Cyanamid Co.,* 896 F.Supp. 851, 860, 36 U.S.P.Q.2d 1011 (S.D.Ind.1995) (quoting *Illinois Tool Works,* 906 F.2d at 683), *aff'd,* 82 F.3d 1568, 38 U.S.P.Q.2d 1705 (Fed.Cir.1996).

A plaintiff must instead "proffer 'some evidence and reasoned analysis' about the inadequacy of monetary damages in order to establish irreparable harm." *RasterOps v. Radius, Inc.,* 861 F.Supp. 1479, 1496 (N.D.Cal.1994) (quoting *Nutrition 21,* 930 F.2d at 871). This plaintiff has failed to do. I therefore conclude that Sunrise's financial evidence does not offer substantial support for its assertion of irreparable harm. The availability of damages is particularly compelling here because Sunrise cannot point to any specific interest that requires protection through preliminary injunctive relief. *See id.*[769]

---

applies, the mere fact that plaintiff's injuries are monetarily compensable is insufficient rebuttal.

**769.** I also note that Sunrise granted Puritan Bennett a license under the '303 Patent, which, even though it was in settlement of litigation, tends to suggest that infringement can be recompensed with money damages. *See High Tech,* 49 F.3d at 1557; *Bridwell,* 103 F.3d at 976. Given the probable infringement of only the '224 Patent, however, I find that the '303 Patent license is not persuasive on the existence *vel non* of irreparable harm aris-

Defendant also argues that Sunrise unduly delayed in seeking a preliminary injunction, further indicating the absence of irreparable harm. Sunrise accused AirSep of infringement in November 1998, seven months before it brought the instant action and filed the instant motion. Dkt. no. 84, at 130-31; *see Abbott Labs. v. Selfcare, Inc.,* 17 F. Supp.2d 43, 50 (D.Mass.1998) (preliminary injunction denied; nine-month delay pointed away from irreparable harm). "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech,* 49 F.3d at 1557.

Sunrise points out that it was unable to obtain an ImPulse Select device to test until late January 1999. Dkt. no. 84, at 130. It then waited five more months to test it, obtain the opinion of outside counsel and the approval of corporate management before filing suit. *Id.* at 130-31. I decline to hold the pre-January 1999 "delay" against Sunrise, as there is no evidence that it was to blame for the delay in obtaining defendant's product, and procuring such an example was an important exercise of Sunrise's duty under Fed. R. Civ. P. 11 to ensure that its prospective lawsuit was justified. As to the remainder, there is authority that such a period is reasonable as a lapse of time between the gathering of appropriate evidence and the filing of the suit. *Bridwell,* 103 F.3d at 976 (four months); *accord Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.,* 836 F.Supp. 1247, 1257, 29 U.S.P.Q.2d 1574 (W.D.Va.1993) (eight months, no bar); *SMI Indus. Canada Ltd. v. Caelter Indus., Inc.,* 586 F.Supp. 808, 819, 223 U.S.P.Q. 742 (N.D.N.Y.1984) (six months, no bar).

Plaintiff, nevertheless, must rely solely on the presumption of irreparable harm, having adduced no persuasive evidence of its own on that issue. Defendant, on the other hand, has shown that Sunrise's prod-

ing out of the '224 Patent, which has never

ucts have a long life cycle, that patents are not especially important to Sunrise's business strategy, and that defendant has the ability to pay a money judgment. I conclude that this evidence rebuts the presumption of irreparable harm.

## VI. THE BALANCE OF THE HARDSHIPS

When balancing the hardships, it must be remembered that there is a public policy in favor of protecting valid patents, which is furthered by a grant of injunctive relief. *E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F.Supp. 1135, 1146, 10 U.S.P.Q.2d 1579 (D.Del.), *aff'd mem.,* 887 F.2d 1095, 1989 WL 108217, 13 U.S.P.Q.2d 1731 (Fed.Cir. 1989). The balance of hardships does not favor a defendant which "took a calculated risk that it might infringe [the plaintiff's] patents." *Smith Int'l,* 718 F.2d at 1581. On the other hand, a weak showing of likelihood of success on the merits tips the balance of hardships in favor of the defendant. *Illinois Tool Works,* 906 F.2d at 683; *see Abbott Labs.,* 17 F. Supp.2d at 51 ("[B]ecause the plaintiff has failed to make the showing required on the first two prongs, fairness compels a finding that the equities tip in favor of the defendants in this case."); *Five Star Mfg., Inc. v. Ramp Lite Mfg., Inc.,* 14 F. Supp.2d 1228, 1233 (D.Kan.1998) ("The court need not consider the balance of hardships or the public interest if plaintiff fails to establish either of the first two factors.") (citing *Bridwell,* 103 F.3d at 973).

Given the lack of demonstrated irreparable harm, I need not consider the balance of hardships further. I note, however, that the relative significance of the ImPulse Select to AirSep's business is much greater than the relative significance of the patented product's significance to Sunrise. Specifically, should an injunction issue, AirSep would face an immediate loss of a substantial portion of its pre-tax profit, at

been licensed.

least until it could "tool up" and manufacture the ImPulse again (assuming, of course, that it would still be marketable). Dkt. no. 84, at 136. Moreover, the evidence establishes that the ImPulse Select device contributes disproportionately to AirSep's overall profitability vis-a-vis its other products. *Id.* Sales of the ImPulse Select device represent 10% of AirSep's overall sales and 15 to 20% of the medical products division revenues. On the other hand, Sunrise's sales of the EX 2000 are approximately two percent of Sunrise's overall sales, and fourteen percent of the sales of the Respiratory Products Division. *Id.* at 117.

In addition, Sunrise will be able to continue to compete with AirSep should an injunction not issue, but, in contrast, an injunction would severely limit AirSep's ability to compete during the pendency of the litigation, as it would have no product to sell until the ImPulse could be re-introduced. Therefore, the balance tips toward AirSep. *See Ethicon Endo-Surgery v. United States Surgical Corp.*, 855 F.Supp. 1500, 1516-17 (S.D.Ohio 1994); *Alternative Pioneering Sys.; Inc. v. Direct Innovative Prods., Inc.*, 822 F.Supp. 1437, 1449 (D.Minn.1993). Indeed, the evidence also shows that should an injunction issue, AirSep would face immediate and significant layoffs of 25 to 50 people in the first two weeks following the issuance of the injunction and 50 to 100 more people in the following six months. Dkt. no. 84, at 138-39; *See Atari Corp. v. Sega of America, Inc.*, 869 F.Supp. 783, 792, 32 U.S.P.Q.2d 1237 (N.D.Cal.1994) (preliminary injunction denied; court considered significant layoffs to tip balance of hardships in favor of defendant).

The evidence further establishes that AirSep did not proceed recklessly or unreasonably after receiving notice of infringement from Sunrise. Specifically, AirSep received written and oral opinions of non-infringement with respect to both the

'224 Patent and the '303 Patent. Such evidence cuts in favor of AirSep on the balance of hardships. *See Alliance Research Corp. v. Telular Corp.*, 859 F.Supp. 400, 405, 32 U.S.P.Q.2d 1626 (C.D.Cal.1994) (preliminary injunction denied; court observed that alleged infringer did not proceed recklessly in view of a legal opinion indicating that it was not infringing).

Finally, the evidence establishes that AirSep received design patent protection for its ImPulse Select device, which was granted over Sunrise's '224 Patent that AirSep disclosed to the examiner. "The existence of one's own patent[, however,] does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants on the right *to exclude others* and confers no right on its holder to make, use, or sell." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 879 n. 4, 20 U.S.P.Q.2d 1045 (Fed.Cir.1991). AirSep's *design* patent does not demonstrates AirSep's objective good faith that it did not copy the subject matter of the '224 *utility* patent embodied in Sunrise's EX 2000 device. The two different types of patents have different purposes, and one could infringe either without infringing the other.

## VII. WHETHER PUBLIC POLICY SUPPORTS THE GRANT OF AN INJUNCTION

"Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458. In assessing those public policy concerns, the court should balance any shortage in supplying consumers resulting from an injunction against "the strong public policy favoring the enforcement of patent rights." *PPG Indus.*, 75 F.3d at 1567. The balance favors the patentee when no short-

Net
Quantity
Net Sales Shipped ASP

age is found. *Id.* Here, there is no evidence of a shortage and no indication of public harm should a preliminary injunction issue.

## VIII. CONCLUSION and ORDER

For the foregoing reasons, I decline to issue a preliminary injunction.[770] An appropriate order follows.

### *ORDER*

AND NOW, this twenty-fifth day of April 2000, upon consideration of the parties' exceptions to the court's findings of fact, dkt. nos. 85, 87, it is hereby

ORDERED and DIRECTED that:

1. plaintiff's motion for preliminary injunction, dkt. no. 4, is DENIED;

2. defendant's motion for summary judgment, dkt. no. 21, is DENIED as MOOT;

3. defendant's motion for attorney's fees, dkt. no. 21, is DENIED;

4. defendant's motion for judgment as a matter or law under Fed. R. Civ. P. 52(c), dkt. no. 64, is DENIED;

5. the parties shall attend a case management conference in Room 104, 319 Washington Street, Johnstown, Pa., on Wednesday, May 31, 2000, at 2:30 P.M.

---

770. Plaintiff, but not defendant, consented to merge the preliminary injunction proceeding with the trial on the merits. Accordingly, the two proceedings are not merged, and the case must therefore, absent settlement, continue through dispositive motions or trial.